**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ELAINE and VICTOR SWANGER,** | : | |
| **As Parents and Legal Guardians of** | : | |
| **BJS, and BJS,** | : | **No: 4:11-CV-00894** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | **CIVIL ACTION - LAW** |
| **Warrior Run School District, Patricia** | : | |
| **Cross, Douglas Barenzetti,** | : | |
| **Tammy Osenga, Cynthia** | : | **Hon. Robert D. Mariani** |
| **Del Gotto, and Duane Mattison,** | : | |
| **Diversified Treatment Alternatives,** | : | |
| **Alvin Weaver** | : | |
| **Defendants** | : | **JURY TRIAL DEMANDED** |

**PLAINTIFFS' BRIEF OPPOSING MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

**SCHEMERY ZICOLELLO, P.C.**

By:   s/Michael J. Zicolello
            Michael J. Zicolello
            I.D. No: 65522
            Amy R. Boring
            I.D. No: 208461
            Attorneys for Plaintiff

333 Market Street
Williamsport, PA 17701
Telephone:  (570) 321-7554
Facsimile:  (570) 321-7845
Email: mike@sz-law.com
            amy@sz-law.com

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii-iv

PLAINTIFF'S BRIEF OPPOSING MOTION FOR SUMMARY JUDGMENT . . . . . . 1-17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

CERTIFICATE OF WORD COUNT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                          <u>Page</u>

Albright v. Abington Mem. Hosp., 696 A.2d 1159, 1164 (Pa. 1997) . . . . . . . . . . .  9

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) . . . . . . . . . . . . . . . . .  6

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). . . . . . . . . . . . . . . . . . . . . .  5

Cohen v. Kids Peace Nat'l Ctrs., Inc., 256 Fed. Appx 490, 492 (3rd Cir. 2007) . . .  9

Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 (3rd Cir. 2006). . . . . . .  6

D.R. by L.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364,
1369 (3rd Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

Emerich v. Philadelphia Ctr. for Human Dev., 720 A.2d 1032, 1040 (Pa. 1998) . . 12

Fredericks v. Castora, 360 A.2d 696, 699 (Pa. Super. 1976) . . . . . . . . . . . . . . . .  9

Herman v. County of York, 482 F.Supp.2d 554, 567 (M.D. Pa. 2007) . . . . . . . . .  8

Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352 (1974) . . . . . . . . . . . . . . 13

Kach v. Hose, 589 F.3d 626, 646 (3rd Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . .13, 14

Moore v. Kulicke and Soffa Indus., 318 F.3d 561, 566 (3rd Cir. 2003) . . . . . . . . .  7

Morse v. Lower Merion School Dist., 132 F.3d 902, 908 (3rd Cir. 1997) . . . . . . . . 15

Seebold v. Prison Health Servs., 57 A.3d 1232, 1244-45 (Pa. 2012) . . . . . . . . . .12

White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3rd Cir. 1988).. . . . . . . . . . . .  6

Williams v. Borough of West Chester, 891 F.2d 458, 459-61 (3rd Cir. 1989). . . . .  6

## <u>Statutes</u>

Fed.R.Civ.P. 56(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

50 Pa. C.S.A. §7101 *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8, 9, 11

50 Pa. C.S.A. §7114. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7, 8

50 Pa. C.S.A.. §7103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

55 Pa. Code § 3800.20(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## PLAINTIFFS' BRIEF OPPOSING MOTION FOR SUMMARY JUDGMENT

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs, Elaine and Victor Swanger and BJS, filed this action against Duane Mattison, Warrior Run School District, Patricia Cross, Douglas Bartenzetti, Tammy Osenga, and Cynthia Del Gotto.  Additionally, Plaintiffs have brought claims against Diversified Treatment Alternatives (hereinafter "DTA") and Alvin Weaver, a mental health professional employed by DTA, in Count VIII, Negligence, and Count IX, Section 1983, of the Second Amended Complaint.  On June 23, 2014, DTA and Weaver filed a Motion for Summary Judgment.  Accordingly, this timely Brief in Opposition is being filed concurrently with Plaintiffs' Counterstatement of Facts.[1]

The Plaintiffs are BJS and her parents, Victor and Elaine Swanger.  Defendants DTA and Weaver are mental health professionals in whose care and custody Defendant Duane Mattison was placed at all times relevant to Plaintiffs' claims in the Second Amended Complaint.  The other Defendants in this matter work for Warrior Run School District.

During the 2010- 2011 school year, Plaintiff BJS was an eighteen year-old, mentally retarded, special needs student enrolled in a Warrior Run School District special education class, with Duane Mattison.  Since June 2007, Mattison had been in the care, custody, and treatment of Defendants DTA and Weaver in connection with Mattison's dependency adjudication by the Court of Common Pleas of Tioga County,

---

[1] Plaintiff will provide a brief summary of the key facts, taken from Plaintiff's Concise Counter Statement of Facts, which includes detailed citations to the record, and which are incorporated herein as if set forth fully.

Pennsylvania because Mattison had sex with a male student and sexually touched several female students in Williamson High School.

Immediately prior to being placed in the care of DTA and Weaver in 2007, Mattison underwent several comprehensive psychological evaluations.  One such evaluation, dated June 6, 2007 by Jon R. Grigg, M.D., has been filed of record by Defendants as Document 135-20 and is emblematic of Mattison's troubled sexual history as he entered DTA's care, custody, and control.  Grigg notes in the evaluation that Mattison had engaged in "repeated attempted sexual contact with female peers at school."  Doc. 135-20, at 17.  In that evaluation, Grigg details a history of physical and sexual abuse of Defendant Mattison by his father and stepmother, which began at the age of 3.  The evaluation reveals further that Mattison was discovered while engaging in a sexual act with a "same-age male" in the bathroom at Williamson High School.  This act was not an isolated incident, but constituted one event in a pattern of "consensual activity with each other on a number of occasions over several years."  Doc. 135-20, at 18.  The report further notes that "in the last few months, [Mattison] has demonstrated increased inappropriate sexual interest in activities at school," including touching "a number of female clients on their buttocks," making "gestures of masturbating in front of females," and stealing "female hygiene products from the school nurse's office."  Id.  Dr. Grigg suggested, as "strongly recommended and medically necessary," that Mattison enter "a residential treatment facility specializing in sexual offenses" as "he is certainly predisposed and on the road to a more serious sexual offense."  Id. at 20.  Mattison required residential treatment because "the intellectual limitations and severity of his sexual abuse and earlier consensual, same-age sexual experiences has strongly

- 2 -

reinforced a disturbed sexual belief system and desires." Id.

Roughly contemporaneous with the Grigg report, Laurel Youth Services did a comprehensive work up on Mattison, including a damning statement from Mattison's Life Skills Teacher at Williamson High School, Erick Cummings, who described Mattison as a "potential sexual predator" who "was very manipulative and attention seeking and . . . that he tried to take advantage of female students." Exhibit 11 (6/12/07 Laurel Youth Services Report), at 6. This assessment was based on an exhaustive 15 page report.

In June 2007, Mattison entered the treatment, care, and custody of DTA which placed him in residential treatment at its Lewisburg facility. Because DTA and Weaver have refused to testify or to turn over any records concerning Mattison's time spent with DTA and Weaver in vain reliance on a phantom confidentiality claim, it is impossible to determine how long Mattison remained at Lewisburg, when he transferred to DTA's facility at Montour Learning Center, what, if any treatment, he received during this course of time, and, crucially, whether he made **_any_** improvement at all as far as controlling his dangerous and deviant sexual urges in a school setting and thereby lessening his risk to fellow students and peers to the point that he was safe to resume attending public school.

In February 2009, Mattison was placed by DTA with one of its foster families, Pat and Bob Baier, while shortly thereafter DTA, through Shelley Gira, enrolled Mattison in special education in public school at Warrior Run, formally reporting, under oath, no remarkable history on the Act 30 Form, despite Mattison's history of deviant and sexually abusive behavior towards his peers and fellow students. Apparently, DTA did share informally at least some aspects of Mattison's propensity for sexual abuse of his peers

- 3 -

and fellow students with Warrior Run Assistant Principal Douglas Bartenzetti and

Warrior Run Special Education Teacher Trisha Marino, as these are acknowledged in

the testimony of Mattison and Elaine Swanger as well as the March 16, 2011

Manifestation Declaration.  At any rate, Mattison completed the last few months of his

tenth grade at Warrior Run, and was re-enrolled in Warrior Run for the 2009-2010

school year, for the eleventh grade.  However, DTA pulled Mattison precipitously out of

Warrior Run in November 2009, because he sexually abused a chicken while at his

foster home.  Mattison did not return to Warrior Run for the remainder of the 2009-2010

school year, as DTA feared the threat he posed to himself and to other students.

DTA and Weaver re-enrolled Mattison at Warrior Run for 12th grade in the 2010-

2011 school year, and he was placed at a desk directly behind BJS in a special

education class taught by Cynthia Del Gotto.  In a DTA psychological evaluation dated

10/25/10, which the Court redacted in connection with its rulings on the psychotherapist

privilege asserted by DTA, it is noted that Mattison was removed from Warrior Run in

November 2009 because his "sexually acting out" had convinced DTA "that it would be

safer for everyone if Duane was at Alternative Education Program for the rest of 11th

grade."  Exhibit 9, at 1.  In that report, the DTA psychologist, Bruce Anderson, MA, notes

that Duane had also "disclosed that he had sexual contact with a female dog on several

occasions including vaginal intercourse with a dog" as well as sexually abusing a five

year old girl, a one-year old girl, a four-year old male cousin, and an eight year old boy,

in addition to those school age victims he had indicated in prior reports.  Exhibit 9, at 1-

2.  Despite these frightening warning signs, DTA and Weaver left Mattison in Warrior

Run.

- 4 -

Predictably, in at least three separate incidents during the 2010-2011 school year, Mattison sexually touched BJS in the classroom at Warrior Run, the last such touching occurring on March 14, 2011.  With respect to the incidents prior to March 14, 2011, Mattison testified that he groped BJS underneath her bra and inside her pants on each occasion.  BJS did not report these incidents because she was "afraid" of Mattison.  On March 14, 2011, in the special education class, Mattison again groped BJS up her shirt and under her bra and touched her vagina by reaching inside her pants.  Additionally, in this incident he told her to "suck his penis," and at least one child in the school room, Nathan Neidig, saw him expose himself to her on this occasion.  Neidig reported Mattison's conduct to the teacher at the end of the class period. Defendants DTA and Weaver withdrew Mattison from Warrior Run on the very same day due to the severity of his conduct with BJS, and by agreement with Warrior Run, did not return him to a public school environment as he completed his education.  Exhibit 8 (Manifestation Determination).

## II.   **ARGUMENT**

### A.   **STANDARD OF REVIEW**

Summary judgment is appropriate only when the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c)(2).   Summary judgment may only be entered against a party who bears the burden of proof at trial, if he or she "fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. V. Catrett, 477 U.S. 317, 323-24 (1986).  A showing is sufficient when a

jury could return a verdict for that party on the evidence presented.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  All doubts as to the existence of a genuine issue of a material fact must be resolved against the moving party.  White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3rd Cir. 1988).

In determining whether a party has presented sufficient evidence to establish a genuine issue of material fact, the Court must consider circumstantial as well as direct evidence **_and_** give the nonmoving party all reasonable inferences deducible from the evidence.  Williams v. Borough of West Chester, 891 F.2d 458, 459-61 (3rd Cir. 1989). Lastly and crucially, "credibility determinations that underlie findings of fact are appropriate to a bench verdict. . . . but they are inappropriate to the legal conclusions necessary to a ruling on summary judgment."  Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 (3rd Cir. 2006).  In conclusion, at summary judgment, "a District Court should not weigh the evidence and determine the truth itself, but should instead determine whether there is a genuine issue for trial."  Id.

**B.**    **COUNT VIII– NEGLIGENCE**

In their Brief in Support of the Motion for Summary Judgment, the DTA Defendants provide two arguments in support of entry of judgment in their favor.  The first argument is that DTA and Weaver are entitled to limited immunity under the Mental Health Procedures Act, 50 Pa. C.S.A. §7101 *et seq*. (hereinafter MHPA). The second argument advanced by the DTA Defendants is that Plaintiffs have failed to present evidence that DTA and Weaver owed any duty of care towards them.  Neither argument survives scrutiny.

## 1.   Limited Immunity Under the MHPA

Defendants first challenge Plaintiffs' negligence count by raising the shield of limited immunity under the MHPA, which is enshrined in 50 Pa. C.S.A. §7114. Specifically, the DTA Defendants claim entitlement to limited immunity because "DTA provides voluntary and involuntary mental health treatment services to at-risk adolescent males in both an inpatient and outpatient setting, like the treatment it provided to Mattison." Doc. 136, at 11.   This is a fatally insufficient evidentiary showing for the Court to grant summary judgment to the DTA Defendants.

To begin, any form of immunity constitutes an affirmative defense, upon which the DTA Defendants bear the dual burden of production and persuasion, otherwise known collectively as the burden of proof.   Moore v. Kulicke and Soffa Indus., 318 F.3d 561, 566 (3rd Cir. 2003).   Defendants have failed to produce any evidence that demonstrates that MHPA limited immunity applies to the DTA Defendants decisions (1) to leave Mattison in Warrior Run while he constantly demonstrated a frightening danger of sexual abuse to female students in his special needs class, including BJS; (2) to not share adequate information with DTA's treatment partner Warrior Run School District while Mattison was enrolled in special education classes at Warrior Run; and (3) to not warn the female children and the parents of those children enrolled in the special education class with Mattison at Warrior Run.

In relevant part, the statutory immunity grant under the MHPA reads as follows: "In the absence of willful misconduct or gross negligence, . . . a director of a facility . . . or any other authorized person who participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial

hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced . . . shall not be civilly or criminally liable for such decision or any of its consequences."   50 Pa. C.S.A. §7114(a).  However, the scope of the MHPA, and hence its immunity provision, is as follows: "[t]his act establishes rights and procedures for all involuntary treatment of mentally ill persons, whether inpatient or outpatient, and for all voluntary inpatient treatment of mentally ill persons."  50 Pa. C.S.A. §7103; Herman v. County of York, 482 F.Supp.2d 554, 567 (M.D. Pa. 2007). "Inpatient treatment shall include all treatment that requires full or part-time residence in a facility."  50 Pa. C.S.A. §7103; Herman v. County of York, 482 F.Supp.2d 554, 567 (M.D. Pa. 2007).

        In this case, the DTA Defendants cite to absolutely no evidence indicating that they were providing mental health care to Mattison in any manner other than a voluntary outpatient setting when he sexually abused BJS during the 2010-2011 school year.  And in fact all evidence of record undercuts the DTA Defendants assertion of immunity, as no involuntary treatment proceedings were instituted under the MHPA ***at any time*** that Mattison was in the care, custody, and control of DTA from June 2007 through March 14, 2011.  Mattison, simply was not in a residential setting when he harmed BJS and had not been in such a setting since the outset of the 2010-2011 school year.  Thus, the MHPA's limited immunity does not apply to the DTA Defendants.

## 2.    Proof of Negligence and Gross Negligence

        Defendants alternatively contend that Plaintiffs have insufficient evidence of either negligence or gross negligence on the part of the DTA Defendants as well as a failure to

prove a duty to warn BJS.  These assertions are unfounded.

The existence of negligence or gross negligence, the latter of which is the standard Plaintiffs would have to carry if the Court were to somehow conclude that the MHPA applies to the DTA Defendants, typically constitutes a jury question.    Albright v. Abington Mem. Hosp., 696 A.2d 1159, 1164 (Pa. 1997); Cohen v. Kids Peace Nat'l Ctrs., Inc., 256 Fed. Appx 490, 492 (3ʳᵈ Cir. 2007).  Indeed, a court may only decide the issue as a matter of law if "the conduct in question falls short of gross negligence, the case is entirely free from doubt, and no reasonable jury could find gross negligence."  Id. In this case, Plaintiffs have presented a mountain of evidence that reveals that the DTA Defendants were negligent and grossly negligent in their treatment of Mattison, thereby presenting a question of fact for the jury.

The Pennsylvania Supreme Court has defined gross negligence as "a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference[, and in which] the behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care."  Albright, 696 A.2d at 1164.  It is well established that negligence, on the other hand, has been defined by Pennsylvania courts merely as "the absence of care under the circumstances." see e.g., Fredericks v. Castora, 360 A.2d 696, 699 (Pa. Super. 1976).  Negligence and gross negligence are largely a continuum.

In this case, Plaintiffs have clearly presented sufficient evidence to demonstrate a contested material fact of gross negligence, and by obvious implication, negligence in the DTA Defendants' treatment of Mattison.  From the outset, DTA was painfully aware of Mattison's past history involving his serial sexual abuse of same age peers, younger

children, and handicapped children in the school setting.  Truly, Mattison's Life Skills

teacher at Williamson High School had emphatically assessed him as developing

"sexual predator" towards young women in his school.   Exhibit 11 (6/12/07 Laurel Youth

Services Report), at 6.  Indeed, this disturbing history resulted in Mattison being

adjudicated dependent by the Tioga County Court and turned over to DTA for treatment

as a male juvenile sex offender in order to prevent such occurrences in the future, such

treatment of which is DTA's asserted specialty.  Furthermore, while in DTA's care,

Mattison revealed even more lurid and shocking details of his sexual deviancy including

that he had sexual contact with a female dog on several occasions including vaginal

intercourse with a dog, had sexually abused a five year old girl, a one-year old girl, a

four-year old male cousin, and an eight year old boy.  Nonetheless, the DTA Defendants

cleared Mattison for placement in the special education classroom at Warrior Run

February 2009.  Then, when Mattison again engaged in bestiality by sexually abusing a

chicken in November 2009, DTA quietly but quickly pulled him out of Warrior Run

because he was a clear danger to his classmates, a fact that DTA explicitly

acknowledges in its memos and reports.  DTA next placed Mattison back in Warrior Run

special education classes for the 2010-2011 school year despite his frightening history

of deviancy toward his lower functioning classmates and towards animals.  Quite

predictably, Mattison sexually abused his mentally retarded classmate, BJS, on at least

three occasions during the 2010-2011 school year.  School district records, on which

DTA's Alvin Weaver signed off, reveal that Mattison continued to sexually act out at

school during the 2010-2011 year, prompting regular meetings between Weaver and

school personnel, and that school personnel were aware from Mattison's conduct and

meetings with Weaver that they should attentively monitor Mattison especially around female classmates in the special education class room.  Truly, these recorded discussions belie DTA's assertions that confidentiality of records precluded them from discussing Mattison's treatment records with Warrior Run.  Nonetheless, DTA enrolled him in Warrior Run, kept him there when he showed obvious ongoing signs of sexual aggression towards classmates, and DTA's employees and agents, including Weaver, have testified under oath that at no time did they share information about Mattison's diagnoses or history with their treatment partner Warrior Run or with the students in the classroom or their parents.  Thus, the evidence Plaintiffs have marshaled eloquently demonstrates gross negligence and negligence on the part of the DTA Defendants.

Nonetheless, the DTA Defendants raise one last argument to try to knock out one of Plaintiffs' several theories of negligence/gross negligence, namely that the MHPA and Pennsylvania negligence law demonstrates that they were forbidden from warning Warrior Run School.  Yet, even if the Court finds that the MHPA applies to the information in DTA's custody while Mattison was at Warrior Run, it is clear that necessary information may be shared with treatment partners. 55 Pa. Code § 3800.20(b)(3).  And, Warrior Run was a treatment partner of Mattison and the disclosure of the information to Warrior Run was clearly necessary for Warrior Run to carry out its responsibilities both to Mattison and to BJS, as Plaintiff's expert report readily indicates. 55 Pa. Code § 3800.20(b)(3); Exhibit 10.   The DTA Defendants are attempting to escape culpability by hiding behind a phantom shield of "confidentiality."

Finally, the DTA Defendants attack the duty that they owed to BJS.  The Pennsylvania Supreme Court has held that "a mental health professional who

- 11 -

determines, or under the standards of the mental health profession, should have
determined, that his patient presents a serious danger of violence to another, bears a
duty to exercise reasonable care to protect by warning the intended victim against such
danger." Emerich v. Philadelphia Ctr. for Human Dev., 720 A.2d 1032, 1040 (Pa. 1998).
The Court further held that "the duty to warn will only arise where the threat is made
against a specifically identified or ***readily identifiable victim***." Id. (emphasis added).  In
this case, the conduct of Duane Mattison throughout his treatment by DTA
demonstrated that he constituted a serious danger of violence to BJS as a readily
identifiable victim, in that she was a mentally retarded, same age, female classmate in
the special education classroom at Warrior Run.  Thus, the DTA Defendants owed a
duty to BJS to warn her and her parents, and summary judgment on Plaintiffs'
negligence/ gross negligence claim is not appropriate.

Additionally, it is important to note that Plaintiffs' negligence claim is predicated
on more than just a failure to warn BJS and her parents.  Specifically, Plaintiffs are
asserting additional theories of liability namely that the DTA Defendants grossly
negligently failed to share Mattison's necessary mental health information with their
treatment partner, Warrior Run, and that the DTA Defendants are liable to BJS for
negligently performing the undertaking of treating Defendant Mattison for his sexually
deviant and abusive behavior, which failure resulted in physical harm to BJS.  *See e.g.,*
Seebold v. Prison Health Servs., 57 A.3d 1232, 1244-45 (Pa. 2012)   (Holding that under
Restatement Section 324(a) of the Second Restatement of Torts, "a physician entering
into such a relationship which he should recognize as necessary for the protection of
others has the duty to exercise reasonable care in the patient's treatment.").  These

- 12 -

theories obviously survive the Motion for Summary Judgment, regardless of how the Court decides the duty to warn aspect.  And, in fact, the record evidence militates with one voice towards DTA's liability and not against it.  For these reasons, the Court should deny the Motion for Summary Judgment to dismiss Count VIII.

   **C.**     **Count IX– SECTION 1983**

                        **1.**     **DTA Defendants as State Actors**

        Next the DTA Defendants seek summary judgment against Plaintiffs on Count IX of the Second Amended Complaint, a claim that DTA and Weaver violated BJS's substantive due process rights under the Fourteenth Amendment.  First, the DTA Defendants assert that they are not state actors in their care, custody, and control of Mattison.  Second, and alternatively, the DTA Defendants assert that Plaintiffs have failed to provide sufficient evidence that they owed BJS a constitutional duty to protect her from Mattison.  Neither argument suffices to justify summary judgment on Count IX.

        Specifically in their first argument against the Section 1983 claim, the DTA Defendants contend that they are not state actors. It is well established that Section 1983 liability requires proof of a violation of a constitutional right by a state actor.  Kach v. Hose, 589 F.3d 626, 646 (3rd Cir. 2009).  However, the United States Supreme Court has found "state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State," commonly referred to as the "public function" test. Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352 (1974).  Additionally, courts have found state action when a "private party has acted with the help of or in concert with state officials," commonly known as the "close nexus" test.  Kach, 589 F.3d at 646.

- 13 -

Finally, courts also apply the "symbiotic relationship" test, which evaluates "whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." Id.  Plaintiffs have developed sufficient evidence to pass each test.

In this case, Plaintiffs have presented evidence that DTA and Weaver assumed custody, care, and control of Defendant Mattison from Tioga County Department of Human Services, who had custody and responsibility for Mattison pursuant to the Court's Dependency Order.  Additionally, pursuant to that Dependency Order, the Court found Mattison at risk and lacking "proper parental care, control, subsistence, and education" necessary for his "physical, mental, or emotional health" and was therefore "at risk" for his "health, safety, or welfare." *See* Doc. 135-4.  It is beyond dispute that caring for dependent children is a power traditionally reserved for the state and exercised by it.  In this case, DTA and Weaver were exercising that power on behalf of the state when they placed Mattison in Warrior Run special education classes even after he demonstrated serious danger to other special education children.  Furthermore, in providing Mattison with care, custody, and control as the surrogate of the state, DTA and Weaver were privy to the lurid details of Mattison's history and being determined to be in need of essential care and education.  Indeed, DTA and Weaver would not have received this information, information that they assert is so sensitive it could not even be turned over to their treatment partners at Warrior Run, unless the state viewed and treated them as its agent and proxy in providing care for Mattison to protect both him and society.  Clearly, both the state and the DTA Defendants benefitted from this relationship. Finally, as an additional factor for state action, DTA receives state funding,

- 14 -

as most of their referrals for care come from state sources, and they are subject to extensive government regulation.   Under these circumstances, DTA and Weaver are state actors under the "public function," the "close nexus," and the "symbiotic relationship" tests, and no basis exists to grant summary judgment.

### 2.        Constitutional Duty for Substantive Due Process Claim

Defendant raises one final argument in support of summary judgment, namely that it had no constitutional duty to protect BJS from the sexual assaults of Mattison. This argument is also unavailing, however, as the DTA Defendants in fact had a constitutional duty to protect BJS from Mattison under the state created danger theory as well as the special relationship theory.

Generally, "the Due Process Clause does not impose an affirmative duty upon the state to protect its citizens." D.R. by L.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364, 1369 (3rd Cir. 1992).  However, two exceptions to this rule exist in (1) the state created danger theory, and (2) the special relationship doctrine.  Id. at 1369.  Both exceptions apply to this case.

The Third Circuit has recognized that "the state created danger theory is a viable mechanism for establishing a constitutional claim" under Section 1983.  Morse v. Lower Merion School Dist., 132 F.3d 902, 908 (3rd Cir. 1997).  A plaintiff in a state created danger case must make out the following elements: "the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur."  Id.  Based upon these elements, it is

- 15 -

clear that the Plaintiffs have made out a state created danger claim.

To begin, Plaintiffs have provided a mountain of evidence that demonstrates that the DTA Defendants were aware of Mattison's proclivity to sexually abuse his peers, especially those students who were mentally challenged, such as BJS.  Secondly, Weaver and DTA acted in willful disregard for BJS by keeping Mattison in the class with her after he demonstrated continued sexual deviancy, by deciding to not share essential information concerning Mattison's history, treatment, and diagnoses with his care partner Warrior Run, and by not warning BJS or her parents of the danger Mattison posed. Third, the DTA Defendants acted, as indicated above, in a manner that made BJS, Mattison's mentally retarded student peer much more vulnerable to the foreseeable injury of sexual assault; they knew they were enrolling Mattison in a special needs classroom around those individuals who were most vulnerable to his predatory actions. Fourth, the DTA Defendants used their authority to create an opportunity that would not have otherwise existed for Mattison to harm BJS by enrolling him in the Warrior Run special education program and placing BJS in a dangerous position of spending her school days in the 2010-2011 school year in close proximity to a sexually deviant young man with a long history of sexually abusing his retarded classmates and no self control. Thus, Plaintiffs have made a hallmark case of the state created danger theory, and summary judgment on Defendants' Section 1983 claim is inappropriate.

But, additionally, the present case presents a set of facts that establishes liability on the basis of a special relationship between the DTA Defendants and BJS.  This theory holds that "when the state enters into a special relationship with a particular citizen, it may be held liable for failing to protect him or her from the private actions of

third parties." D.R. by L.R., 972 F.2d at 1369.  In D.R. by L.R., a case relied upon by the DTA Defendants, the Court address the following issue: "whether compulsory attendance paired with the *in loco parentis* authority fo the school defendants resulted in such a affirmative restraint of D.R.'s liberty by the state that she was without reasonable means of self-protection and, indeed, whether the focus should be confined to the school day." Id. at 1370.  In that case, the Court found no such special relationship based upon compulsory attendance and *in loco parentis* authority of the school.  Id. at 1373.

However, in this case, in addition to compulsory attendance and *in loco parentis* authority of the school, the DTA Defendants, undertook a duty to treat and control Mattison while he was in their care, control, and custody, as he was at all times relevant to this proceeding.  As mental health providers, they entered into a special relationship with the foreseeable victim of Mattison's classroom sexual predations, BJS, based upon there insufficient treatment of Mattison.  Additionally, the DTA Defendants were fully aware that Mattison was being placed in the Warrior Run special education classroom with students who were much less well equipped to fend for themselves in the activities of daily living than were the students in L.R. by D.R., and this knowledge heightens the nature of the duty DTA owed to BJS.  Based upon this unique factual setting, it is clear that D.R. by L.R. has no preclusive effect on the existence of a constitutional duty between the DTA Defendants and BJS.  Therefore, the Court should find such a duty through a special relationship between DTA and Weaver and BJS, and that, accordingly, summary judgment on Count IX is inappropriate.

- 17 -

## IV.   <u>CONCLUSION</u>

In conclusion, the Plaintiffs have produced sufficient evidence to create contested issues of material fact with respect to both Counts VIII and IX of the Second Amended Complaint, and Summary Judgment should be denied.

Respectfully submitted,

**SCHEMERY ZICOLELLO, P.C.**

By: _ s/Michael J. Zicolello_____
      Michael J. Zicolello
      I.D. No: 65522
      Amy R. Boring
      I.D. No: 208461
      Attorneys for Plaintiff

333 Market Street
Williamsport, PA 17701
Telephone:  (570) 321-7554
Facsimile:  (570) 321-7845
Email: mike@sz-law.com
      amy@sz-law.com

- 18 -

## <u>CERTIFICATE OF WORD COUNT</u>

I, Michael J. Zicolello, hereby certify that this Brief contains 4986 words and meets the word count requirements.

Respectfully submitted,

**SCHEMERY ZICOLELLO, P.C.**

By:  s/Michael J. Zicolello
      Michael J. Zicolello
      I.D. No: 65522
      Amy R. Boring
      I.D. No: 208461
      Attorneys for Plaintiff

333 Market Street
Williamsport, PA 17701
Telephone:  (570) 321-7554
Facsimile:  (570) 321-7845
Email: mike@sz-law.com
      amy@sz-law.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ELAINE and VICTOR SWANGER,** | : | |
| **As Parents and Legal Guardians of** | : | |
| **BJS, and BJS,** | : | **No: 4:11-CV-00894** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | **CIVIL ACTION - LAW** |
| **Warrior Run School District, Patricia** | : | |
| **Cross, Douglas Barenzetti,** | : | |
| **Tammy Osenga, Cynthia** | : | **JUDGE MARIANI** |
| **Del Gotto, Duane Mattison,** | : | |
| **Diversified Treatment Alternatives,** | : | |
| **Alvin Weaver** | : | |
| **Defendants** | : | **JURY TRIAL DEMANDED** |

<u>**CERTIFICATE OF SERVICE**</u>

Michael J. Zicolello hereby certifies that a copy of the foregoing Brief Opposing Motion for Summary Judgment has been served upon the following individuals and in the manner indicated below on this 22nd day of January, 2015:

**VIA ELECTRONIC FILING:**

Barry Kronthal, Esquire
Margolis Edelstein
3510 Trindle Road
Camp Hill, PA 17011

Thomas E. Brenner, Esquire
Goldberg Katzman, P.C.
PO Box 6991
Harrisburg, PA 17112

William Hebe, Esquire
Spencer, Gleason, Hebe
& Rague, P.C.
17 Central Avenue
Wellsboro, PA 16901

**SCHEMERY ZICOLELLO, P.C.**

By:  s/Michael J. Zicollelo
        Michael J. Zicolello
        I.D. No: 65522
        Amy R. Boring
        I.D. 208461
        Attorneys for Plaintiff

- 20 -