## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ELAINE AND VICTOR SWANGER,** | : |
| **as parents and legal guardians of** | : |
| **B.J.S., and B.J.S.,** | : |
| | : |
| **Plaintiffs,** | : |
| **v.** | : **4:11-CV-894** |
| | : **(JUDGE MARIANI)** |
| **WARRIOR RUN** | : |
| **SCHOOL DISTRICT, et al.,** | : |
| | : |
| **Defendants.** | : |

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is a Motion for Summary Judgment by Defendants

Warrior Run School District, Patricia Cross, Douglas Bertanzetti, Tammy Osenga, and

Cynthia Del Gotto (collectively hereinafter "School Defendants") (Doc. 156). Defendants

Diversified Treatment Alternatives ("DTA") and Alvin Weaver also moved for summary

judgment (Doc. 133) which will be addressed in a separate opinion. The issues have been

fully briefed and the parties have submitted extensive documentary evidence in support of

their respective positions. For the reasons that follow, the Court will grant the School

Defendants' motion.

### II. PROCEDURAL HISTORY

Plaintiffs, Bobbie Jo Swanger, and Elaine and Victor Swanger, as parents and legal

guardians of Bobbie Jo, filed a Complaint (Doc. 1) with this Court on May 11, 2011. Since

this time, Plaintiffs have filed an Amended Complaint (Doc. 34), which was the subject of a motion to dismiss by the School Defendants which the Court granted in part and denied in part, prompting Plaintiffs to file a Second Amended Complaint on March 8, 2013 (Doc. 77). Plaintiffs' Second Amended Complaint, against Defendants Warrior Run School District, Patricia Cross, Douglas Bertanzetti, Tammy Osenga, Cynthia Del Gotto, Duane Mattison, Diversified Treatment Alternatives, and Alvin Weaver, sets forth nine counts: violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* (Count I) and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (Count II) against the Warrior Run School District; violation of Bobbie Jo's substantive due process rights under 42 U.S.C. § 1983 (Count III) and breach of fiduciary duty (Count IV) against Patricia Cross, Douglas Bertanzetti, Tammy Osenga, and Cynthia Del Gotto; assault (Count V), battery (Count VI), and intentional infliction of emotional distress (Count VII) against Duane Mattison; and negligence (Count VIII) and violation of 42 U.S.C. § 1983 (Count IX) against Diversified Treatment Alternatives and Alvin Weaver. (Doc. 77).

In addition to filing an Answer to Plaintiffs' Second Amended Complaint, the School Defendants also filed a cross-claim against Diversified Treatment Alternatives, Alvin Weaver, and Duane Mattison alleging that those Defendants are solely liable if it is determined that Plaintiffs are entitled to recover damages, or in the alternative, if it is determined that the School Defendants are liable to Plaintiffs, that the other Defendants are

2

jointly and severally liable with them and/or should be held liable over the School

Defendants for contribution and/or indemnification. (Doc. 78).

## III. STATEMENT OF UNDISPUTED FACTS

In accordance with Local Rule 56.1, the School Defendants have submitted a

Statement of Material Facts in Support of their Motion for Summary Judgment (Doc. 157) as

to which they submit there is no genuine issue or dispute for trial. Plaintiffs have submitted

their response, a Counter Statement of Facts to the School Defendants' Statement of Facts

(Doc. 162) with the result being that the following facts have been admitted except as

specifically noted:

The parties to this action are as follows. Plaintiffs, Elaine Swanger and Victor

Swanger are the parents and guardians of Plaintiff Bobbie Jo Swanger, who, at all times

relevant to this action, was a student at Warrior Run School District in its special education

and life skills program due to her mental retardation. (Doc. 157, ¶¶ 1, 2). At all times

relevant hereto, Defendant Duane Mattison was also a student at Warrior Run School

District in its special education and life skills program, and under the legal and physical

custody of the Tioga County, Pennsylvania Department of Human Services. (Id. at ¶ 3).

Defendants Patricia Cross and Douglas Bertanzetti were the principal and assistant

principal respectively at Warrior Run High School. (Id. at ¶¶ 4, 5). Defendant Cynthia Del

Gotto was a learning support teacher at the high school and Defendant Tammy Osenga

was a teacher at the high school who taught language arts and math to students in the life

3

skills program. (*Id.* at ¶¶ 6, 7). Defendant Diversified Treatment Alternatives is a Pennsylvania non-profit organization that provides individualized psychiatric treatment programs for at-risk adolescent males. (*Id.* at ¶ 8). Defendant Alvin Weaver is a mental health professional in DTA's Community Residential Rehabilitation host home where he is "part of a treatment team that provides counseling to post-traumatized individuals." (Dep. of Alvin Weaver, Doc. 162, Ex. 2, at 6-7).

In May 2007, the Court of Common Pleas of Tioga County issued an Order which adjudicated Mattison dependent and in need of treatment, supervision, and/or rehabilitation, and ordered that he be placed in the custody of the Tioga County Human Services Agency and the Laurel Youth Services Diagnostic Unit for diagnostic evaluation. (Doc. 157, ¶ 12). Laurel Youth Services then evaluated Mattison and recommended him for treatment. (*Id.* at ¶ 13). The Tioga County, Pennsylvania Department of Human Services, thereafter placed Mattison with DTA, to be enrolled in its residential treatment program. (*Id.*). Mattison was later transferred to DTA's second home at the Montour Learning Center. (*Id.* at ¶ 14). Kristen Powell, Mattison's caseworker at DTA, and Michael Jones, DTA's administrative coordinator at the Montour Learning Center, both testified that they were unaware of any sexual incidents or misconduct by Mattison while he was at DTA. (*Id.* at ¶¶ 15, 16).

In February 2009, Mattison graduated from the Learning Center and was placed in the foster home of Pat and Bob Baier. (Doc. 157, ¶ 18). Soon thereafter, Mattison began attending Warrior Run High School and was enrolled in the school's life skills program for

4

the rest of his tenth grade, and a portion of his eleventh grade[1] and twelfth grade school years. (Doc. 157, ¶¶ 19, 22).

On March 14, 2011, during Mattison's twelfth grade year, Mattison, while seated directly behind Bobbie Jo, had sexual contact with her during Del Gotto's English class. According to Mattison, he "asked [Bobbie Jo] if [he] could put [his] hand up her shirt and feel her breast and she had shook her head yes . . . and asked her if [he] could put [his] finger in her vagina, she shook her head yes." He also asked Bobbie Jo "to suck [his] penis" on this occasion. (Dep. of Duane Mattison, Doc. 162, Ex. 3, at 57-58, 63; see also Doc. 157, ¶¶ 23, 24; Doc. 162, ¶¶ 23, 24). Mattison testified that this incident occurred while Del Gotto was helping another student in the classroom. (Doc. 157, ¶ 48). Additionally, Mattison admitted that he "touched [Bobbie Jo] underneath her bra and . . . put [his] hand down her pants" two or three times in Del Gotto's classroom during his senior year prior to the March 14 incident. (Dep. of Mattison, at 43-44).

After class on March 14, 2011, Nathan Neidig, another student seated immediately behind Mattison, reported to Del Gotto what he had witnessed between Mattison and Bobbie Jo. Specifically, Neidig testified that he "reached [his] head around the corner to see what [Mattison] was doing" and saw that Mattison had his hand down Bobbie Jo's

---

[1] Mattison "was removed from [Warrior Run High School] in the beginning of the 11th grade year because of concerns about his potential to act out sexually" following an incident where Mattison had sexual contact with an animal at the Host Home in November 2009. (October 25, 2010 DTA Psychological Evaluation, Doc. 162, Ex. 9, at 4). Because he "did not exhibit any additional sexual acting out behaviors after that time", the DTA evaluation notes that "it was felt that [Mattison] should be given the opportunity to attend public school for his 12th grade year." (Id.).

5

pants. (Doc. 157, ¶¶ 25, 26; Dep. of Nathan Neidig, Doc. 156-1, at 15, 16). Del Gotto testified that she and Trish Marino, another teacher at Warrior Run High School, then brought Bobbie Jo into the classroom and asked her to show them what happened between her and Mattison. (Doc. 157, ¶ 27; Dep. of Cynthia Del Gotto, Doc. 156-1, at 14). The incident was subsequently reported to Bertanzetti who then met with Mattison to discuss the allegations, during which time Mattison admitted that he put his hand up Bobbie Jo's shirt. (Doc. 157, ¶¶ 28, 29). Mattison was removed from Warrior Run High School that afternoon.[2] (Id. at ¶ 30). Bertanzetti contacted Ms. Swanger that same day and informed her that Mattison had inappropriately touched Bobbie Jo's breast and genital region. (Id. at ¶ 32).

After learning of the incident, Ms. Swanger contacted the Pennsylvania State Police to report the incident and pursue criminal charges against Mattison. (Doc. 157, ¶ 33). Ultimately, on May 17, 2011, a criminal complaint was filed in Northumberland County, Pennsylvania, charging Mattison with aggravated indecent assault, indecent assault, and indecent exposure based on the March 14, 2011 events. As a result, Mattison pled guilty to the charges of indecent assault and nolo contendere to indecent exposure. (Id. at ¶¶ 34, 35).

Before March 14, 2011, Bobbie Jo never told anyone that Mattison had made advances towards her. (Doc. 157, ¶ 36). While the Swangers did not notice or recognize

---

[2] Mattison never returned to Warrior Run High School after March 14, 2011. (Doc. 157, ¶ 31).

6

any signs of sexual abuse in their daughter, according to Ms. Swanger, approximately one month before the March incident, Bobbie Jo "got quieter" and would spend more time in her room reading by herself, instead of with the family. (*Id.* at ¶¶ 38, 39; Dep. of Elaine Swanger, Doc. 162, Ex. 7, at 51-52).

At no time have Plaintiffs consulted with any healthcare professional regarding Bobbie Jo and the problems they believe to have occurred or resulted from the incident between her and Mattison. (Doc. 157, ¶ 40). Specifically, Bobbie Jo has never been examined by her family physician for any issues relating to the incident between her and Mattison and, despite her family physician's office providing the family with a list of psychologists that Bobbie Jo could speak with, according to Ms. Swanger, Bobbie Jo "chose not to talk to anyone." (Doc. 157, ¶¶ 41, 42; Doc. 162, ¶¶ 41, 42; Dep. of Elaine Swanger, at 56).

Plaintiffs also admit several key facts regarding the deposition testimony of certain Defendants and other school officials; specifically (1) that Cross testified that she was unaware of any prior sexual history involving Mattison (Doc. 157, ¶ 53; Doc. 162, ¶ 53); (2) that Del Gotto testified that prior to the alleged incident, she had never been told or knew that Mattison had any history of sexual misconduct, and that prior to March 14, 2011, no student had ever advised her that Mattison was acting out sexually in any inappropriate manner (*id.* at ¶¶ 49, 50), and (3) that Osenga testified that she was never made aware of any sexual misconduct by Mattison while at Warrior Run School District, or at any other

school, prior to March 14, 2011, and that while she was a teacher at Warrior Run, she was never told that Mattison had ever acted out sexually in any manner whether in or out of school (*id.* at ¶¶ 51, 52). Plaintiffs also admit that Trisha Barry, a special education teacher at Warrior Run who taught Mattison, testified that she only knew that Mattison had been abused prior to the date of the alleged incident and that she was never aware of any previous problems at Mattison's prior school, or of any prior sexual misconduct by Mattison. (*Id.* at ¶¶ 56, 57).

## IV. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S.

8

at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

9

## V. ANALYSIS

Both the School Defendants and Plaintiffs focus almost exclusively on the extent of the individual school defendants' knowledge of Mattison's sexual history, including any prior sexual misconduct at Warrior Run or Williamson High School[3]. In support of their respective arguments, the parties largely rely on deposition testimony, and, while each side has also submitted several other documents, including a psychological evaluation of Mattison dated October 25, 2010, and a Manifestation Determination Report conducted following Mattison's actions on March 14, 2011, the majority of these documents offer little support to either side's arguments.

Because the issue of knowledge plays an important part in the Court's analysis of the merits of each Count against the School Defendants, we will begin with a summary of our findings as to those facts of record which are undisputed, including those regarding each of the individual school defendant's potential knowledge of Mattison's sexual history and the potential risk he posed to female students at Warrior Run.

When Mattison originally enrolled at Warrior Run in February, 2009, his foster mother Patricia Baier, and Shelly Diggan, the clinical coordinator for the specialized foster care program at DTA, both signed an Act 30 form, stating that Mattison had not previously

---

[3] Prior to early 2007, Mattison was enrolled at Williamson High School. While at Williamson High School, Mattison "engaged in a sexual act in the [School's] bathroom" with another male student and "demonstrated increased sexual interest in activities at school" marked by "touch[ing] a number of different female clients on their buttocks" and making "gestures of masturbating in front of females." (Psychiatric Evaluation of Duane Mattison, Laurel Youth Services, June 6, 2007, Doc. 156, Ex. C, at 17-18; *see also*, Dep. of Mattison, at 21-24).

10

been suspended or expelled for any act or offense listed in Pennsylvania Act of 30, of 1997.[4] (Doc. 156, Ex. 1, Patricia Cross Dep. Ex., Shelly Diggan Dep. Ex.).

According to Mattison, when he "first started" at Warrior Run (in 10th grade), he informed Bertanzetti that there were rumors circulating at school about Mattison's sexual issues, specifically the touching that he had done at a previous school. (Dep. of Mattison, at 27-29). Mattison testified that Bertanzetti told him that he would "take care of it" and that the rumors subsequently stopped. (Id. at 29-30). However, Mattison admitted to not having any other conversations with anyone else from the school prior to March 14, 2011, about his sexual history of touching. (Id. at 30).

In turn, Bertanzetti testified that prior to March 14, 2011, no teacher "knew of anything happening" between Mattison and Bobbie Jo, that other than what Bobbie Jo told him, he had no knowledge of other inappropriate touching by Mattison of Bobbie Jo, that he did not recall Mattison approaching him regarding a rumor about Mattison's prior sexual misconduct, and that he did not know why Mattison had previously left Warrior Run during his 11th grade year. (Dep. of Douglas Bertanzetti, Doc. 162, Ex. 6, at 6, 11, 15, 18, 34).

The only undisputed fact with respect to Bertanzetti's knowledge is that he was aware of one prior allegation of sexual misconduct between Mattison and another student,

---

[4] According to this form, entitled Notification of Offense Involving Weapons, Alcohol or Drugs, Infliction of Injury to Another Person, or Any Act of Violence Committed on School Property, pursuant to Pennsylvania Act 30, of 1997, "prior to admission to any school entity, the parent, guardian or other persons having control or charge of a student shall, upon registration, provide a sworn statement or affirmation stating whether the pupil was previously suspended or expelled from any public or private school of this commonwealth or any other state for an act or offense involving weapons, alcohol or drugs or for the willful infliction of injury to another person or for any act of violence committed on school property...."

11

Sara Swartz. Prior to March, 2011, the mother of another student, Sara Swartz, reported to Bertanzetti that Mattison asked Swartz if he could touch her. (Dep. of Bertanzetti, at 7). Bertanzetti investigated the report, determined that Mattison was not talking to Swartz when he made the comment, but did take preventative measures to keep the two separated because they "were both getting too close to each other." (Id. at 8, 25-26). Bertanzetti also determined that there was no evidence that Mattison had physically touched Swartz. (Id. at 26).

With respect to Principal Cross, Plaintiffs admit that Cross testified that she was unaware of any prior sexual history involving Mattison. (Doc. 157, ¶ 53; Doc. 162, ¶ 53). Cross further testified that she was aware that Mattison left Warrior Run for a period of time prior to returning, but did not know the reason for his absence. (Dep. of Patricia Cross, Doc. 162, Ex. 5, at 7-8). She also stated that she was aware of the accusations regarding Mattison and Swartz, that they were investigated by Bertanzetti, and were "founded [sic] untrue." (Id. at 12). Furthermore, according to Cross, hypothetically even if the school was provided with an Act 30 form indicating that a student was suspended or expelled from school for inappropriate sexual touching, the school would be prohibited from advising the teachers of this history. (Id. at 17-18).

Plaintiffs admit that Del Gotto testified that prior to the alleged incident, she had never been told or knew that Mattison had any history of sexual misconduct, and that prior to March 14, 2011, no student had ever advised her that Mattison was acting out sexually in

12

any inappropriate manner. (Doc. 157, ¶¶ 49, 50; Doc. 162, ¶¶ 49, 50). Del Gotto also testified that Marino told her that Mattison should not be seated next to Sara Swartz and that Del Gotto "figured it was just that Sara could be a little forward and that maybe, you know, something was going on between them." (Dep. of Del Gotto, at 9, 14). Del Gotto also stated that she was aware that Mattison had been out of school for part of the 2009-2010 school year, but was unaware of the reason for this. (Id. at 20-21).

Plaintiffs also admit that Osenga testified that she was never made aware of any sexual misconduct by Mattison while at Warrior Run School District, or at any other school, prior to March 14, 2011, and that while she was a teacher at Warrior Run, she was never told that Mattison had ever acted out sexually in any manner whether in or out of school (Doc. 157, ¶¶ 51, 52; Doc. 162, ¶¶ 51, 52). Osenga further testified that while she knew about the allegations regarding Swartz, all she knew about it was that Swartz had never said that anything happened, and Marino never cautioned Osenga that Mattison should be separated from any other female students. (Dep. of Tammy Osenga, Doc. 156-1, at 14, 20). Osenga also admitted that she was aware that Mattison left school for part of the 2009-2010 school year but was never advised as to the reasons. (Id. at 18).

The school defendants' deposition testimony seemingly conflicts with the notes in the Manifestation Determination report (Doc. 162, Ex. 8). The Manifestation Determination Review, conducted on March 16, 2011 as a result of the March 14 incident, states that "Duane has been under the watchful eye of administration and teachers, DTA staff

13

members have been made aware of issues with Duane in school and they have been working with him" and that "[d]uring the current school year, Mr. Weaver has been invited to the school on more than one occasion to discuss issues and concerns with Duane, specifically his inappropriate sexual tendencies." (Id. at 2). The Manifestation Determination report clearly reinforces the presence of a factual issue regarding Bertanzetti's knowledge of Mattison's sexual behavior at Warrior Run as he was the person who would have participated in the meetings and interacted with Weaver. However, the report is far too general to create an issue of fact as to Cross, Del Gotto, and Osenga's knowledge. There is no indication that Cross was ever involved in any of the meetings, investigations, or disciplinary decisions regarding Mattison, and Cross herself testified that she did not know that Mattison was even associated with DTA prior to March 14, 2011 (Dep. of Cross, at 11, 27), an assertion that has not been contradicted by any other deposition testimony or documentary evidence. Further, the report does not state which teachers were told to watch Mattison or which teachers or administrators had issues and concerns regarding Mattison's sexual tendencies or what these "sexual tendencies" consisted of, including whether these issues and concerns were primarily related to the incident with Swartz. There is therefore no record evidence that directly imputes knowledge to Del Gotto or Osenga of Mattison's sexual history or that indicates Del Gotto or Osenga knew Mattison needed to be more carefully watched or kept away from the female students. In short, Plaintiffs have not come forward with evidence creating a dispute of fact as to the absence

14

of knowledge on the part of Cross, Del Gotto, or Osenga of Mattison's sexual history or propensities.

## A. Count II –Title IX

School Defendants argue that Defendants Cross, Bertanzetti, Osenga, and Del Gotto are entitled to summary judgment with respect to Plaintiffs' claim under Title IX (Count II) because "there is no competent evidence in the Record . . . establishing that the Individual School Defendants knew of any such prior sexual misconduct of Defendant Mattison prior to coming to the Warrior Run School District, or after attending Warrior Run, but before the alleged incident with" Bobbie Jo. (Doc. 156, ¶¶ 23-26). Plaintiffs' brief response to Defendants' argument amounts to nothing more than disputing this statement by claiming that the individual school defendants did know about Mattison's prior sexual misconduct and the defendants' actions thus constituted deliberate indifference. (Doc. 163, at 10). The Court is compelled to point out to the defendants, as the plaintiffs inexplicably failed to do, that the individual school defendants were not sued in Count II, only the School District itself.[5] However, because the issue of what certain individual defendants, in particular Cross and Bertanzetti, knew, and what actions they took or failed to take, constitutes an essential element of Plaintiffs' Title IX claim against the School District, the

---

[5] Nor could the individual school defendants have been sued under Title IX. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009) ("Title IX reaches institutions and programs that receive federal funds . . . but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals").

15

Court will construe Defendants' motion as requesting summary judgment in favor of the School District.

In relevant part, Title IX provides that "no person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX can also be enforced through a private right of action wherein monetary damages are available. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281, 118 S.Ct. 1989, 158 A.L.R. Fed. 751 (1998) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992)). In imposing a duty upon a funding recipient not to discriminate on the basis of sex, Title IX encompasses sexual harassment, including for "deliberate indifference to known acts of peer sexual harassment." *Davis Next Friend LaShona D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). Thus, in limited circumstances, deliberate indifference to known acts of harassment of a student by another student can amount to an intentional violation of Title IX, capable of supporting a private damages action.[6] *Id.* at 643.

---

[6] The Supreme Court has specifically emphasized the importance of the relationship between the harasser and the victim, as it would necessarily affect the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits as well as the systemic effect on a program or activity. Unlike in situations where a teacher engaged in harassment of a student, *see Franklin* and *Gebser*, "[p]eer harassment, in particular, is less likely to satisfy these requirements." *Davis*, 526 U.S. at 653.

In a case such as the one presently before this Court, to proceed on a claim against an educational institution under Title IX, the student must establish that the institution was "deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. Accordingly, a plaintiff seeking recovery for a Title IX violation predicated on student-on-student sexual harassment must establish five elements: (1) the defendant is a Title IX funding recipient; (2) an "appropriate person" had actual knowledge of the alleged discrimination or harassment; (3) the discrimination or harassment, which the funding recipient had actual knowledge of, was "severe, pervasive, and objectively offensive"; (4) "the funding recipient acted with deliberate indifference to known acts of harassment in its programs or activities"; and (5) the discrimination or harassment "effectively barred the victim's access to an educational opportunity or benefit." *Hill v. Cundiff*, -- F.3d --, 2015 WL 4747048, at *15 (11th Cir. 2015).

An "appropriate person" is one who, at minimum, "has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf" to end this discrimination. *Gebser*, 524 U.S. at 290.

Recovery based on the principles of *respondeat superior* or constructive notice "frustrate[s] the purposes" of Title IX, and therefore the school official must have actual knowledge in order for the plaintiff to prevail. *Gebser*, 524 U.S. at 285. Actual notice

17

necessitates more than a simple report of inappropriate conduct, however, the standard

"does not set the bar so high that a school district is not put on notice until it receives a

clearly credible report of sexual abuse from the plaintiff-student." *Escrue v. Northern OK*

*College*, 450 F.3d 1146, 1154 (10th Cir. 2006) (quoting *Doe v. Sch. Admin. Dist. No. 19*, 66

F.Supp.2d 57, 62 (D.Me. 1999)). Therefore, while actual knowledge does not require

absolute certainty that harassment has occurred, there must be more than an awareness of

a mere possibility of the harassment. *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 360 (3d

Cir. 2005). The educational institution has "'actual knowledge' if it knows the underlying

facts, indicating sufficiently substantial danger to students, and was therefore aware of the

danger." *Id.* at 361.

Upon a showing of actual knowledge by an appropriate person, Plaintiff must show

that the funding recipient exercised deliberate indifference. A funding recipient is

"deliberately indifferent" when the recipient's response to the harassment, or lack of

response, is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at

648-649. Deliberate indifference requires an "official decision by the recipient not to remedy

the violation." *Gebser*, 524 U.S. at 290.

Furthermore, deliberate indifference incorporates a causation requirement. The Title

IX funding recipient's deliberate indifference must subject the students to further

harassment, to wit, the indifference must "cause students to undergo harassment or make

them liable or vulnerable to it." *Davis*, 526 U.S. at 644-645 (internal quotations omitted).

18

This harassment must take place in a context subject to the school's control. *Id.* at 645.

Therefore, the school is only liable when "the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* This causation element results in a requirement that harassment, or the likelihood or vulnerability of a student to be subjected to it, must occur subsequent to an official's decision not to remedy a known violation.

The fact that the appropriate person's initial response does not remedy or prevent the harassment, or that the school does not use a particular method to remedy or prevent the harassment, does not provide sufficient grounds for liability. *Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001). A school district is not required to respond to harassment or discrimination in a specific manner, nor is the district required to eradicate all sexual harassment; however, the school district's response must be reasonable in light of the known circumstances. For example, "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances." *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260-261 (6th Cir. 2000). The funding recipient is not required to "engage in [a] particular disciplinary action." *Davis*, 526 U.S. at 648. Accordingly, "[s]chool administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed 'deliberately indifferent' to acts of student-on-student

19

harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.*

In this case, both parties woefully fail to address the elements and material facts necessary to state a Title IX action. While the first issue before the Court is necessarily a determination of whom within Warrior Run could be considered an "appropriate person"[7], the parties' briefs only address, and vigorously dispute who, if anyone, was aware of Mattison's sexual history. It is thus left to the Court, unaided by any contribution from the parties, to determine whether there is a genuine dispute as to who was or were the "appropriate person(s)" capable of taking corrective action on the school's behalf because neither party puts forth any facts or arguments on this subject. The parties apparently fail to realize that without a determination regarding who was an "appropriate person", arguments regarding who knew what and when are largely irrelevant and do not further the analysis required to determine whether summary judgment is proper on the Plaintiffs' deliberate indifference claims.

Nonetheless, based on the record and solely for purposes of conducting a full analysis, the Court will assume that both Principal Cross and Assistant Principal Bertanzetti may constitute an "appropriate person".

The Third Circuit has found that a school principal "who is entrusted with the responsibility and authority normally associated with that position will ordinarily be 'an

---

[7] The parties do not address, and therefore appear to agree, that the Warrior Run School District is a funding recipient under Title IX.

appropriate person' under Title IX." *Warren ex rel. Good v. Reading Sch. Dist.*, 278 F.3d 163, 171 (3d Cir. 2002). Cross testified that her job duties included "oversee[ing] the functions of the building itself, the students and [her] staff from scheduling, teachers' schedules to students' schedules, perform[ing] observations and evaluations on staff members, do[ing] the hiring of staff together with a committee, enrollment of students, course selections and placements of students together with our counselors and the assistant principal . . . ." (Dep. of Cross, at 7). She further testified that when discipline issues arose, either she or the assistant principal would handle the issue and that the assistant principal had the authority to engage in, and make conclusions in, investigations without consulting her. (*Id.* at 13, 20-21).

Because school officials and administrators' duties vary among school districts, "deciding who exercises substantial control for the purposes of Title IX liability is necessarily a fact-based inquiry." *Murrell v. Sch. Dist. No.1*, 186 F.3d 1238, 1247 (10th Cir. 1999). Here, there is sufficient evidence to create an issue of fact as to whether Bertanzetti was capable of taking corrective action on the school's behalf. According to Bertanzetti, his duties included overseeing the faculty and student body as well as discipline and "just about anything else that goes on during the day." (Dep. of Bertanzetti, at 5). Bertanzetti also investigated many incidents and complaints for the purpose of determining whether a school policy had been violated. (*Id.* at 6). In the past, he had investigated the complaint by Swartz against Mattison and implemented "protective measures to keep them separated

21

because [they] heard [Swartz and Mattison] were both getting too close to each other." (Id. at 25). Upon learning of possible sexual misconduct by Mattison against Bobbie Jo, Bertanzetti was the first administrator contacted and was the person who conducted the investigation, contacted Alvin Weaver and Ms. Swanger, all of which ultimately led to Mattison being removed from school. Bertanzetti's responsibilities, including investigating incidents in the school, and his apparent authority to address these situations, create a factual question regarding his status as an "appropriate person."

Assuming Cross and/or Bertanzetti constituted "appropriate person(s)", the issue becomes whether one or both had actual knowledge of Mattison's past sexual misconduct prior to his enrollment at Warrior Run, of the prior sexual incidents against Bobbie Jo or other female students in the school, or that Mattison posed a "substantial danger" to other students at Warrior Run.

Preliminarily, even if a fact-finder were to find that Cross was an "appropriate person" pursuant to Title IX, no actual knowledge can be attributed to her. Plaintiffs admit that Cross testified that she was unaware of any prior sexual history involving Mattison (Doc. 157, ¶ 53; Doc. 162, ¶ 53) and a review of her deposition testimony reveals nothing to contradict this statement. Plaintiffs have not submitted a single piece of evidence which contradicts this testimony or could even reasonably imply that Cross was aware of Mattison's sexual history or that he posed a threat to any student at Warrior Run. Therefore, this issue remains only as to whether Bertanzetti had actual knowledge.

22

As previously discussed, Defendants' deposition testimony, in conjunction with certain documents submitted on the record, demonstrate clear disputes of fact with respect to Bertanzetti's actual knowledge. Mattison and Bertanzetti's contrasting testimony, in conjunction with the Manifestation Determination, create material factual issues regarding whether the assistant principal was aware of Mattison's sexual history prior to March 11, 2011, both at Williamson High School and at Warrior Run, or whether Bertanzetti was on notice of a substantial risk that Mattison posed to the female students. *See Bostic*, 418 F.3d at 360-361 (finding that actual knowledge does not require absolute certainty that harassment has occurred, but there must be more than an awareness of a mere possibility of the harassment and thus an educational institution has "'actual knowledge' if it knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger.").

Nonetheless, even drawing all inferences in the light most favorable to the Swangers, assuming that Bertanzetti was an appropriate person with actual knowledge, Plaintiffs fail to establish a genuine dispute of material fact to call into question School Defendants' assertion that they were not deliberately indifferent. For Plaintiffs to succeed on their Title IX claim and establish that the school was deliberately indifferent, there would have to be evidence in the record to demonstrate that Bertanzetti either knew that Mattison was a substantial danger to the other female students or knew about the sexual harassment against Bobbie Jo or other students, and took insufficient, or no, measures to attempt to

remedy the situation. Here, while there are differing accounts by Bertanzetti and Mattison

as to what Mattison told Bertanzetti, there is nothing to suggest that Bertanzetti's actions, or

lack thereof, sufficiently amount to deliberate indifference. If Bertanzetti did not know about

Mattison's sexual past and any continuing sexual harassment of female students at Warrior

Run[8], he could not have been deliberately indifferent in not remedying the situation.

Alternatively, if Bertanzetti did have actual knowledge of harassment of one or more female

students at Williamson High School or Warrior Run and the danger that Mattison posed to

the students at Warrior Run, the record indicates that he took corrective measures to ensure

that Mattison was under the "watchful eye" of certain, albeit unknown, administrators and

teachers, and made DTA staff members aware of "issues with Duane in school" and

discussed issues and concerns with Weaver "on more than one occasion" regarding

Mattison's inappropriate sexual tendencies.[9] (Manifestation Determination, at 2).

Furthermore, whether Bertanzetti was on notice or not, it is undisputed that he conducted an

---

[8] While it is undisputed that Bertanzetti knew about an alleged past sexual incident between student Sara Swartz and Mattison, this would be insufficient in itself to put Bertanzetti on notice that Mattison was a threat to other students. See Davis, 526 U.S. at 652-653 ("[T]he provision that the discrimination occur 'under any education program or activity' suggests that the behavior be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity. Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment."). This finding in Davis makes clear that if one incident cannot generally be said to form the basis for a Title IX claim for the person who was harassed, it could hardly be said that a single incident, which occurred to another student other than the plaintiff, could sufficiently put the appropriate person on notice that this harassment would repeatedly happen again to the plaintiff.

[9] The record does not reflect what these "inappropriate sexual tendencies" consisted of, including whether these tendencies were directed towards other students, merely involved inappropriate comments or actually involved sexually touching other students.

24

investigation into the only previously reported incident of sexual misconduct against another student by Mattison at Warrior Run. Although he concluded that there was no proof that Mattison had inappropriately touched Swartz, Bertanzetti did conduct an investigation into the report, including talking to Mattison and Swartz, the classroom teacher and aid who were in the room, and "anybody else who was in the room that may have been there at the time", and ultimately implemented preventative measures to keep Swartz and Mattison separated. (Dep. of Bertanzetti, at 8, 25, 26). While Bertanzetti's investigation and subsequent remedial measures clearly did not prevent Mattison's alleged repeated harassment of Bobbie Jo, the fact that the appropriate person's initial response does not remedy or prevent the harassment, cannot provide sufficient grounds for liability. *See Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001). Additionally, Bertanzetti's reaction to the incident on March 14, 2011, which is seemingly undisputedly the first time he, or any other teacher or administrator, was made aware of Mattison's harassment towards Bobbie Jo, cannot be said to be deliberately indifferent. Rather, Bertanzetti took immediate action, resulting in Mattison's removal from school that same day. In short, whether an inference of knowledge on the part of Bertanzetti is drawn or not, the result is the same: the plaintiffs have not presented a triable dispute of fact to establish deliberate indifference.

Because Plaintiffs cannot demonstrate that an appropriate person was deliberately indifferent so as to establish a cause of action under Title IX, the Court need not determine in this Count whether the discrimination or harassment of Bobbie Jo rises to the level of

"severe, pervasive, and objectively offensive" or effectively barred her access to an

educational opportunity or benefit, though it does have reservations that Plaintiffs' evidence

as to the number of incidents when Mattison touched Bobbie Jo, the manner and nature of

the touching, and the brevity of each incident would meet the requirements of "severe,

pervasive, and objectively offensive" conduct.

Summary judgment will thus be granted in favor of the School District on Count II.

## B. Count I – Section 504 of the Rehabilitation Act

Count I of the Second Amended Complaint alleges a violation of Section 504 of the

Rehabilitation Act by the Warrior Run School District. Section 504 provides in relevant part

that:

> No otherwise qualified individual with a disability in the United States, . . .
> shall, solely by reason of his or her disability, be excluded from the
> participation in, be denied the benefits of, or be subjected to discrimination
> under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794(a).

To establish a violation of Section 504, a plaintiff must show that "(1) [s]he is

'disabled' as defined by the Act; (2) [s]he is 'otherwise qualified' to participate in school

activities; (3) the school or the board of education receives federal financial assistance; and

(4) [s]he was excluded from participation in, denied the benefits of, or subject to

discrimination at, the school." *Andrew M. v. Delaware Cnty. Office of Mental Health &*

*Mental Retardation,* 490 F.3d 337, 350 (3d Cir. 2007) (quoting *Ridgewood Bd. of Educ. v.*

26

N.E., 172 F.3d 238, 253 (3d Cir.1999), superseded by statute on other grounds as recognized by D.F. v. Collingswood Borough Bd. of Educ., 694 F.3d 488 (3d Cir. 2012)).

School Defendants do not specifically address these elements, instead arguing that they are entitled to summary judgment on this Count because "the Record contains no evidence whatsoever that WRSD acted in an intentional manner or consciously disregarded [Bobbie Jo's] disability." (Doc. 161, at 9). Plaintiffs dispute Defendants' contention, arguing that a plaintiff does not need to prove that a defendant's discrimination was intentional in order to establish a violation of the Rehabilitation Act. (Doc. 163, at 9 (citing K.R. v. Sch. Dist. of Philadelphia, 2008 WL 2609810, at *6 (E.D.Pa. 2008)(citing Ridgewood)).[10] The parties' disagreement as to the applicable law appears to be based on a fundamental disagreement regarding the content of Count I. In the School Defendants' Motion to Dismiss the Amended Complaint, they requested that this Court "strike the demand for compensatory damages in Count I of the Amended Complaint" (Doc. 41, ¶¶ 17-19). Defendants did not move to dismiss the entire count. Therefore, in its Memorandum Opinion granting in part and denying in part Defendants' motion, the Court focused on the appropriate standard for maintaining a claim for compensatory damages under Section 504, finding that a plaintiff must establish intentional discrimination in order to succeed on his or

---

[10] Because neither party addresses each of the specific elements necessary to establish a Section 504 violation, other than the necessary level of discrimination, the Court will assume that the first three elements are not in dispute, specifically, that Bobbie Jo is disabled as defined by the Act, that she is otherwise qualified to participate in school activities, and that the school or the board of education receives federal financial assistance. At issue therefore is only whether Bobbie Jo was excluded from participation in, denied the benefits of, or subject to discrimination at, the school.

her claim. (Doc. 50, at 12-14). Because it was not at issue, the Court did not address whether a plaintiff must show intentional discrimination in order to succeed on a Section 504 claim in general.

Although a showing of intentional discrimination is not a requisite to establishing a Section 504 claim in general, see Ridgewood, 172 F.3d at 253, the statutory language of the Act, which prohibits discrimination against a person "solely by reason of his or her disability" illustrates the existence of a causation element. Specifically, a plaintiff must show that "[t]he state . . . failed to provide the service for the sole reason that the child is disabled." Andrew M., 490 F.3d at 350.

Plaintiffs merely argue that "there is sufficient evidence from which a jury could conclude that School Defendants knew about Mattison's prior sexual misconduct." (Doc. 163, at 9). This argument alone fails to show any causal relationship between Bobbie Jo's disability and Mattison's misconduct towards her or that her disability in some way affected the decisions or conduct of any of the individual school defendants. Even assuming that one or more of the school defendants did know about Mattison's history, Plaintiffs do not demonstrate how this knowledge in itself resulted in discrimination. Rather, Plaintiffs must show that Bobbie Jo was subjected to discrimination because of her disability.

According to Mattison, his special education classes were held in three separate classrooms, all of which had assigned seats. (Dep. of Mattison, at 31-32). During the 2010-2011 school year, there were seven or eight students in Del Gotto's class, and Del Gotto

only taught Mattison and Bobbie Jo for one period. (Dep. of Del Gotto, at 11-12; Dep. of Mattison, at 77). Mattison sat behind Bobbie Jo in Del Gotto's class but not in his other classes. (Dep. of Del Gotto, at 11-12; Dep. of Mattison, at 40-41, 56). In Osenga's class, which consisted of eight students (Dep. of Osenga, at 24), Mattison sat at "a total opposite table" from Bobbie Jo (Dep. of Mattison, at 100; see also Dep. of Osenga, 22-24; Osenga Dep. Ex. 2). Mattison also testified that he had gym, drivers' ed, and art with the "regular" students. (Dep. of Mattison, at 30). The students were given assigned seats in driver's ed. Although the students could choose where to sit in art class, once they chose their seat, the students' names were written down in those seats. (Id. at 30-31).

All of the students in Del Gotto and Osenga's classes were disabled and none of the parties have provided any evidence to the Court showing where the other female students with the same or similar disabilities as Bobbie Jo were seated, including whether one or more of the other female students sat next to Mattison in any of his classes. There is also no evidence that Mattison was not permitted to sit next to female students in his "regular" classes or that any precautions were taken to protect students in these regular classes from Mattison which were not taken in the special education courses. Similarly, there is no evidence that Mattison touched any other student in his special education classes (other than the unsubstantiated allegations regarding Swartz) or that any of the teachers or administrators were aware of his sexual advances towards Bobbie Jo or any other student in the special education classrooms. Cf. Adam C. v. Scranton Sch. Dist., 2011 WL 996171

(M.D.Pa. 2011) (rejecting the Magistrate Judge's grant of summary judgment to the School

District where the Magistrate Judge reasoned that the student could not have been

discriminated against under Section 504 because all students at the school "suffered the

same educational shortfalls" where all the students in the school were disabled, instead

finding that it is sufficient that the plaintiff is part of a class that is discriminated against

because of his or her disability). In the present case, even if Plaintiffs had presented

evidence that all female students in the special education classes were somehow

discriminated against as a class and were equally vulnerable to Mattison's advances, there

is no record evidence to suggest that Bobbie Jo was treated differently than any other

student, disabled or not.[11]

Because Plaintiffs have failed to show any genuine dispute of material fact as to any

discrimination on the part of the teachers or administrators, it necessarily follows that they

cannot succeed in establishing that the discrimination was intentional, therefore precluding

any claim for compensatory damages. As explained in detail in the Court's previous

memorandum (Doc. 50), despite Plaintiff's reliance on *Ridgewood*'s statement that "a

plaintiff need not prove that defendants' discrimination was intentional", 172 F.3d at 253, we

agree with the substantial case law holding that the Third Circuit's reasoning does not

---

[11] Plaintiffs' argument with respect to their Title IX claim, which also forms the basis for the Section 504 claim, that Defendants acted with "deliberate indifference in permitting Mattison to sit by or near BJS in class and by choosing not to monitor Mattison at all times in the classroom" is particularly unavailing in terms of Osenga. As stated, Mattison and Bobbie Jo were not even seated near each other in the classroom, and a review of Mattison's testimony and Osenga's testimony and drawing of the class set-up indicate that, other than completely removing Mattison from the classroom, the two students could not have been much further apart.

preclude the requirement that a plaintiff seeking compensatory damages in a Section 504 claim must prove intentional discrimination.[12] *See Kaitlin C. ex rel. Shannon M. v. Cheltenham Tp. Sch. Dist.*, 2010 WL 786530, at \*5 (E.D.Pa. 2010)("Compensatory damages and their relationship to intentional discrimination were not at issue in *Ridgewood*. Moreover, they were not directly at issue in the cases upon which the court in *Ridgewood* relied."); *Patrick B. ex. rel. Keshia B. v. Paradise Protectory and Agr. Sch. Inc.*, 2012 WL 3233036, at \* 6-7 (M.D.Pa. 2012); *D.E. v. Central Dauphin Sch. Dist.*, 2013 WL 7752393, at \* 4 (M.D.Pa. 2013)(collecting cases).

Accordingly, the Court will grant School Defendants' motion for summary judgment on Plaintiffs' Section 504 Rehabilitation Act claim due to Plaintiffs' failure to present any evidence to create a factual dispute to contradict Defendants' evidence that Bobbie Jo was not discriminated against due to her disability.

### C. Count III – 42 U.S.C. § 1983

To succeed on a claim under 42 U.S.C. § 1983, the plaintiff must demonstrate a violation of a right protected by the Constitution or laws of the United States, committed by a person acting under color of state law. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (en banc). Therefore, in evaluating a § 1983 claim, a Court must first "identify the exact contours of the underlying right said to have been violated" and determine "whether the

---

[12] This Court's Memorandum Opinion granting in part and denying in part School Defendants' motion to dismiss Plaintiffs' amended complaint made clear that Plaintiffs must demonstrate intentional discrimination by the defendants in order to sustain their claim for compensatory damages under the Rehabilitation Act. (Doc. 50, at 12-14).

plaintiff has alleged a deprivation of a constitutional right at all." *Id.* (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). Here, Plaintiffs' § 1983 claim rests on the substantive due process clause of the Fourteenth Amendment, and alleges that the individual school defendants, acting under color of state law, deprived Bobbie Jo of her right to bodily integrity. (Doc. 77, ¶ 55).

In the Court's memorandum opinion addressing Defendants' motion to dismiss Plaintiff's Amended Complaint, we found that Plaintiffs must proceed on a state created danger theory in order to maintain their § 1983 claim. (Doc. 50, at 8-10).[13]

"Liability under the state-created danger theory is predicated upon the states' affirmative acts which work to plaintiffs' detriments in terms of exposure to danger." *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1374 (3d Cir. 1992) (en banc). To meet the requirements of a state-created danger claim under the Fourteenth Amendment substantive due process clause, a plaintiff must show (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's

---

[13] Plaintiffs briefly argue that a special relationship existed between the School Defendants and Bobbie Jo. (Doc. 163, at 13-14). The Court previously rejected this argument in its Memorandum Opinion addressing Defendants' motion to dismiss, finding that "the Amended Complaint does not allege the requisite facts that would convert the non-custodial relationship between the school and Bobbie Jo to a special relationship." (Doc. 50, at 8). Count III in Plaintiffs' Amended Complaint and Second Amended Complaint is identical, and the Court has already addressed, and dismissed, any argument that a special relationship can form the basis of Plaintiffs' § 1983 claim.

actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. *Bright v. Westmoreland Cnty.*, 443 F3d 276, 281 (3d Cir. 2006); *Robinson v. Peirce*, 586 Fed.Appx. 831, 834 (3d Cir. 2014).

Defendants argue that under the state created danger theory, Plaintiffs "cannot demonstrate that the School Defendants created a dangerous environment for [Bobbie Jo] based on their inaction." (Doc. 161, at 15). Defendants rely on the foreseeability element necessary to establish a state created danger, arguing once again that there is no record evidence that the individual school defendants were aware of Mattison's history of inappropriate sexual behavior and it was therefore not reasonably foreseeable to these defendants that Mattison would have acted inappropriately toward Bobbie Jo or any other student. (*Id*. at 16). In response, relying on the Manifestation Determination report, Bertanzetti's undisputed knowledge of a prior incident between Mattison and Swartz, and Mattison's deposition testimony that he told Bertanzetti about his past, Plaintiffs argue that "with this knowledge, the Individual School Defendants permitted Mattison to be seated by or near [Bobbie Jo] and ineffectively monitored him so as to allow him the opportunity to sexually touch [Bobbie Jo] on more than one occasion." (Doc. 163, at 13).

Once again, the Court preliminarily notes that there is no record evidence with respect to Cross' knowledge of Mattison's sexual history, his affiliation with DTA, or that he

posed any risk to other students. In fact, there has been not even been an allegation that Cross had any personal involvement with Mattison. At best, Cross admits knowing about an investigation by Bertanzetti into Swartz's mother's allegations against Mattison, which resulted in a determination that the accusations were unfounded. Plaintiffs have not pointed to any evidence, direct or indirect, that could reasonably imply any knowledge on the part of Cross that Mattison posed any kind of foreseeable harm to Bobbie Jo or any other student at Warrior Run. Furthermore, regardless of the extent of Cross' knowledge, Plaintiffs have not put forth any evidence demonstrating that Cross took any affirmative actions in a way that put Warrior Run students in danger or made them more vulnerable to danger. Summary judgment must therefore be granted to Cross on Plaintiffs' § 1983 claim.

The first and fourth elements of a state-created danger test are so intertwined as to be capable of analysis together. "[T]he relevant test involves asking whether a state actor's behavior constituted an affirmative act, and, if so, whether the affirmative act created a foreseeable opportunity for harm." *Bright*, 443 F.3d at 283 n.7 (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902 (3d Cir. 1997)).

As this Court previously stated in its prior Memorandum Opinion, "if Defendants Osenga and Del Gotto were aware of Mattison's history, then it would reasonably be foreseeable that he would act out again." (Doc. 50, at 9). On this basis, the Court allowed Plaintiffs' § 1983 claim to proceed against the teachers. However, Plaintiffs have not come

forth with sufficient evidence to establish knowledge, and therefore foreseeability, on the part of either Osenga or Del Gotto.

As discussed, *supra*, Plaintiffs admit that both teachers testified that they were unaware of any prior sexual misconduct on the part of Mattison and that neither of them had been advised that Mattison was acting out in a sexually inappropriate manner (Doc. 157, ¶¶ 49-52; Doc. 162, ¶¶ 49-52). Both teachers knew that there had been an issue between Mattison and Swartz, but both believed that the allegations were either unfounded or were the result of Swartz being "a little forward." (Dep. of Del Gotto, at 9, 14; Dep. of Osenga, at 14, 20). While the teachers knew Mattison had left school for part of the 2009-2010 year, neither teacher knew the reason for this.[14] Plaintiffs' reliance on the Manifestation Determination report to support an argument that Del Gotto and Osenga knew about Mattison's sexual misconduct, making it foreseeable that he would assault another student, is misplaced. The report does not state which teachers were told to watch Mattison or which teachers or administrators had issues and concerns regarding Mattison's sexual tendencies or what these "sexual tendencies" consisted of. There is also no record evidence that Del Gotto and/or Osenga ever attended any of the meetings at school where Mattison's "inappropriate sexual tendencies" were discussed. In sum, Plaintiffs have put forth no evidence to create a material factual dispute as to Defendants' contention that Osenga and Del Gotto were not aware of Mattison's history. Absent this knowledge, it

---

[14] Mattison was removed from school for an incident at his Host Home. His removal was in no way related to any incident on school property or involving another student. Therefore, there is no reason that any of the individual defendants would have known the reason for his absence.

35

would therefore not have been foreseeable that seating Mattison next to Bobbie Jo created an opportunity for harm.[15]

The Court has already held that there is a question as to Bertanzetti's knowledge of Mattison's sexual history and whether he was on notice of a substantial risk or danger that Mattison posed to the female students. Mattison and Bertanzetti's conflicting deposition testimony regarding what Mattison told the assistant principal with respect to his past as well as the contents of the Manifestation Determination report clearly create a material issue of fact as to Bertanzetti's knowledge and therefore whether it was reasonably foreseeable to him that Mattison would act out again.

Nonetheless, even though an issue of fact exists as to Bertanzetti's knowledge, and even assuming that Osenga and Del Gotto had knowledge of Mattison's past, Plaintiffs cannot show the occurrence of an affirmative action by any of the individual school defendants which created a danger to, or that rendered, Bobbie Jo more vulnerable to danger than had one or more of the school defendants not acted at all.

The Supreme Court has held that "[i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf – through incarceration, institutionalization, or other similar restraint of personal liberty – which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Social Srvcs.*, 489 U.S. 189, 200, 109 S.Ct. 998,

---

[15] It is once again worth pointing out that Mattison did not sit next to Bobbie Jo in Osenga's class, further weakening Plaintiffs' argument with respect to Osenga.

36

103 L.Ed.2d 249 (1989). "But a specific and deliberate exercise of state authority, while necessary to satisfy the fourth element of the test, is not sufficient. There must be a direct causal relationship between the affirmative act of the state and plaintiff's harm." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 432 (3d Cir. 2006).

Courts have freely admitted that it is oftentimes difficult to determine where state action ends and inaction begins:

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger . . . and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

*Ye v. United States*, 484 F.3d 634, 637 (3d Cir. 2007) (citing *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982)).

Keeping these standards in mind, the Court will now examine several cases in which the Third Circuit has applied such standards in determining whether a state actor exercised his or her authority to take affirmative action that was the "but for" cause of the plaintiff's injury.

In *D.R. by L.R.*, the Third Circuit condemned the state actor school defendants who had allegedly been aware that the plaintiffs, two female high school students, had been verbally, physically, and sexually molested routinely by multiple male classmates over the course of several months in a unisex bathroom and class darkroom, but did nothing to intervene. 972 F.2d at 1373. "We readily acknowledge the apparent indefensible passivity

37

of at least some school defendants under the circumstances. Accepting the allegations as true, . . . they show nonfeasance but they do not rise to the level of a constitutional violation." *Id.* at 1376. There, the harm was caused the by private actors (*i.e.,* the male students), not state actors. As such, the Court determined that the plaintiffs had failed to show "as required under *DeShaney*, that the school defendants either impermissibly limited the freedom of the plaintiffs to act on their own behalf, or barred their access to outside support. Nor do they demonstrate that defendants violated a constitutional duty by creating or exacerbating the danger posed by the student defendants." *Id.*

The facts before the Third Circuit in *Bright v. Westmoreland County* were even more compelling, and yet, the Court did not accept the plaintiff's state-created danger theory. In *Bright*, Charles Koschalk, had pled guilty to corrupting the morals of the plaintiff's twelve-year-old daughter and had been sentenced to 23 months of probation. 443 F.3d at 278. However, in direct violation of the terms of his probation, he attempted to re-establish contact with his victim on numerous occasions. *Id.* The plaintiff asked a police officer to arrest Koschalk, and the officer assured him that immediate action would be taken. *Id.* at 279. Koschalk's probation officer had already initiated proceedings to have Koshalk's probation revoked. *Id.* at 278. However, in the intervening ten weeks between her report and the probation hearing, Koschalk murdered the plaintiff's other daughter, Annette, in retaliation for the plaintiff's attempts to keep Koschalk away from the plaintiff's older daughter. *Id.* at 279. In affirming the district court's dismissal of the complaint, the Third

Circuit held that "[t]his theory of liability based solely on a failure of the state to act is clearly foreclosed by *DeShaney*." *Id.* at 284. "The reality of the situation described in the complaint is that what is alleged to have created a danger was the failure of the defendants to utilize their state authority, not their utilization of it." *Id.* Citing *DeShaney*, the *Bright* Court held that "the Due Process Clause did not require that Westmoreland County 'become the permanent guarantor' of the Bright family's safety from private violence any more than it required Winnebago County to 'become the permanent guarantor' of Joshua's safety from the same sort of harm." *Id.* at 285. Again, the harm was caused by a private actor, and the state had done nothing to prevent the plaintiff from taking precautions to protect his family from Koschalk. "It is *misuse* of state authority, rather than a failure to use it, that can violate the Due Process Clause." 443 F.3d at 292-93 (emphasis added).

Two of the few instances in which the Third Circuit has found a cause of action for state-created danger are *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996) and *Rivas v. City of Passaic*, 365 F.3d 181 (3d Cir. 2004). In *Kneipp*, the plaintiff, Samantha Kneipp, and her husband, Joseph, were stopped by the police on a wintery evening for causing a disturbance on a highway. 95 F.3d at 1201. Both appeared intoxicated, but the police let Joseph go home first because he had to care for the couple's infant. *Id.* at 1201-02. He assumed the police would either arrest his wife or bring her home, but instead, after detaining her for a few more minutes, they released her in her heavily inebriated state to walk the rest of the way home alone. *Id.* at 1202. Soon afterward, she was found

39

unconscious at the bottom of an embankment. *Id.* at 1203. Her exposure to the cold had

caused anoxia, leading to permanent brain damage. *Id.* The damage severely impaired

several basic body functions: the plaintiff could not even swallow on her own, and she was

left virtually blind. *Id.* at n.16. However, unlike in *D.R. by L.R.* and *Bright*, the Third Circuit

in *Kneipp* found that the police had affirmatively acted to increase Samantha's risk of harm:

> there is sufficient evidence in the summary judgment record to show that
> Officer Tedder and the other police officers used their authority as police
> officers to create a dangerous situation or to make Samantha more
> vulnerable to danger had they not intervened. The conduct of the police, in
> allowing Joseph to go home alone and in detaining Samantha, and then
> sending her home unescorted in a seriously intoxicated state in cold weather,
> made Samantha more vulnerable to harm. It is conceivable that, but for the
> intervention of the police, Joseph would have continued to escort his wife
> back to their apartment where she would have been safe. A jury could find
> that Samantha was in a worse position after the police intervened than she
> would have been if they had not done so. As a result of the affirmative acts of
> the police officers, the danger or risk of injury to Samantha was greatly
> increased.

*Id.* at 1209.

In *Rivas*, EMTs responded to a 911 call that the decedent, Mr. Rivas, was

experiencing seizures. The EMTs alleged that upon their arrival at the Rivas home, Mr.

Rivas assaulted one of them. 365 F.3d at 185. In response, the EMTs called the police,

who arrived and restrained Mr. Rivas. There was some evidence on the record that though

the EMTs reported the assault by Mr. Rivas to the police, they omitted any reference to his

seizures, and the EMTs admitted that placing someone who is prone to seizures in

restraints could increase his risk of harm. *Id.* at 186. It apparently took several police

40

officers to restrain Mr. Rivas, and in violation of proper protocol, they placed him face-down instead of face-up on a stretcher. Furthermore, also against proper protocol, the police carried him down the stairs of the apartment head-first instead of feet-first. The EMTs allegedly observed these violations of protocol but said nothing. *Id.* Once the paramedics arrived, they noticed that Mr. Rivas was face-down on the stretcher and instructed the police to turn him over. *Id.* at 188. When they did so, the paramedics discovered Mr. Rivas was not breathing, and despite their efforts, he was pronounced dead soon afterwards. *Id.* Because of the facts in dispute, the Third Circuit affirmed the district court's denial of summary judgment in favor of the defendant state actors. *Id.* at 184. Furthermore, the Court determined that the EMTs' actions of (1) calling the police to report Rivas's assault, (2) failing to inform them of his condition, and (3) allowing the police to violate emergency response protocol "when taken together, created an opportunity for harm that would not have otherwise existed." *Id.* at 197.

Having examined the fact patterns in *D.R.by L.R.* and *Bright*, and contrasted them with those in *Kneipp*[16] and *Rivas*, this Court must conclude that, with the exception of Del Gotto, this case provides yet another example of state inaction.

---

[16] *Kneipp* pre-dated *Bright* and used slightly different variations of the four-part elemental test by using "willful disregard" for the safety of the plaintiff in lieu of conscience-shocking conduct. *See also Sanford*, 456 F.3d at 308 for a discussion of the standards applied in *Rivas*. However, for the purposes of this Court's analysis, an examination of those differences is unnecessary because the affirmative acts taken by the defendants in *Kneipp* and *Rivas* are qualitatively different from the facts in this case.

41

Here, Bertanzetti is not alleged to have taken any affirmative actions. Even if

Bertanzetti was aware of Mattison's sexual history or that he posed a danger to other

female students, at worst, he engaged in nonfeasance or negligence. As in *D.R.by L.R.*,

> [w]e readily acknowledge the apparent indefensible passivity of at least some
> school defendants under the circumstances. Accepting the allegations as
> true, *viz.*, that one school defendant was advised of the misconduct and
> apparently did not investigate, they show nonfeasance but they do not rise to
> the level of a constitutional violation. As in *DeShaney*, "[t]he most that can be
> said of the state functionaries in this case is that they stood by and did
> nothing when suspicious circumstances dictated a more active role for them."
> *DeShaney*, 489 U.S. at 203, 109 S.Ct. at 1007.

*D.R. by L.R.*, 972 F.2d at 1376. Unlike in *D.R.*, Bertanzetti did perform an investigation

when a student's mother brought allegations against Mattison, and according to the

Manifestation Determination report, he met with Weaver to discuss issues Mattison was

having at school. Plaintiffs have not produced any evidence to show that Bertanzetti

misused his state authority, or that "but for" Bertanzetti's actions, Bobbie Jo was placed in

greater danger than she otherwise would have been in. Ultimately, "[t]he reality of the

situation . . . is that what is alleged to have created a danger was the failure of the

defendant[] to utilize [his] state authority, not [his] utilization of it." *Bright*, 443 F.3d at 284.

The only affirmative action that can be said to be at issue here is the seating

placement of Mattison by Del Gotto and Osenga in the classrooms. Osenga did not seat

Mattison next to Bobbie Jo, and any affirmative action on her part, even if she did have

knowledge of Mattison's sexual history, can therefore not be said to have made Bobbie Jo

more vulnerable to the harm Mattison may have caused.

While Bobbie Jo and Mattison were seated near each other in Del Gotto's class,[17] this is insufficient in itself to establish that Del Gotto created a dangerous situation for Bobbie Jo or made her more vulnerable to danger than had these two students not been seated near each other. The fact that Mattison was seated directly behind Bobbie Jo cannot be said on the record evidence to be the catalyst for Mattison's sexual touching of her or that "but for" this proximity of seating, he would not have acted on his sexual impulse to do so. According to Ms. Swanger, Bobbie Jo informed her that Mattison had once touched her in Osenga's class (Dep. of Elaine Swanger, at 39), a class in which Mattison and Bobbie Jo were not seated near each other, thereby indicating that Mattison's seat placement did not necessarily play a role in his decision to touch Bobbie Jo. Nor is there any other evidence that Mattison chose to act sexually inappropriately towards Bobbie Jo simply because she was the person sitting near him. The only other allegation against Del Gotto merely amounts to a failure on her part to act, specifically, to "[]effectively monitor him" (Doc. 163, at 13).

Thus, an examination of the facts in evidence produced during discovery shows that at most, Del Gotto did nothing to prevent Bobbie Jo's injuries from occurring. The only arguably affirmative action that took place was Del Gotto's placement of Bobbie Jo near Mattison in her class. Though Del Gotto's presumed placement of Bobbie Jo near Mattison

---

[17] The record does not clearly indicate whether Del Gotto chose these seats for the students rather than allowing the students to choose their seats for the school year on the first day of class. But drawing all inferences in favor of the Plaintiffs, the Court will assume that Del Gotto made the decision to seat Bobbie Jo near Mattison.

43

may be deemed to meet an expansive definition of an affirmative act, Del Gotto can just as easily be characterized as having engaged in a failure to use her authority to seat Mattison elsewhere in the classroom, a failure that does not constitute the requisite affirmative act for the imposition of liability under a state created danger theory.

With respect to Del Gotto's alleged failure to constantly monitor Mattison, this amounts to negligence at best and cannot be said to constitute an affirmative action that led to Mattison's sexual misconduct. *See Brown v. Sch. Dist. of Philadelphia*, 456 Fed.Appx. 88, 91 (3d Cir. 2011) (the *failure* of a school to provide supervision of a mentally handicapped student after she had previously allegedly been propositioned by another student and hit in the head, even after promising the parents that it would do so, does not constitute an affirmative act by the school or its employees for purposes of establishing § 1983 liability).

Finally, no individual school defendant did anything to restrict either Bobbie Jo's freedom or her parents' freedom. The Court in *D.R. by L.R.* determined there was insufficient evidence that "the school defendants either impermissibly limited the freedom of the plaintiffs to act on their own behalf, or barred their access to outside support." 972 F.2d at 1376; *see also Brown v. Grabowski*, 922 F.2d 1097, 1116 (3d Cir. 1990). The same applies to the situation here. Plaintiffs do not contend that Bobbie Jo was prohibited from moving seats or that she ever asked to move seats and there is no evidence that Bobbie Jo ever told anyone of any sexual misconduct by Mattison prior to March 14, 2011.

Further, even if Plaintiffs could establish that the harm caused to Bobbie Jo was foreseeable and fairly direct, and was the result of one or more state actors' affirmative use of his or her authority in a way that created a danger Bobbie Jo or rendered her more vulnerable to danger than had the state not acted at all, none of the defendants' conduct can be said to shock the conscience.

In *Sanford v. Stiles*, the Third Circuit articulated the test by which a district court should determine whether a state actor's behavior shocked the conscience. 456 F.3d 298 (3d Cir. 2006). The Circuit adopted a sliding scale approach whereby "the state actor's behavior must always shock the conscience. But what is required to meet the conscience-shocking level will depend upon the circumstances of each case, particularly the extent to which deliberation is possible." *Id*. at 310.

> The level of culpability required to shock the conscience increases as the time
> state actors have to deliberate decreases.    In a hyperpressurized
> environment, an intent to cause harm is usually required. On the other hand,
> in cases where deliberation is possible and officials have the time to make
> unhurried judgments, deliberate indifference is sufficient. . . . We also
> recognize that there are circumstances involving something less urgent than
> a split-second decision but more urgent than an unhurried judgment.
> Generally, this category will include situations in which the state actor is
> required to act in a matter of hours or minutes. . . . [In those circumstances,]
> the defendants [must] disregard a great risk of serious harm.

*Id*. at 309-10 (internal quotation marks and citations omitted). *See also, Chainey v. Street*, 523 F.3d 200, 219-220 (3d. Cir. 2008) ("Deprivation [of a protected interest] violates due process only when it shocks the conscience, which encompasses only the most egregious official conduct. . . . While the meaning of the [shocks the conscience] standard varies

depending upon factual context, merely alleging an improper motive is insufficient, even where the motive is unrelated to the merits of the underlying decision.") (internal citations and quotations omitted). The Third Circuit summarized the levels necessary to establish conscience shocking behavior as follows: (1) deliberate indifference; (2) gross negligence or arbitrariness that indeed shocks the conscience; or (3) intent to cause harm. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 241 (3d Cir. 2008).

Even drawing all reasonable inferences in favor of Plaintiffs and assuming that there is a question of fact as to one or more of the individual defendant's knowledge of Mattison's past sexual history and any sexual danger he posed at Warrior Run, no reasonable factfinder could find that the teachers and/or administrators were so "deliberately indifferent" to a substantial risk of serious harm as to shock the conscience. Here, Plaintiffs' entire case revolves around the theory that the teachers and administrators knew about Mattison's issues and the risks he posed to the other students for a significant period of time, yet failed to take any action. Because this argument is clearly based on a theory that deliberation was possible and the teachers and administrators had time to make "unhurried judgments", a deliberate indifference standard is appropriate in this case. As previously discussed, Plaintiffs fail to establish that any of the defendants were deliberately indifferent to Bobbie

Jo's needs or the potential risks that Mattison posed and the Court need not reiterate its prior analysis supporting these findings.[18]

Therefore, the Court will grant the individual school defendants' motion for summary judgment because there was no state-created danger under the difficult and stringent standard which must be met to show a violation of substantive due process. None of the individual school defendants' conduct shocked the conscience and, to the extent any of these defendants acted affirmatively, they did not engage in affirmative action that placed Bobbie Jo in greater danger than she otherwise would have been in.

## D. Count IV – Breach of Fiduciary Duty

Defendants contend that they are immune from suit with respect to Count IV, Breach of Fiduciary Duty. (Doc. 161, at 17-18). Pursuant to the Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat. Ann. § 8541 et seq. ("PSTCA"), a local agency cannot be held "liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. Cons. Stat. Ann. § 8541. The Act provides for eight exceptions to this rule: (1) vehicle liability; (2) care, custody or control of personal property; (3) real property; (4) trees, traffic controls and street lighting;

---

[18] In the context of a state created danger claim, the Third Circuit has "describe[d] deliberate indifference as requiring 'that a person consciously disregard a substantial risk of serious harm'", Kaucher, 455 F.3d at 427 (quoting Ziccardi v. City of Philadelphia, 288 F.3d 57, 65 (3d Cir. 2002)) (internal quotation marks omitted), but has found that "actual knowledge" is not required to satisfy the deliberate indifference culpability standard, see Phillips, 515 F.3d at 242 ("Our test for whether a plaintiff has alleged that an action 'shocks the conscience' does not contain a requirement that the actor know his or her actions are 'conscience-shocking.'"). Rather, the state actor's conduct "must evince a willingness to ignore a foreseeable danger or risk." Morse, 132 F.3d at 910. Even though it is not required that Defendants know their behavior is conscience shocking, Plaintiffs have not demonstrated a triable issue of fact as to any of the defendants' willingness to ignore a foreseeable danger.

(5) utility services facilities; (6) streets; (7) sidewalks; and (8) care, custody or control of

animals. 42 Pa. Cons. Stat. Ann. § 8542(b). Additionally,

> "[m]unicipal *employees,* including school district employees, are generally immune from liability to the same extent as their employing agency, so long as the act committed was within the scope of the employee's employment. 42 Pa. Cons.Stat. § 8545. However, there is an exception to this general rule: Employees are not immune from liability under § 8545 where their conduct amounts to 'actual malice' or 'willful misconduct'".

*Sanford v. Stiles,* 456 F.3d 298, 315 (3d Cir. 2006). The Pennsylvania Supreme Court has

recognized willful misconduct as requiring a demanding level of fault. *Id.* "Willful

misconduct has been defined by the Pennsylvania Supreme Court as 'conduct whereby the

actor desired to bring about the result that followed or at least was aware that it was

substantially certain to follow, so that such desire can be implied.'" *Id.* (quoting *Renk v. City

of Pittsburgh,* 641 A.2d 289, 293 (Pa. 1994)). "[E]ven where a public employee acts with a

degree of culpability equivalent to "recklessness," Pennsylvania law nevertheless affords

him immunity." *Bright,* 443 F.3d at 287 (finding that an allegation of deliberate indifference

is not sufficient to avoid PSTCA immunity).

It is undisputed that none of the eight exceptions to the PSTCA apply here. Thus,

Plaintiffs must have presented evidence to create a material factual dispute as to whether

the individual school defendants' conduct could amount to actual malice or willful

misconduct. As discussed throughout this opinion, there is insufficient evidence upon which

a reasonable jury could find actual malice or willful misconduct on the part of any of the

individual school defendants. Therefore summary judgment will be granted in favor of

Cross, Bertanzetti, Del Gotto, and Osenga on Count IV of Plaintiffs' Second Amended
Complaint.

## E. Additional Grounds for Summary Judgment

The individual school defendants also argue that they are entitled to absolute
immunity with respect to Counts II, III, and IV pursuant to the Paul D. Coverdell Teacher
Protection Act and request that the claim for punitive damages against them in their official
capacity in Counts III and IV be dismissed. (Doc. 161, at 11-13, 18-21).

The Coverdell Act, 20 U.S.C. §§ 6731 *et seq.*, immunizes teachers, principals, and
other school professionals from liability when "undertak[ing] reasonable actions to maintain
order, discipline, and an appropriate educational environment", stating that "no teacher in a
school shall be liable for harm caused by an act or omission of the teacher on behalf of the
school." *Id*. at §§ 6732, 6736.  Immunity is available when "the harm was not caused by
willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious,
flagrant indifference to the rights or safety of the individual harmed by the teacher." *Id*. at §
6736(a)(4).  Immunity is unavailable if Defendants failed to comply with federal, state, or
local laws.  The Court need not determine whether this immunity would apply as summary
judgment will be granted to the School Defendants on other grounds.

This Court previously dismissed the punitive damages against the individual school
defendants in their official capacities, only permitting Plaintiffs to proceed on their punitive
damages claim against the individual defendants in their individual capacities.  (Doc. 50, at

14-15). While the School Defendants only appear to request that the punitive damages claim be dismissed against them in their official capacities, the law put forth in support of this request applies only to the requisite standard for establishing punitive damages with respect to defendants in their individual capacities. However, although it is unclear what Defendants are specifically requesting from the Court, we decline to reach this issue in light of our grant of summary judgment to the School Defendants on other grounds.

## VI. CONCLUSION

For all of the foregoing reasons, the Court will grant the School Defendants' motion for summary judgment (Doc. 156). A separate Order follows.

Robert D. Mariani
United States District Judge