## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ELAINE AND VICTOR SWANGER, :
as parents and legal guardians of :
B.J.S., and B.J.S., :
 :
   **Plaintiffs,** :
 **v.** : **4:11-CV-894**
 : **(JUDGE MARIANI)**
WARRIOR RUN :
SCHOOL DISTRICT, et al., :
 :
   **Defendants.** :

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is a Motion for Summary Judgment by Defendants Diversified Treatment Alternatives ("DTA") and Alvin Weaver (collectively hereinafter "Mental Health Defendants"). (Doc. 133). Defendants Warrior Run School District, Patricia Cross, Douglas Bertanzetti, Tammy Osenga, and Cynthia Del Gotto (collectively hereinafter "School Defendants") also moved for summary judgment (Doc. 156) which will be addressed in a separate opinion. The issues have been fully briefed and the parties have submitted extensive documentary evidence in support of their respective positions. For the reasons that follow, the Court will grant the Mental Health Defendants' Motion for Summary Judgment.

## II. PROCEDURAL HISTORY

Plaintiffs, Bobbie Jo Swanger, and Elaine and Victor Swanger, as parents and legal guardians of Bobbie Jo, filed a Complaint (Doc. 1) with this Court on May 11, 2011. Since this time, Plaintiffs have filed an Amended Complaint (Doc. 34), which was the subject of a motion to dismiss by the School Defendants which the Court granted in part and denied in part, prompting Plaintiffs to file a Second Amended Complaint on March 8, 2013 (Doc. 77). Plaintiffs' Second Amended Complaint, against Defendants Warrior Run School District, Patricia Cross, Douglas Bertanzetti, Tammy Osenga, Cynthia Del Gotto, Duane Mattison, Diversified Treatment Alternatives, and Alvin Weaver, sets forth nine counts: violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq. (Count I) and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (Count II) against the Warrior Run School District; violation of Bobbie Jo's substantive due process rights under 42 U.S.C. § 1983 (Count III) and breach of fiduciary duty (Count IV) against Patricia Cross, Douglas Bertanzetti, Tammy Osenga, and Cynthia Del Gotto; assault (Count V), battery (Count VI), and intentional infliction of emotional distress (Count VII) against Duane Mattison; and negligence (Count VIII) and violation of 42 U.S.C. § 1983 (Count IX) against Diversified Treatment Alternatives and Alvin Weaver. (Doc. 77).

In addition to filing an Answer to Plaintiffs' Second Amended Complaint, the School Defendants also filed a cross-claim against Diversified Treatment Alternatives, Alvin Weaver, and Duane Mattison alleging that those Defendants are solely liable if it is

2

determined that Plaintiffs are entitled to recover damages, or in the alternative, if it is determined that the School Defendants are liable to Plaintiffs, that the other Defendants are jointly and severally liable with them and/or should be held liable over the School Defendants for contribution and/or indemnification. (Doc. 78).

## III. STATEMENT OF UNDISPUTED FACTS

In accordance with Local Rule 56.1, DTA and Weaver have submitted a Statement of Material Facts in Support of their Motion for Summary Judgment (Doc. 134) as to which they submit there is no genuine issue or dispute for trial. Plaintiffs have submitted their response, a Counter Statement of Facts (Doc. 154) with the result being that the following facts have been admitted except as specifically noted:

Plaintiffs, Elaine Swanger and Victor Swanger are the parents and guardians of Plaintiff Bobbie Jo Swanger, who, at all times relevant to this action, was a student at Warrior Run School District in its special education and life skills program due to her mental retardation. (Doc. 134, ¶¶ 1, 2). At all times relevant hereto, Defendant Duane Mattison was also a student at Warrior Run School District in its special education and life skills program, and under the legal and physical custody of the Tioga County, Pennsylvania Department of Human Services. (Id. at ¶ 3). Defendants Patricia Cross and Douglas Bertanzetti were the Principal and Assistant Principal respectively at Warrior Run High School. (Id. at ¶¶ 4, 5). Defendant Cynthia Del Gotto was a learning support teacher at the

high school and Defendant Tammy Osenga was a teacher at the high school who taught language arts and math to students in the life skills program. (*Id.* at ¶¶ 6, 7).

Defendant Diversified Treatment Alternatives is a Pennsylvania non-profit organization that provides individualized psychiatric treatment programs for at-risk adolescent males. (*Id.* at ¶ 8). DTA is licensed by the Pennsylvania Department of Public Welfare Office of Mental Health and Substance Abuse Services and the Office of Children and Youth Families, and is accredited by the Joint Commission of Healthcare Organizations. (*Id.* at ¶ 9). Defendant Alvin Weaver is a mental health professional in DTA's Community Residential Rehabilitation host home where he is "part of a treatment team that provides counseling to post-traumatized individuals." (Dep. of Alvin Weaver, Doc. 154, Ex. 2, at 6-7). Weaver, as a Mental Health Professional for DTA, is a member of a treatment team, which consists of approximately seven mental health professionals, who collaborate to provide individualized counseling and treatment services to DTA patients. (Doc. 134, ¶ 11). Among the treatment services provided by DTA, two of its main programs are its Residential Treatment Program and Specialized Foster Care Program. (*Id.* at ¶ 12).

Adolescent males are typically referred to DTA for treatment by county Children & Youth Services Departments, Juvenile Probation Departments, county Mental Health Mental Retardation Services programs, as well as some private referrals, such as parents and family members. (Doc. 134, ¶ 13; Doc. 154, ¶ 13). Upon referral to DTA for services, a patient will typically begin treatment at DTA's main residential treatment facility in Danville or

4

Lewisburg. (Doc. 134, ¶ 14). Once a patient has met certain treatment milestones and has demonstrated awareness of DTA's program and rules and expectations, the patient is eligible to transfer to the Montour Learning Center, DTA's "second home" for continued treatment. (*Id*. at ¶ 15). At this Learning Center, adolescents continue their individualized course of treatment and work with DTA staff on relapse prevention plans and other goals that the adolescent needs to accomplish in order to be eligible for post-placement. (*Id*. at ¶ 16). As part of managed care, DTA provides psychological evaluations to its patients regularly throughout the course of treatment. (*Id*. at ¶ 17). Once a patient successfully completes DTA's residential treatment programs and is eligible for post-placement, there are several options depending on the individual's family situation and support system; the adolescent may return to his family, transition to an independent living environment with the assistance of DTA, or be placed with a foster care family through DTA's foster care program or other agency. (*Id*. at ¶ 18). While in DTA's specialized foster care program, adolescents undergo psychiatric evaluations by a DTA psychiatrist and attend weekly individual and group therapy sessions run by DTA's case managers. (*Id*. at ¶ 19).

In May 2007, the Court of Common Pleas of Tioga County issued an Order adjudicating Mattison dependent and in need of treatment, supervision, and/or rehabilitation, and ordered that Mattison be placed in the custody of the Tioga County Human Services Agency and at the Laurel Youth Services Diagnostic Unit for diagnostic evaluation. (Doc. 134, ¶ 26). Laurel Youth Services evaluated Mattison and recommended him for treatment,

5

as a result of which the Tioga County, Pennsylvania Department of Human Services, placed him with DTA, to be enrolled in DTA's residential treatment program. (*Id.* at ¶ 27).

That same month, Mattison entered DTA's residential treatment program, where he began undergoing mental health treatment at its facility in Lewisburg. (*Id.* at ¶ 28). After a period of time, Mattison was transferred to DTA's second home at the Montour Learning Center. (Dep. of Kristen Powell, Doc. 154, Ex. 4, at 10). While at the Montour Learning Center, Mattison attended on-site schooling, provided by the Central Susquehanna Intermediate Unit. (Doc. 134, ¶ 30). According to Kristen Powell, Mattison's caseworker at the Montour Learning Center, there were no problems with him acting out sexually or other incidents reported while at the Montour Learning Center. (Dep. of Powell, at 9, 11). Michael Jones, DTA's Administrative Coordinator at the Montour Learning Center, testified that at the time Mattison graduated from the residential treatment program and was placed in foster care, "Duane had demonstrated no sexually inappropriate behavior within the residential treatment component" which was approximately two years in duration. (Doc. 134, ¶ 32). Mattison also testified that no incidents occurred while he lived at DTA. (*Id.* at ¶ 33).

In February 2009, Mattison graduated from the Montour Learning Center and was placed in the foster home of Pat and Bob Baier. (Doc. 134, ¶ 34). Soon thereafter, Mattison began attending Warrior Run High School and was enrolled in the school's life skills program for the rest of his tenth grade, and a portion of his eleventh grade and twelfth grade school years. (Doc. 134, ¶¶ 35, 39; Doc. 154, ¶¶ 35, 39).

On March 14, 2011, an incident allegedly occurred between Mattison and Bobbie Jo
in Del Gotto's English class at Warrior Run High School. (Doc. 134, ¶ 40). Mattison, seated
in the desk immediately behind Bobbie Jo, reached around his laptop and desk, and
"touched her underneath her bra and ... put [his] hand down her pants." (Doc. 134, ¶ 41;
Dep. of Duane Mattison, Doc. 154, Ex. 3, at 43-44). Nathan Neidig, another student seated
immediately behind Mattison, testified that he "reached [his] head around the corner to see
what [Mattison] was doing" and saw that Mattison had his hand down Bobbie Jo's pants.
(Doc. 134, ¶ 42). After class, Neidig reported to Del Gotto what he had witnessed between
Mattison and Bobbie Jo. (Id. at ¶ 43). Del Gotto testified that she and Trish Marino, another
teacher at Warrior Run, then brought Bobbie Jo into the classroom and asked her to show
them what happened between her and Mattison. (Id. at ¶ 44). The incident was then
reported to Bertanzetti, who met with Mattison to discuss the reported incident, at which
time Mattison admitted that he put his hand up Bobbie Jo's shirt. (Id. at ¶¶ 45, 46).
Mattison was removed from Warrior Run High School that afternoon. (Doc. 134, ¶ 47).[1]
Bertanzetti contacted Ms. Swanger that same day and informed her that Mattison had
inappropriately touched Bobbie Jo's breast and genital region. (Id. at ¶ 49). Ms. Swanger
testified that during that telephone call, Bertanzetti encouraged her to press criminal
charges against Mattison and "said that they wanted to get Duane out of the school district

---

[1] Mattison never returned to Warrior Run High School after he was removed on March 14, 2011.
(Doc. 134, ¶ 48).

and if [she] would bring charges against him that would make it easier for them to do that."
(*Id.* at ¶ 56).

After learning of the incident, Ms. Swanger contacted the Pennsylvania State Police
to report the incident and pursue criminal charges against Mattison. (Doc. 134, ¶ 50).
Ultimately, on May 17, 2011, a criminal complaint was filed in Northumberland County,
Pennsylvania, charging Mattison with aggravated indecent assault, indecent assault, and
indecent exposure based on the March 14, 2011 events. As a result, Mattison pled guilty to
the charges of indecent assault and nolo contendere to indecent exposure. (*Id.* at ¶¶ 52,
53). On August 25, 2011, the Court issued orders suspending the imposition of Mattison's
sentence and, along with certain conditions, placed Mattison on probation for a period of
two years for each of the charges, to run consecutively. (*Id.* at ¶ 54). The Court further
ordered that Mattison reside, participate, and successfully complete the Mainstay North
Program. (*Id.* at ¶ 55).

Before March 14, 2011, Bobbie Jo never told anyone that Mattison had made
advances towards her. (Doc. 134, ¶ 57). While the Swangers did not notice or recognize
any signs of sexual abuse in their daughter, according to Ms. Swanger, approximately one
month before the March incident, Bobbie Jo "got quieter" and would spend more time in her
room reading by herself, instead of with the family. (*Id.* at ¶¶ 59, 60; Dep. of Elaine
Swanger, Doc. 154, Ex. 7, at 51-52).

8

After March 2011, Ms. Swanger testified that she received multiple phone calls from the school, informing her that Bobbie Jo "was writing different singer's names from magazines and saying that she wanted to make sex with them, she wanted to kiss them" and that Bobbie Jo had received detention several times for different issues. (Doc. 134, ¶ 63). At no time have Plaintiffs consulted with any healthcare professional regarding Bobbie Jo and the problems they believe to have occurred or resulted from the incident between her and Mattison. (Id. at ¶ 64). Specifically, Bobbie Jo has never been examined by her family physician for any issues relating to the incident between her and Mattison and, despite her family physician's office providing the family with a list of psychologists that Bobbie Jo could speak with, according to Ms. Swanger, Bobbie Jo "chose not to talk to anyone." (Doc. 134, ¶¶ 65, 66; Doc. 154, ¶¶ 65, 66; Dep. of Elaine Swanger, at 56). Ms. Swanger also testified that no healthcare practitioner has related any of the perceived changes in Bobbie Jo's behavior or health to the incident between Mattison and Bobbie Jo. (Doc. 134, ¶ 67; Doc. 154, ¶ 67).

The parties agree that DTA and its administrative and clinical staff, including Alvin Weaver, are required to comply with Pennsylvania Department of Public Welfare Rules and Regulations which govern the confidentiality of records and the release of confidential information to outside third parties such as the Warrior Run School District, but Plaintiffs dispute that these regulations limited the exchange of information between DTA and Warrior Run personnel. (Doc. 134, ¶ 69; Doc. 154, ¶ 69).

9

## IV. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-

moving party, and where the non-moving party's evidence contradicts the movant's, then

the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974

F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127

S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the

summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts. Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial. The mere existence of some alleged factual dispute between
> the parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no *genuine* issue of
> *material* fact. When opposing parties tell two different stories, one of which is
> blatantly contradicted by the record, so that no reasonable jury could believe
> it, a court should not adopt that version of the facts for purposes of ruling on a
> motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## V. ANALYSIS

### A. Count VIII – Negligence

Count VIII alleges that the Mental Health Defendants "determined, or should have

determined, that Defendant Mattison presented a serious danger of acting out sexually

against other students" and "took inadequate, or no steps to warn the school" about

Mattison's "known sexually aggressive behavior" despite "a duty to exercise reasonable

care to protect by warning the intended or readily identifiable victims of Defendant Mattison

11

against such danger and . . . to disclose information about a client that they knew or had reason to believe could be a harm to others." (Doc. 77, ¶¶ 86-88).

Under Pennsylvania law, a plaintiff must prove the following elements to prevail on a negligence claim: (1) the defendant had a duty to conform to a certain standard of conduct; (2) the defendant breached that duty; (3) such breach caused the injury in question; and (4) the plaintiff incurred actual loss or damage. *Pyeritz v. Commonwealth,* 32 A.3d 687, 692 (Pa. 2011). Mental Health Defendants argue that there are no record facts to support a finding that they owed a duty to warn or disclose Mattison's mental health information to Plaintiffs or the School District. (Doc. 136, at 7). In so doing, Defendants rely on federal and state statutes and regulations and Pennsylvania Department of Public Welfare Rules and Regulations for the proposition that they were legally prohibited from disclosing Mattison's confidential mental health information, as well as a general assertion that, under Pennsylvania law, the Mental Health Defendants do not owe a duty to control the conduct of a third party to protect another from harm. (*Id.* at 7-11).

Whether a defendant in an action for negligence is under a legal duty to conform to a certain standard of conduct is a question of law. Thus, although the issue of negligence is one better left to a fact finder, in the absence of a duty, the fact trier has nothing to consider. *See Emerich v. Philadelphia Ctr. for Human Dev., Inc.,* 720 A.2d 1032, 1044 (Pa. 1998) ("While the existence of a duty is a question of law, whether there has been a neglect of such duty is generally for the jury."). Nonetheless, "[t]he issue of whether an act or a failure

12

to act constitutes negligence may be removed from consideration by a jury and decided as a matter of law when the case is free from doubt and there is no possibility that a reasonable jury could find negligence." *Id.*

Under common law in Pennsylvania, there is generally no duty to control the conduct of a third party to protect another from harm. *Emerich*, 720 A.2d at 1036. However, a limited exception exists where a defendant either has a special relationship with the third person "which imposes a duty upon the actor to control the third person's conduct" or has a special relationship with the intended victim which gives rise to a right to protection for the victim. Restatement (Second) of Torts § 315 (1965). "The vast majority of courts that have considered the issue have concluded that the relationship between a mental health care professional and his patient constitutes a special relationship which imposes upon the professional an affirmative duty to protect a third party against harm. Thus, the concept of a duty to protect by warning, albeit limited in certain circumstances, has met with virtually universal approval." *Emerich*, 720 A.2d at 1037. Therefore, "a mental health professional who determines, or under the standards of the mental health profession, should have determined, that his patient presents a serious danger of violence to another, bears a duty to exercise reasonable care to protect by warning the intended victim against such danger." *Id.* at 1040, 1043. This limited duty to warn only arises "where a specific and immediate threat of serious bodily injury has been conveyed by the patient to the professional regarding a specifically identified or readily identifiable victim." *Id.* at 1041, 1043. Because

13

"the protective privilege ends where the public peril begins", the law protecting privileged communications between a mental health care professional and his or her patient is not violated, and does not prohibit, a finding that a duty existed on the part of the mental health professional to warn an intended victim of a patient's threats of serious bodily harm. *Id.* at 1043 (quoting *Tarasoff v. Regents of Univ. of California*, 551 P.2d 334, 347 (Cal. 1976)).

Assuming a special relationship existed between the Mental Health Defendants and Mattison, the limited duty imposed by Pennsylvania law still precludes a finding that the Mental Health Defendants owed, and therefore breached, a duty to the plaintiffs. It is undisputed that DTA and Weaver were aware of Mattison's past sexual history, including his previous sexual behavior at Williamson High School. But there is absolutely no record evidence that Mattison ever communicated a threat to any DTA mental health professional regarding an intent to cause serious bodily harm to any student at Warrior Run, let alone to Bobbie Jo. The narrow exception to the general rule that there is no duty to control the conduct of a third party to protect another from harm is limited to whether the third party *said or communicated* a threat to the mental health professional regarding a specific or readily identifiable individual. Here, the only evidence of record is that DTA knew about Mattison's past, including his sexual propensities. Plaintiffs use this evidence to suggest that DTA should have known that, due to Mattison's past, he would touch one or more of his fellow students at Warrior Run and therefore the defendants owed Plaintiffs a duty to warn. Such a finding would lead to an application of the duty excessive in scope and breadth which

14

would risk violating a patient's rights and undermining the purpose of strict mental health professional-patient confidentiality rules and law. Under Plaintiffs' reasoning, the Mental Health Defendants had a duty to warn an almost unlimited array of potential victims, whose identification would be difficult at best. Should the Mental Health Defendants have warned only the females in Mattison's special education classes? Or every student, male and female, in the special education classes[2]? Every female at Warrior Run or every student in the school since Mattison testified that he participated in several regular education classes[3]? Other than the entire student body, Plaintiffs have not put forth evidence to narrow this population to establish the presence of a specifically identified or readily identifiable victim.[4] To adopt Plaintiffs' argument would force mental health professionals to

---

[2] Mattison also had a history of sexual behavior with other males. See Laurel Youth Services Psychiatric Evaluation, June 6, 2007, Doc. 154, Ex. 11, at 2 (Mattison and another boy "engaged in a sexual act in the bathroom of the Williamson High School earlier this year [2007], which, Duane states, was forced upon him, while the other Individual states it was consensual." Regardless of whether this one encounter was consensual, "it is clear that [the two boys] engaged in consensual activity with each other on a number of occasions over several years.").

[3] Mattison testified that he had gym, drivers' ed, and art with the "regular" students. (Dep. of Mattison, at 30).

[4] Plaintiffs argue that Bobbie Jo was a readily identifiable victim "in that she was mentally retarded, same age, female classmate in the special education classroom." (Doc. 155, at 12). Although multiple psychiatric reports state that Mattison previously touched female students at Williamson and engaged in sexually inappropriate behavior towards these students, the reports do not indicate that all of the females were the same age as Mattison, although certainly some of them were, or, crucially, that each of the females Mattison touched were mentally challenged. See e.g., Laurel Youth Services Social History, June 12, 2007, Doc. 154, Ex. 11, at 5, 9, 12, 13, 14 ("In March 2007, several female students at Williamson Jr./Sr. High School reported that Duane made inappropriate gestures towards them"; a teacher reported that Mattison "touched the buttocks of three or four classmates"; at 15-years-old, Mattison touched the buttocks of a 13-year-old female student without her consent.). The only indication that Mattison targeted mentally challenged students is one teacher's opinion that "Duane chose the lowest functioning female students in the classroom and tried to be alone with them." Id. at 6. The psychiatric reports do not state that Mattison's inappropriate behavior was limited to mentally challenged females and do not make a determination as to whether Mattison specifically targeted mentally challenged students.

15

warn an unnecessarily large, and to some extent arbitrary, designation of people of a patient's potential danger to them, solely in an attempt to avoid potential liability.

Both parties rely on *Emerich* in support of their respective arguments, and the Court acknowledges that the duty to warn is applicable to this case and would extend to the serious and immediate threat of sexual assault. But Plaintiffs have not put forth any evidence to show a genuine factual dispute as to whether Mattison ever communicated a threat to anyone at DTA which would be encompassed within the *Emerich* exception. DTA, via Weaver, acknowledged that the duty established under *Emerich* exists and that he was bound by it.[5] Plaintiffs, though they had an opportunity to do so, never further inquired of Weaver (or ever inquired of any other DTA employee) whether he, or any other mental

---

[5] The following exchange took place during Plaintiffs' examination of Weaver:

Q. I have on follow-up. In your opinion is there any situation that would warrant the disclosure of information to a school or to an official?

A. If there was a signed release for records, in that instance information could be released.

Q. A signed release by whom?

A. The client.

Q. Is there a reason, a health and safety reason, that you might have to disclose the information as far as you know?

A. Based on -- for example, if someone was disclosing that they were going to do significant harm to themselves or someone else, if they said to me they were going to murder someone, then I am obligated to share information with the police, for example.

Q. Is that the only situation that you believe would obligate you to disclose?

A. Again, these are hypothetical situations

Q. Right.

A. -- but if a situation would be significant harm to self or others.

Q. What do you consider significant harm?

A. It's a very vague area. I don't have a definition.

Q. So if you had information that you considered to be significant harm to others then you could disclose it?

A. Yes.

(Dep. of Weaver, at 24-25).

health care professional, had ever received information from Mattison that he intended to, or

threatened to, sexually assault or seriously injure a readily identifiable person such as

Bobbie Jo or any other student at Warrior Run. In addition to Weaver's testimony that he

knew he had a duty to disclose a patient's confidential information to the extent that a

patient had communicated "that they were going to do significant harm to themselves or

someone else", and the fact that Weaver never informed anyone that Mattison posed a

threat to any students, Jones' deposition testimony further bolsters Defendants' argument

that "[d]iscovery has not revealed any evidence that Mattison communicated any threats of

serious bodily injury, much less any specific and immediate threats" (Doc. 136, at 11).

During Jones' deposition, the following exchange took place between him and Plaintiffs'

counsel:

> Q. Were you aware of concerns at the Warrior Run school about Mr. Mattison and his actions with other students?
> A. He was removed from school once again when there was some incidents of him acting out.
> Q. Are you aware of anything prior to that?
> A. No.
> Q. With other students?
> A. No.
> Q. Is that something you would –
> A. You know, with other students. Would he come into group therapy sessions and discuss his interactions with other people and give us an opportunity to raise red flags if we thought there was an issue? Yeah. So I can't say that was never part of conversations of other students. Not enough that I would draw a red flag and say he's not going back there again.

(Dep. of Jones, at 20). The record does not indicate that in any of these conversations

Mattison communicated a threat of serious bodily injury towards any specific person or class

17

of persons. Nonetheless, the clear implication to be drawn from Jones' testimony is that any "red flags" would necessarily include threats of serious bodily harm and would have, at minimum resulted in DTA removing Mattison from school to avoid the execution of these threats. Furthermore, the school officials specifically testified to never having been told by any DTA employee that Mattison was a threat, let alone a serious threat who had specifically targeted a student or class of students. (See Dep. of Bertanzetti, at 21 ("Q: When you explained to Alvin [Weaver] what happened [on March 14, 2011] did he share any information about whether Duane had done anything like this in the past? A: No, he didn't"); see generally, Dep. of Patricia Cross, Doc. 154, Ex. 5 (testifying that she was unaware of any prior sexual history involving Mattison and that she did not know that Mattison was even associated with DTA prior to March 14, 2011)).

It is no excuse on the part of Plaintiffs for their failure to come forward with facts regarding whether Mattison ever communicated a specific threat that Mattison's mental health treatment records are not otherwise subject to disclosure as this Court has previously ruled (see Doc. 148). This is so because Emerich narrowly carves out an exception to the prohibition on the disclosure of confidential information conveyed to a mental health professional to allow the disclosure of "a specific and immediate threat of serious bodily injury against a specifically identified or readily identifiable third party." See Emerich, 720 A.2d at 1042 ("we believe that the protection against disclosure of confidential information gained in the therapist-patient relationship does not bar the finding of a duty to warn"). It

18

was thus within the Plaintiffs' prerogative to inquire into whether Mattison had ever communicated a threat the nature of which is covered by *Emerich*.

The Court has found that Bobbie Jo was not a readily identifiable victim, and there is no record evidence that Mattison ever communicated a threat about her, or any other Warrior Run student, to any DTA mental health professional. There is no record evidence that Mattison had previously engaged in any physically harmful behavior towards another student at school or that he was violent towards his peers. Accepting that Mattison had previously touched several students' buttocks at Williamson High School and made sexually inappropriate gestures, there is no evidence, or even allegation, that he had, for example, previously raped or sexually assaulted another student or that he ever attempted to do so. Thus, Mattison's past conduct does not present strong evidence that he was at risk of causing "*serious* bodily harm" to one of his fellow students, such as to impose liability on the Mental Health Defendants for a failure to warn. Nor do Plaintiffs point to any case wherein a Court has found that mere sexual touching of an individual, such as another student, without more, created an issue of fact as to whether a person could be found to pose a threat of serious bodily harm to that same group, i.e. other students. In fact, DTA and Weaver's position that they owed no duty of care is strengthened by the fact that there is no evidence that at any time during his enrollment at Warrior Run, Mattison ever engaged in any

inappropriate sexual behavior with any Warrior Run student[6] that could amount to the necessary standard of "serious" bodily harm.

Plaintiffs assert that their negligence claim is predicated on more than just a failure on the part of the Mental Health Defendants to warn Bobbie Jo and her parents. Rather, Plaintiffs contend that their claim is also based on "additional theories of liability namely that the DTA Defendants grossly negligently failed to share Mattison's necessary mental health information with their treatment partner, Warrior Run, and that the DTA Defendants are liable to [Bobbie Jo] for negligently performing the undertaking of treating Defendant Mattison for his sexually deviant and abusive behavior, which failure resulted in physical harm to [Bobbie Jo]." (Doc. 155, at 12). These assertions are without merit. Ignoring the irony of Plaintiffs' first argument, given that their argument in opposition to the School Defendants' motion for summary judgment is that enough information was turned over to the School so as to put them on notice that Mattison was a threat to Bobbie Jo, Plaintiffs' argument that DTA was a "treatment partner" of Warrior Run is unsupported by any evidence or law. There is no evidence in the record that Warrior Run was responsible for

---

[6] The only reported incident of sexual misconduct by Mattison towards another student prior to March, 2011, was an accusation by the mother of another student, Sara Swartz. The mother reported to assistant principal Bertanzetti that Mattison asked Swartz if he could touch her. (Dep. of Bertanzetti, at 7). Bertanzetti investigated the report, determined that Mattison was not talking to Swartz when he made the comment, but did take preventative measures to keep the two separated because they "were both getting too close to each other." (*Id*. at 8, 25-26). Bertanzetti also determined that there was no evidence that Mattison had physically touched Swartz. (*Id*. at 26). To the extent that the Manifestation Determination, conducted on March 16, 2011 as a result of the March 14 incident, states that "[d]uring the current school year, Mr. Weaver has been invited to the school on more than one occasion to discuss issues and concerns with Duane, specifically his inappropriate sexual tendencies" (Manifestation Determination, March 16, 2011, Doc. 154, Ex. 8), this does not present sufficiently specific evidence to show that Mattison posed a threat to any particular student or group of students, let alone a threat of *serious* bodily harm.

"treating" Mattison, and the use of the undefined term "treatment partner" implies the existence of a legal or contractual relationship between the parties to treat Mattison's mental health issues, a duty that there is no record evidence the School District had or was willing or attempted to undertake.[7] Plaintiffs' contention that DTA should have provided Warrior Run with Mattison's records further indicates that the School had no role in his "treatment". At best, Warrior was attempting to inform DTA and Weaver of the issues that had arisen at school so that DTA could take action in dealing with Mattison. The record does not support an inference that the school participated in any psychiatric "treatment" of Mattison. Additionally, Plaintiffs' argument that the Mental Health Defendants were grossly negligent in failing to share Mattison's necessary mental health information is the equivalent to an argument asserting that DTA and Weaver had a duty to inform the School District about Mattison's past sexual history and any current sexual issues he may have had. Plaintiffs point to no law, statute, or case indicating that such a duty exists. Furthermore, if the Mental Health Defendants did have a duty, it would have to be within the ambit of their duty to warn a specific or readily identifiable person or group of persons if they knew, or had reason to know, that the patient would cause that person(s) "severe bodily harm."

Finally, Plaintiffs assert that the Mental Health Defendants were negligent in treating Mattison, quoting *Seebold v. Prison Health Services* for the general proposition that "a

---

[7] Plaintiffs' own expert report by Lisa Thorsen, Ed.D, C.R.C. (Doc. 154, Ex. 10) further hurts their argument that the school and DTA were treatment partners. While the reports states that these "organizations" should collaborate, in the expert's opinion, "[i]nstead of working together as partners, Warrior Run School District and Diversified Treatment Alternatives chose to work as separate entities without concern for the safety of the individual child." (*Id.* at 13-14).

physician entering into such a relationship which he should recognize as necessary for the protection of others has the duty to exercise reasonable care in the patient's treatment", 57 A.3d 1232, 1244-1245 (Pa. 2012). (Doc. 155, at 12). Plaintiffs' reliance on *Seebold* is inapposite. The Court's holding in *Seebold* is limited to its facts and the area of treatment of communicable diseases and Plaintiffs offer no other case law to explain the circumstances under which a mental health professional can be held liable to a third person for negligently treating a patient.

Because Plaintiffs have failed to establish a dispute of fact as to whether the Mental Health Defendants owed a duty to Plaintiffs, as well as whether these Defendants were negligent, the Court need not address whether the Mental Health Defendants would have been protected by the limited immunity under the Mental Health Procedures Act, 50 P.S. § 7101, *et seq.*, thereby requiring Plaintiff to show gross negligence or willful misconduct.[8]

For the reasons explained above, the Court will grant the Mental Health Defendants' motion for summary judgment with respect to Plaintiffs' claim for negligence (Count VIII).

---

[8] The Mental Health Procedures Act ("MHPA") "establishes rights and procedures for all involuntary treatment of mentally ill persons, whether inpatient or outpatient, and for all voluntary inpatient treatment of mentally ill persons." 50 P.S. § 7103. In the absence of willful misconduct or gross negligence, the Act provides county administrators, facility directors, physicians, or any other authorized persons immunity from civil and criminal liability when that person "participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced . . . ." *Id.* at § 7114.

## B. Count IX – 42 U.S.C. § 1983

To succeed on a claim under 42 U.S.C. § 1983, the plaintiff must demonstrate a violation of a right protected by the Constitution or laws of the United States, committed by a person acting under color of state law. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (en banc). Therefore, in evaluating a § 1983 claim, a Court must first "identify the exact contours of the underlying right said to have been violated" and determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." *Id.* (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). Here, Plaintiffs' § 1983 claim rests on the substantive due process clause of the Fourteenth Amendment, and alleges that DTA and Weaver, acting under color of state law, deprived Bobbie Jo of her right to bodily integrity. (Doc. 77, ¶ 93).

The Mental Health Defendants argue that they were not acting under color of state law but that, should the Court find that they were, summary judgment in their favor is still appropriate because they had no affirmative duty under the due process clause to protect Bobbie Jo due to the absence of a special relationship between them and Bobbie Jo. (Doc. 136, at 11-18).

"The Due Process Clause does not impose an affirmative duty upon the state to protect its citizens. Rather, it serves as a limitation on the state's power to act." *DeShaney v. Winnebago Cnty. Dep't of Social Srvcs.*, 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). "[W]hen the state enters into a special relationship with a particular citizen, it

may be held liable for failing to protect him or her from the private actions of third parties."

*D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1369 (3d Cir.

1992) (en banc). However,

[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf- through incarceration, institutionalization, or other similar restraint of personal liberty-which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*DeShaney*, 489 U.S. at 200.

In *DeShaney*, the local Department of Social Services ("DSS") received a report that Joshua DeShaney was being physically abused by his father, and following an incident in which Joshua was treated at a hospital for multiple bruises and abrasions, DSS obtained a court order which placed Joshua in the temporary custody of the hospital. 489 U.S. at 192. However, after an inquiry determined there was insufficient evidence of child abuse, Joshua was returned to his father's care. *Id.* Over the next several months, despite evidence of ongoing abuse, DSS did nothing to intervene. *Id.* Eventually, Joshua's father, Randy, beat his son so severely that Joshua suffered permanent brain damage. *Id.* Despite the tragic facts of the case, the Supreme Court concluded that the "most that can be said of the state functionaries in this case is that they stood by and did nothing." *Id.* at 203.

The [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come

24

to harm through other means. Nor does history support such an expansive reading of the constitutional text.

*Id.* at 195. Therefore, "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them." *Id.* at 201.

In *D.R. by L.R.*, the Third Circuit condemned the state actor school defendants who had allegedly been aware that the plaintiffs, two female high school students, had been verbally, physically, and sexually molested routinely by multiple male classmates over the course of several months in a unisex bathroom and class darkroom, but did nothing to intervene. 972 F.2d at 1373. "We readily acknowledge the apparent indefensible passivity of at least some school defendants under the circumstances. Accepting the allegations as true, . . . they show nonfeasance but they do not rise to the level of a constitutional violation." *Id.* at 1376. There, the harm was caused the by private actors (*i.e.*, the male students), not state actors. As such, the Court determined that the plaintiffs had failed to show "as required under *DeShaney*, that the school defendants either impermissibly limited the freedom of the plaintiffs to act on their own behalf, or barred their access to outside support. Nor do they demonstrate that defendants violated a constitutional duty by creating or exacerbating the danger posed by the student defendants." *Id.*

In a later case, the Third Circuit affirmed *D.R. by L.R.*'s holdings:

[In *D.R. by L.R.*,] we held that where parents remain the primary caretakers of students and where students are not deprived of access to sources of help, there is no special relationship between the school and students, despite the

25

state's compulsory school attendance laws. 972 F.2d at 1371-72. Like the parents in *D.R. by L.R.* who maintained custody over the high school students, the Allens, . . . maintained custody over Jaquan. In fact, the Allens had more control over Jaquan's education than other parents because they had to approve his special needs educational plan. *See D.R. by L.R.*, 972 F.2d at 1371. . . . There is no record evidence that [defendant] physically restrained Jaquan or otherwise impaired his liberty in such a fashion that prevented him from taking care of himself. In fact, as a resource-level student, Jaquan could seek the haven of his emotional support classroom or report school-related problems to his parents.

*Allen v. Susquehanna Twp. Sch. Dist.*, 233 Fed. Appx. 149, 152 (3d Cir. 2007) (affirming the district court's grant of summary judgment in favor of the school defendants when a student with a serious emotional disturbance left school without permission and was struck and killed by an automobile).

Relying on *DeShaney*, *D.R. by L.R.*, and their progeny, this Court previously rejected the special relationship theory as a basis for liability under Plaintiffs' § 1983 claim against the School Defendants because the Amended Complaint did not allege the requisite facts that would convert the non-custodial relationship between those defendants and Bobbie Jo to a special relationship. (Doc. 50). Plaintiffs' arguments now against the Mental Health Defendants to show a special relationship are even more attenuated and fail to establish a relationship between DTA, Weaver, and Bobbie Jo.

Plaintiffs attempt to distinguish *D.R. by L.R.* by arguing that in addition to compulsory attendance and *in loco parentis* authority of the school, in the present case, the Mental Health Defendants "undertook a duty to treat and control Mattison while he was in their care, control, and custody", thus entering them into a special relationship with Bobbie Jo.

26

(Doc. 155, at 17). *D.R. by L.R.* and *Allen* both focus on the custody and control of the parents of the *victims*, and these individuals' ability to act, not the person or group exercising control over the private perpetrator. The issue of who exercised custody or control over Mattison is not relevant to the inquiry here, but rather whether Bobbie Jo, whose parents undisputedly were her primary caretakers, was deprived of access to sources of help by the Mental Health Defendants. There is no record evidence that DTA or any of its employees restrained or prevented, or even had the power to restrain or prevent, Bobbie Jo either physically or otherwise, from acting on her own behalf or otherwise deprived her of access to sources of help. Bobbie Jo never informed anyone of Mattison's actions against her prior to March 14, 2011, including her own parents (Doc. 134, ¶ 57; Doc. 154, ¶ 57), never requested to move seats or indicated that she was suffering any harm at school, and never had any interaction with DTA or its employees. Even assuming that DTA and Weaver were state actors, Plaintiffs have not put forth any evidence demonstrating the presence of a special relationship between the Mental Health Defendants and Plaintiffs, and as the Court previously stated with respect to Plaintiffs' negligence claim, the Mental Health Defendants did not owe a duty to the plaintiffs.

Plaintiffs also assert that the state-created danger theory available under § 1983 is applicable in the present case. (Doc. 155, at 15-16). "Liability under the state-created danger theory is predicated upon the states' affirmative acts which work to plaintiffs' detriments in terms of exposure to danger." *D.R. by L.R.,* 972 F.2d at 1374. To meet the

27

requirements of a state-created danger claim under the Fourteenth Amendment substantive due process clause, a plaintiff must show (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. *Bright v. Westmoreland Cnty.*, 443 F3d 276, 281 (3d Cir. 2006); *Robinson v. Peirce*, 586 Fed.Appx. 831, 834 (3d Cir. 2014).

The Mental Health Defendants do not address the state-created danger theory. Regardless, this theory fails for largely the same reason asserted by Defendants with respect to their special relationship argument. There is no evidence of an affirmative action by DTA or Weaver that created a danger or rendered Bobbie Jo more vulnerable to danger than had Mental Health Defendants not acted at all. Plaintiffs' brief in opposition to the Mental Health Defendants' motion for summary judgment does not specifically identify what affirmative act or acts they believe the Mental Health Defendants engaged in which would make these defendants subject to liability under the substantive due process clause. With respect to the fourth element, Plaintiffs merely argue that "the DTA Defendants used their authority to create an opportunity that would not have otherwise existed for Mattison to harm

[Bobbie Jo] by enrolling him in the Warrior Run special education program and placing

[Bobbie Jo] in a dangerous position of spending her school days in the 2010-2011 school

year in close proximity to" Mattison. (Doc. 155, at 16).

A specific and deliberate exercise of state authority is necessary to satisfy the fourth

element of state-created danger test, but this in itself is not sufficient; there must also be a

direct causal relationship between the affirmative act of the state and plaintiff's harm.

*Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 432 (3d Cir. 2006). Thus, assuming that DTA

and/or Weaver enrolled Mattison at Warrior Run[9] and that enrollment of a student

constitutes an affirmative act, Plaintiffs must still establish that the act of enrolling Mattison,

without more, directly caused Bobbie Jo's injury. Such a theory of causation is too

attenuated to allow Plaintiffs' claim to survive summary judgment. Similar to this Court's

analysis of Plaintiffs' negligence claim, an assertion of a direct causal relationship between

Mattison's enrollment and Bobbie Jo's injury cannot withstand analysis as there is nothing in

the record to suggest that DTA or Weaver was ever presented with information that

Mattison could be, or should have been, understood as presenting a specific threat to

Bobbie Jo or any other readily identifiable person. Under Plaintiffs' theory, DTA should be

held responsible for any harm that Mattison may cause simply by virtue of the fact that they

enrolled him in the school. This would lead to the irrationally excessive imposition of liability

on mental health professionals and elevate innumerable actions, formerly considered

---

[9] The Court notes that there is an issue of fact as to who enrolled Mattison at Warrior Run. (Doc. 134, ¶¶ 35-38; Doc. 154, ¶¶ 35-38). However, the Court need not reach the issue in light of the absence of evidence as to causation.

29

negligent at best, to the level of constitutional violations. The single affirmative act of enrolling Mattison in school, without further affirmative actions by DTA or Weaver with respect to Mattison's educational placement, is insufficient to create a material dispute regarding direct causation. DTA and Weaver did not place Mattison in Bobbie Jo's classes, require her to sit in any specific seat, prevent her in any way from getting help, or, more generally stated, undertake any affirmative action that directly put Bobbie Jo in a situation where she was more vulnerable to danger than had DTA and Weaver not acted at all.

Furthermore, even if Plaintiffs could establish that the harm caused to Bobbie Jo was the result of DTA and Weaver, as state actors, affirmative use of their authority in a way that created a danger to Bobbie Jo or rendered her more vulnerable to danger than had they not acted at all, these defendants' conduct cannot be said to shock the conscience. With respect to this element of the state created danger theory, Plaintiffs argue that "Weaver and DTA acted in willful disregard for [Bobbie Jo] by keeping Mattison in the class with her after he demonstrated continued sexual deviancy, by deciding to not share essential information concerning Mattison's history, treatment, and diagnoses with his care partner Warrior Run, and by not warning BJS or her parents of the danger Mattison posed." (Doc. 155, at 16).

In Sanford v. Stiles, the Third Circuit articulated the test by which a district court should determine whether a state actor's behavior shocked the conscience. 456 F.3d 298 (3d Cir. 2006). The Circuit adopted a sliding scale approach whereby "the state actor's behavior must always shock the conscience. But what is required to meet the conscience-

shocking level will depend upon the circumstances of each case, particularly the extent to

which deliberation is possible." *Id.* at 310.

> The level of culpability required to shock the conscience increases as the time
> state actors have to deliberate decreases. In a hyperpressurized
> environment, an intent to cause harm is usually required. On the other hand,
> in cases where deliberation is possible and officials have the time to make
> unhurried judgments, deliberate indifference is sufficient. . . . We also
> recognize that there are circumstances involving something less urgent than
> a split-second decision but more urgent than an unhurried judgment.
> Generally, this category will include situations in which the state actor is
> required to act in a matter of hours or minutes. . . . [In those circumstances,]
> the defendants [must] disregard a great risk of serious harm.

*Id.* at 309-10 (internal quotation marks and citations omitted). *See also, Chainey v. Street,*

523 F.3d 200, 219-220 (3d. Cir. 2008) ("Deprivation [of a protected interest] violates due

process only when it shocks the conscience, which encompasses only the most egregious

official conduct. . . . While the meaning of the [shocks the conscience] standard varies

depending upon factual context, merely alleging an improper motive is insufficient, even

where the motive is unrelated to the merits of the underlying decision.") (internal citations

and quotations omitted). The Third Circuit summarized the levels necessary to establish

conscience shocking behavior as follows: (1) deliberate indifference; (2) gross negligence or

arbitrariness that indeed shocks the conscience; or (3) intent to cause harm. *Phillips v.

Cnty. of Allegheny,* 515 F.3d 224, 241 (3d Cir. 2008).

Here, Plaintiffs' action against the Mental Health Defendants revolves around the

theory that, from the time of Mattison's placement with DTA and throughout his treatment

with DTA, the Mental Health Defendants knew that Mattison posed, or would pose, a

31

serious danger to other students, yet failed to take appropriate action to protect these students. Because this argument is clearly based on a theory that deliberation was possible and DTA and Weaver had time to make "unhurried judgments", a deliberate indifference standard is appropriate in this case. In the context of a state created danger claim, the Third Circuit has "describe[d] deliberate indifference as requiring 'that a person consciously disregard a substantial risk of serious harm'", *Kaucher,* 455 F.3d at 427 (quoting *Ziccardi v. City of Philadelphia,* 288 F.3d 57, 65 (3d Cir. 2002)) (internal quotation marks omitted), but has found that "actual knowledge" is not required to satisfy the deliberate indifference culpability standard, *see Phillips,* 515 F.3d at 242 ("Our test for whether a plaintiff has alleged that an action 'shocks the conscience' does not contain a requirement that the actor know his or her actions are 'conscience-shocking.'"). Rather, the state actor's conduct "must evince a willingness to ignore a foreseeable danger or risk." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 910 (3d Cir. 1997).

Even drawing all reasonable inferences in favor of Plaintiffs, no reasonable factfinder could find that the Mental Health Defendants were so "deliberately indifferent" to a substantial risk of serious harm as to shock the conscience. As previously discussed, DTA and Weaver did not owe a duty to warn Bobbie Jo or share Mattison's confidential information with Warrior Run absent the type of communication by Mattison provided for by *Emerich.* Furthermore, this Court is unwilling to find that Mattison's enrollment in Warrior Run's special education program, by itself, is conscience shocking. There are no facts of

32

record creating a dispute for trial as to whether DTA and Weaver's determination that Mattison could return to Warrior Run was infected with deficiencies of such egregious nature that they could amount to conduct that shocks the conscience.

Accordingly, the Court will grant the Mental Health Defendants' motion for summary judgment on Count IX (42 U.S.C. § 1983) of Plaintiffs' Second Amended Complaint.

## VI. CONCLUSION

For all of the foregoing reasons, the Court will grant Defendants Diversified Treatment Alternatives and Alvin Weaver's motion for summary judgment (Doc. 133). A separate Order follows.

Robert D. Mariani
United States District Judge