## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ELAINE AND VICTOR SWANGER,    :
as parents and legal guardians of    :
B.J.S., and B.J.S.,    :
    :
        Plaintiffs,    :
    v.    :    4:11-CV-894
    :    (JUDGE MARIANI)
WARRIOR RUN    :
SCHOOL DISTRICT, et al.,    :
    :
        Defendants.    :

## MEMORANDUM OPINION

### I. INTRODUCTION

This is an action arising from inappropriate sexual touching between two mentally challenged high school students. Elaine and Victor Swanger, parents of Plaintiff Bobbie Jo Swanger, sued Defendant Duane Mattison, a student in Bobbie Jo's special education class for inappropriately touching their daughter in her private areas; his school district and school officials and teachers; and a nonprofit organization that provided psychiatric treatment to Mattison as well as a staff member of that organization who treated Mattison. Presently before the Court is a renewed Motion for Summary Judgment by Defendants Warrior Run School District, Patricia Cross, Douglas Bertanzetti, Tammy Osenga, and Cynthia Del Gotto (collectively "School Defendants"), Doc. 202. Defendants Diversified Treatment Alternatives ("DTA") and Alvin Weaver (collectively "Mental Health Defendants") also moved for summary judgment, Doc. 198, which will be addressed in a separate opinion.

The operative Complaint in this case is the Second Amended Complaint, which sets forth nine counts: (1) violation of Section 504 of the Rehabilitation Act of 1973, (2) violation of Title IX of the Education Amendments of 1972, (3) violation of substantive due process rights under 42 U.S.C. § 1983, and (4) breach of fiduciary duty, all against the School Defendants; (5) assault , (6) battery, and (7) intentional infliction of emotional distress, all against Mattison; and (8) negligence and (9) violation of substantive due process rights under 42 U.S.C. § 1983, against the Mental Health Defendants. Doc. 77. The relevant issues in this motion were first briefed in School Defendants' original motion for summary judgment, Docs. 156, 161, which this Court granted on September 30, 2015, Doc. 169.

On appeal, the Third Circuit vacated the Court's judgment without reaching the merits of the summary judgment opinions, and instead instructed the Court to assess "whether federal courts should recognize the [Pennsylvania's Mental Health Procedures Act] broader protections as a federal privilege," and whether, in light of such assessment, the Court should allow the disclosure of DTA's psychiatric treatment records of Mattison before adjudicating any further dispositive motions. *Swanger v. Warrior Run Sch. Dist.,* 659 F. App'x 120, 125 (3d Cir. 2016). However, the Third Circuit's instruction was largely rendered moot on remand, as Defendant Mattison waived his privilege to his psychiatric records. The disclosure of these documents supplemented the parties' original record, and the Defendants, with the exception of Mattison, filed renewed motions for summary judgment, arguing that none of the new evidence should prevent the Court from granting

summary judgment again in their favor. Thus, the task before the Court is to determine to what extent, if any, its previous summary judgment opinions are impacted by the newly available evidence. For the reasons that follow, the Court finds that no new evidence has been placed of record to change our original analysis with respect to the School Defendants.[1] The Court will therefore grant the School Defendants' Motion for Summary Judgment.

## II. PROCEDURAL HISTORY

In accordance with Local Rule 56.1, the School Defendants have submitted a Statement of Material Facts in Support of their Motion for Summary Judgment as to which they submit there is no genuine issue or dispute for trial. Doc. 204. Plaintiffs have submitted their response. Doc. 216. The following facts are not reasonably in dispute except as otherwise noted.

Elaine Swanger and Victor Swanger are parents of Plaintiff Bobbie Jo Swanger, who was a mentally challenged student in Warrior Run School District's special education and life skills program. Doc. 204 ¶¶ 1, 2. Defendant Duane Mattison was also a student in the

---

[1] Although the present Memorandum Opinion addresses the arguments raised by the parties with respect to School Defendants' new motion for summary judgment, because there is no new evidence of record that affects this Court's determination of the School Defendants' lack of liability, the Court also incorporates by reference its prior memorandum opinion granting the School Defendants' motion for summary judgment to the extent the prior Opinion elaborates upon, or helps to clarify, any of the Court's analysis herein. *See e.g. Borough of Ellwood City v. Penn. Power Co.*, 570 F.Supp. 553 (W.D. Pa. 1983) (when ruling on a second motion for summary judgment by the Defendant and a motion for leave to amend the complaint by Plaintiff, the Court incorporated by reference its prior opinion addressing a motion to dismiss which it had treated in part as a motion for summary judgment); *City of Philadelphia v. Sessions*, 309 F.Supp.3d 289 (E.D. Pa. 2018) (When addressing a count in a motion for summary judgment, Court incorporated by reference its "discussion and holding in the Preliminary Injunction Opinion").

special education and life skills program, and under the legal and physical custody of the

Tioga County, Pennsylvania Department of Human Services. *Id.* ¶ 3. Defendant Patricia

Cross was the principal at Warrior Run High School, while Defendant Douglas Bertanzetti

was the assistant principal. *Id.* ¶¶ 4, 5. Defendant Cynthia Del Gotto was a learning

support teacher at the high school, and Defendant Tammy Osenga was a language arts and

math teacher to students in the life skills program. *Id.* ¶¶ 6, 7. Defendant DTA is a

Pennsylvania non-profit organization that provides individualized psychiatric treatment

programs for at-risk adolescent males. *Id.* ¶ 8.[2] Defendant Alvin Weaver is a mental health

professional in DTA's Community Residential Rehabilitation program where he is "part of a

treatment team that provides counseling to post-traumatized individuals." Doc. 215-2 (First

Weaver Dep.) at 6-7.

In May 2007, Tioga County's Court of Common Pleas adjudged Mattison as a

"Dependent Child" in need of treatment, supervision, and/or rehabilitation pursuant to

Pennsylvania's Juvenile Act, and ordered that Mattison be placed in the custody of the

Tioga County Human Services Agency. Doc. 204 ¶ 13. The Court also ordered the Laurel

Youth Services Diagnostic Unit to conduct a diagnostic evaluation, which concluded that

---

[2] Though Plaintiffs purport to "deny" this statement of fact, their only explanation for the "denial" is that "[i]n the context of this case, DTA provides counseling and placement for adjudicated delinquent and/or dependent youth who are primarily referred to DTA by county children and youth or juvenile probation. In short they provide sex offender treatment." Doc. 210 ¶ 8 (internal quotation marks omitted). The Court fails to see how this "denial" controverts the assertion that DTA provides psychiatric treatment for adolescent males. This is simply one of numerous examples where Plaintiffs purport to "deny" statements of facts without challenging the statements' truthfulness or citing to proper portions of the record for support. All such "denials" will be deemed as admitted facts by the Court, and Plaintiffs' counsel are on notice that such practice will not be countenanced by the Court in the future.

4

Mattison was in need of treatment and recommended that he be enrolled in DTA's residential treatment program. *Id.* ¶ 14. Mattison was then transferred to DTA's second home at the Montour Learning Center. *Id.* ¶ 15. Kristen Powell, Mattison's caseworker at DTA, and Michael Jones, DTA's administrative coordinator at the Montour Learning Center, both testified that they were unaware of any sexual incidents or misconduct by Mattison while he was at DTA. *Id.* ¶¶ 16, 17.

In February 2009, Mattison graduated from the Learning Center and was placed in the foster home of Pat and Bob Baier. *Id.* ¶ 19. Soon thereafter, Mattison began attending Warrior Run High School in its life skills program for the rest of his tenth grade, and a portion of his eleventh grade and twelfth grade school years. *Id.* ¶¶ 20, 23.

During Mattison's deposition, he testified that when he first arrived at Warrior Run in tenth grade, he talked to assistant principal Bertanzetti about a "rumor" about his "history about [his] sexual issues" prior to his arrival at Warrior Run. Doc. 215-3 at 28. He testified that Bertanzetti told him that "he's going to take care of it." *Id.* Mattison did not remember anything else about this conversation. *Id.* However, Plaintiffs' counsel returned to the subject later in Mattison's deposition, asking several times if, during this conversation, Mattison informed Bertanzetti that the "rumor was actually true," to which Mattison displayed confusion before ultimately answering: "[y]eah, because [Bertanzetti] questioned me about it and I trusted him enough to let him know my background," without expounding further on what he meant by "my background." *Id.* at 88-89. Bertanzetti does not recall having such a

conversation with Mattison. Doc. 215-6 at 7-8.

At the beginning of Mattison's eleventh grade year, Warrior Run conducted an investigation after a female student, Sara Swartz, accused Mattison of asking her "if he could touch her breasts." Doc. 215-6 (Bertanzetti Dep.) at 7. After interviewing both Mattison and Swartz, as well as other students who had been in the room at the time, Bertanzetti concluded that Mattison "had not done that. He hadn't asked to touch her inappropriately ... he was talking with other boys and ... he wasn't talking about Sara at all. And that was backed up by one of the other boys in the classroom." Id. at 8. Nevertheless, Bertanzetti implemented preventative measures to keep Swartz and Mattison separated after that incident. Id. at 8, 25, 26.

Less than two months later, in November 2009, DTA removed Mattison from Warrior Run High School and placed him back in alternative education "after he had sexual contact with a chicken at the Host Home." Doc. 215-9 (October 25, 2010 DTA Psychological Evaluation) at 4. However, Warrior Run was not made aware of this incident, because it did not involve any persons at school:

Q. When Duane Mattison was removed from school as a result of the chicken incident, was the school told anything?

A. That he was recommended to be in an alternative education program for a period of time to work on his issues.

Q. So and correct me if I'm wrong, they were not told anything in regard to his removal having anything to do with him presenting a danger to other students?

6

A. Correct. Because at that point, it was an animal.

Doc. 215-15 (Weaver Dep.) at 138-39.

After completing eleventh grade in the alternative education program, and because Mattison "did not exhibit any additional sexual acting out behaviors after [November 2009]", DTA suggested Mattison be "given the opportunity to attend public school for his 12th grade year." Id. Mattison was thereafter re-enrolled at Warrior Run High School for his twelfth grade year. Shortly after Mattison was re-enrolled, Weaver was called to Warrior Run for a meeting because Mattison had been "talking to a male peer about a girl and made a comment about touching her breasts." Doc. 215-15 at 201. Both Bertanzetti and Weaver talked to Mattison about the wrongful nature of his comment, telling him that it was "sexually inappropriate and offensive." Id.

On March 14, 2011, during Mattison's twelfth grade year, Mattison, while seated directly behind Bobbie Jo, touched her private areas during Del Gotto's English class. According to Mattison, he "asked [Bobbie Jo] if [he] could put [his] hand up her shirt and feel her breast and she had shook her head yes . . . and asked her if [he] could put [his] finger in her vagina, she shook her head yes." Doc. 215-3 at 57-58. He also asked Bobbie Jo "to suck [his] penis" on this occasion. Id. at 63. Mattison testified that this incident occurred while Del Gotto was helping another student in the classroom. Doc. 204 ¶ 48. Additionally, Mattison admitted that he "touched [Bobbie Jo] underneath her bra and . . . put [his] hand down her pants" two or three times in Del Gotto's classroom during his senior year prior to

7

the March 14 incident. *Id.* at 43-44. After class on March 14, 2011, Nathan Neidig, another student seated immediately behind Mattison, reported to Del Gotto that he had seen Mattison put his hand down Bobbie Jo's pants. Doc. 204 ¶¶ 25, 26. Del Gotto testified that she and Trish Marino, another teacher at Warrior Run High School, asked Bobbie Jo to show them what happened between her and Mattison. *Id.* ¶ 27. The incident was then reported to Bertanzetti, who met with Mattison to discuss the allegations, and Mattison admitted that he put his hand up Bobbie Jo's shirt. *Id.* at ¶ 30. Mattison was removed from Warrior Run High School that afternoon. *Id.* at ¶ 31.

According to a report created after Warrior Run's investigation of the March 14, 2011 incident, titled the "Manifestation Determination" report, the school decided to remove Mattison from school and ask him to return to the Montour Learning Center at DTA, noting that "Duane admittedly knows what he did was wrong" and that he "has been in treatment/counseling for similar behaviors" without expounding further on what such behaviors were. Doc. 215-8 (Manifestation Determination) at 5. The report also summarized Mattison's history at school as follows:

> Prior to this incident Duane has been reported by his teachers to have had issues of inappropriateness with another female in his class. Duane has been under the watchful eye of administration and teachers. DTA staff members have been made aware of issues with Duane in school and they have been working with him .... During the current school year, Mr. Weaver has been invited to the school on more than one occasion to discuss issues and concerns with Duane, specifically his inappropriate sexual tendencies .... Due to a series of concerns over the course of the school year, Duane's teachers have been more closely observing his behavior, especially when he is in close proximity to female students in his class.

8

*Id.* at 4-5. It is unclear what these "issues of inappropriateness" or "series of concerns" refer to, though they likely include the incidents summarized above, where Mattison was accused of talking about Swartz in eleventh grade, and when he was verbally disciplined in twelfth grade for making a comment to a male peer about a female student's breasts. Doc. 210-6 at 7; Doc. 215-15 at 201. The school stated in the Manifestation Determination that it "will not proceed with disciplinary action since Duane will return to DTA." Doc. 215-8 at 6.

On the day Bertanzetti learned about the Bobbie Jo incident, he contacted Ms. Swanger and informed her that Mattison had inappropriately touched Bobbie Jo's breast and genital region. Doc. 204 ¶ 33. Ms. Swanger testified that during that telephone call, Bertanzetti referenced past sexual misconduct by Mattison, telling her "that Duane had had a similar incident with another girl in the classroom," and that "[h]e said that Duane had been removed from the school [in eleventh grade] because of that incident, but that he had been allowed to come back. And he said that they wanted to get Duane out of the school district and keep him out of the school district and if I would bring charges against him that would make it easier for them to do that. And he said that if I would bring charges against Duane, I could prevent it from happening to another girl." Doc. 215-7 (Swanger Dep.) at 17. After learning of the incident, Ms. Swanger contacted the Pennsylvania State Police to report the incident and pursue criminal charges against Mattison. Doc. 204 ¶ 34. On May 17, 2011, a criminal complaint was filed in Northumberland County, Pennsylvania, charging Mattison with aggravated indecent assault, indecent assault, and indecent exposure based

9

on the March 14, 2011 incident. *Id.* ¶ 35. Mattison thereafter pled guilty to the charges of indecent assault and *nolo contendere* to the charge of indecent exposure. *Id.* ¶ 36.

It is undisputed that before March 14, 2011, Bobbie Jo never told anyone that Mattison had acted inappropriately towards her. *Id.* ¶ 37. While the Swangers did not notice or recognize any signs of sexual abuse in their daughter, according to Ms. Swanger, approximately one month before the March 2011 incident, Bobbie Jo "got quieter" and would spend more time in her room reading by herself, instead of with the family. *Id.* ¶ 40. However, the Swangers have not consulted a doctor for any issues that may arise from the incident between Bobbie Jo and Mattison. According to Ms. Swanger, Bobbie Jo "chose not to talk to anyone." *Id.* ¶¶ 42, 43; Doc. 215 ¶¶ 42, 43.

In their briefs, both the School Defendants and Plaintiffs focus primarily on the extent of the individual school defendants' – and specifically Bertanzetti's – knowledge of Mattison's sexual history.[3] Defendants aver that Principal Cross was unaware of any prior sexual history involving Mattison. Doc. 204 ¶ 54. Though Plaintiffs purport to "deny" this fact, they do not point to any portions of the record that involve Cross, must less parts of the record that show Cross was aware of Mattison's sexual history. Doc. 216 ¶ 54 (containing

---

[3] Prior to early 2007, Mattison was enrolled at Williamson High School. While at Williamson High School, Mattison "engaged in a sexual act in the [School's] bathroom" with another male student and "in the last few months, has demonstrated increased inappropriate sexual interest in activities at school" marked by "touch[ing] a number of different female clients on their buttocks" and making "gestures of masturbating in front of females." Doc. 215-11 (Laurel Youth Services June 2007 Psychiatric Evaluation of Duane Mattison) at 25. This report was created before Mattison started treatment at DTA, and four years before the underlying incident to this lawsuit. Plaintiffs do not point to any evidence in the record that the School Defendants had knowledge of Mattison's prior conduct at Williamson High School.

no original statement of denial and instead incorporating by reference paragraphs 45 and 50, neither of which cite to portions of the record involving Cross). To the extent Plaintiffs attempt to deny statements of facts by *ipse dixit* without citing to any relevant evidence in the record, such statements of facts are deemed as admitted.

Similarly, Plaintiffs also deny that prior to the alleged incident, Defendants Osenga and Del Gotto were unaware that Mattison had any history of sexual misconduct, or that he had acted sexually inappropriately at school. Doc. 204 ¶¶ 50-53. However, the only evidence relied upon by Plaintiffs is that at some point, Del Gotto had been told by another teacher, Ms. Marino, that Mattison and Sara Swartz should not be seated next to each other. Doc. 216 ¶ 50. But it is undisputed that Del Gotto was not told of the reason for this arrangement, nor was she aware of Swartz's accusation against Mattison. Doc. 215-13 at 9-10. Instead, Del Gotto assumed that Swartz should not be seated next to Mattison because "Sara [Swartz] could be a little forward and that maybe, you know, something was going on between them." *Id.* at 12. Del Gotto was not aware of any time when Mattison had acted inappropriately prior to the Bobbie Jo incident in March, 2011. *Id.* at 13. On the day of the Bobbie Jo incident, two students had asked Del Gotto for help on their newspaper project when Neidig went up to Del Gotto and told her about what he witnessed between Mattison and Bobbie Jo. *Id.* Del Gotto immediately informed another teacher, Ms. Marino, and asked "if this could possibly be true[, b]ecause [she] had never seen any signs

from Duane or anything." *Id.* at 14. Both teachers then asked Bobbie Jo what happened before taking Bobbie Jo to Bertanzetti's office. *Id.*

As for Defendant Osenga, she testified that though she was vaguely aware that "there was an issue with another girl [i.e. Swartz]" prior to the Bobbie Jo incident, all she knew was that Bertanzetti had conducted an investigation, during which Swartz admitted "nothing happened." Doc. 215-17 at 14, 19. Osanga was not involved in the Swartz investigation, nor was she told by anyone that Mattison should be separated from any student. Doc. 215-17 at 19-20. With respect to Mattison's sexual history, Osenga was only aware that Mattison was himself "sexually abused as a child by his parents and his siblings, and that's why he was in foster care." *Id.* at 14. She never heard any "rumors" about Mattison's sexual conduct, nor was she aware that Mattison had a prior history of sexual misconduct. *Id.* at 10, 21.

Plaintiffs also point to statements in the Manifestation Determination that prior to the Bobbie Jo incident, "Duane has been under the watchful eye of administration and teachers"; that "Duane's teachers have been more closely observing his behavior, especially when he is in close proximity to female students in his class"; and that Weaver had been "invited to the school on more than one occasion to discuss issues and concerns with Duane, specifically his inappropriate sexual tendencies ...." Doc. 216 ¶ 50. However, the Manifestation Determination did not name which teachers were keeping a "watchful eye" on Mattison, and the only incident on the record of a meeting between school employees

12

and Weaver is in Fall of 2010, when Bertanzetti met with Weaver to discuss a comment Mattison made to a male peer about wanting to touch a female student's breasts. Doc. 215-6 (Bertanzetti Dep.) at 7.

As noted above, at the time of the parties' filings of their previous summary judgment briefs, Defendants had not disclosed all of Mattison's psychiatric records from DTA, which this Court deemed as privileged, Doc. 149. On appeal, the Third Circuit declined to "address the substantive merits" of the Court's summary judgment rulings, and instead found that on remand, this Court should conduct a further assessment as to whether Pennsylvania's Mental Health Procedures Act's confidentiality protections should be recognized as a federal common law privilege, and noted that if the Court "declines to recognize the MHPA as a federal common law privilege, it should review the DTA documents *in camera* to determine the extent to which they are protected under the narrower *federal* psychotherapist-patient privilege." *Swanger*, 659 F. App'x at 126 (emphasis in original). However, the parties resolved their privilege disputes upon remand, as "Mattison signed an Authorization to Disclose Health Information which provided for the disclosure of his entire record from [DTA]." Doc. 210 ¶ 76 (Plaintiffs' admission with respect to the Mental Health Defendants' statement of facts). After the disclosure of these records, Defendant Alvin Weaver submitted to a second deposition on June 19, 2017, during which time he was asked to expound upon various case notes and records from the newly

disclosed file. Doc. 215-15. Both his deposition and the DTA records referenced in the deposition were submitted for the present summary judgment record.

The newly available evidence is discussed in more detail in this Court's accompanying memorandum opinion addressing the Mental Health Defendants' motion for summary judgment. However, the Court need not delve greatly into the evidence here, as it is undisputed that such information was not shared with anyone at Warrior Run. In particular, Weaver testified at his second deposition that he is not aware of anyone at DTA sharing "any treatment notes, plans, records of any kind with anyone from the Warrior Run School District or the teachers," nor did anyone from DTA "discuss[] with anyone from Warrior Run School District – teachers, principals ... anything having to do with Mr. Mattison's care, treatment, and/or psychiatric/sexual history." Doc. 215-15 at 178-80. *See also id.* at 138-39, 163 (Weaver testifying no teacher or representatives of Warrior Run ever asked him why Mattison was removed from school in eleventh grade, nor did DTA inform anyone at Warrior Run why Mattison left in eleventh grade); Doc. 215-6 at 21 (Bertanzetti testifying that on the day the Bobbie Jo incident came to light, Weaver came to Warrior Run to remove Mattison from the school, and Weaver did not "share any information about whether Duane had done anything like this in the past"); *id.* at 8-9 (Bertanzetti testifying that he was unaware that Mattison had been receiving weekly counseling treatment at DTA during his time at Warrior Run High School).

## III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light

most favorable to the non-moving party, and where the non-moving party's evidence

contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW,*

*Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912,

113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127

S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary

judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts. Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial. The mere existence of some alleged factual dispute between
> the parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no *genuine* issue of
> *material* fact. When opposing parties tell two different stories, one of which is
> blatantly contradicted by the record, so that no reasonable jury could believe
> it, a court should not adopt that version of the facts for purposes of ruling on a
> motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV. ANALYSIS

### A. Count II – Title IX

Plaintiffs bring a Title IX claim for sex discrimination against Defendant Warrior Run

School District (Count II), alleging in their Second Amended Complaint that the "Defendants

were aware of Defendant Mattison's prior sexual misconduct," and that "[d]espite this

knowledge, Defendants permitted Defendant Mattison to attend classes"; "seated Defendant

16

Mattison directly beside or behind Bobbie Jo Swanger in the classrooms"; "failed to

supervise Defendant Mattison, who was known to act out sexually,"; "were aware that

Defendant Mattison had made unwelcome sexual advances toward Bobbie Jo Swanger";

and "failed to remedy the situation and/or report to the proper authorities." Doc. 77 ¶¶ 46-

51.[4] In the previous motion for summary judgment, the Court found that there was no

genuine dispute of fact as to whether the School Defendants evinced deliberate indifference

towards Bobbie Jo. Doc. 169. In the renewed motion for summary judgment, School

Defendants argue that "there are no new facts of record that would change this [] Court's

previous determination in favor of School Defendants." Doc. 205 at 6. In light of Weaver's

unequivocal testimony that none of the newly available evidence, *i.e.* Mattison's treatment

information at DTA, was shared with the School Defendants, the Court agrees that

summary judgment should be granted in favor of Warrior Run on Plaintiffs' Title IX claim.

In relevant part, Title IX provides that "no person . . . shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination

under any education program or activity receiving Federal financial assistance." 20 U.S.C.

---

[4] Despite the fact that these allegations refer to the plural term "Defendants," the Court is constrained to point out (as it did in the previous opinion), that Count II names only one Defendant, Warrior Run School District, not any of the individual School Defendants. Nor could the individual School Defendants have been sued under Title IX. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009) ("Title IX reaches institutions and programs that receive federal funds . . . but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals"). However, because the issue of what certain individual school officials knew, and what actions they took, bears on the question of the school's alleged deliberate indifference to Bobbie Jo's harm, the knowledge and actions of the individual School Defendants is nevertheless relevant in analyzing this claim.

§ 1681(a). Title IX can also be enforced through a private right of action wherein monetary damages are available. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281, 118 S.Ct. 1989, 158 A.L.R. Fed. 751 (1998) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992)). In imposing a duty upon a funding recipient not to discriminate on the basis of sex, Title IX encompasses sexual harassment, including for "deliberate indifference to known acts of peer sexual harassment." *Davis Next Friend LaShona D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). Thus, in limited circumstances, deliberate indifference to known acts of harassment of a student by another student can amount to an intentional violation of Title IX, capable of supporting a private damages action.[5] *Id.* at 643.

In a case such as the one presently before this Court, to proceed on a claim against an educational institution under Title IX, the student must establish that the institution was "deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. *See also Yan Yan v. Penn State Univ.*, 529 F.App'x 167, 171 (3d Cir. 2013).

---

[5] The Supreme Court has specifically emphasized the importance of the relationship between the harasser and the victim, as it "necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity." *Davis*, 526 U.S. at 653. Unlike in situations where a teacher engaged in harassment of a student, *see Franklin* and *Gebser*, "[p]eer harassment, in particular, is less likely to satisfy these requirements." *Id.*

An "appropriate person" is one who, at minimum, "has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf" to end this discrimination. *Gebser*, 524 U.S. at 290.

Recovery based on the principles of *respondeat superior* or constructive notice "frustrate[s] the purposes" of Title IX, and therefore the school official must have actual knowledge in order for the plaintiff to prevail. *Gebser*, 524 U.S. at 285; *see also*, *id.* at 290 (holding that "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond."). Actual notice necessitates more than a simple report of inappropriate conduct, however, the standard "does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student." *Escrue v. Northern OK College*, 450 F.3d 1146, 1154 (10th Cir. 2006) (quoting *Doe v. Sch. Admin. Dist. No. 19*, 66 F.Supp.2d 57, 62 (D.Me. 1999)). Therefore, while actual knowledge does not require absolute certainty that harassment has occurred, there must be more than an awareness of a mere possibility of the harassment. *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 360 (3d Cir. 2005). The educational institution has "'actual knowledge' if it knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger." *Id.* at 361.

Furthermore, the "actual notice" or "actual knowledge" must be attributed to an "appropriate person." *Warren ex rel. Good v. Reading Sch. Dist.*, 278 F.3d 163, 169 (3d Cir. 2002) (quoting *Gebser*, 524 U.S. at 290). An "appropriate person" is one who, at minimum, "has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf" to end this discrimination. *Gebser*, 524 U.S. at 290. Thus, deliberate indifference requires an "official decision by the recipient not to remedy the violation." *Gebser*, 524 U.S. at 290.

Upon a showing of actual knowledge by an appropriate person, Plaintiff must show that the funding recipient exercised deliberate indifference. A funding recipient is "deliberately indifferent" when the recipient's response to the harassment, or lack of response, is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648-649. Deliberate indifference requires an "official decision by the recipient not to remedy the violation." *Gebser*, 524 U.S. at 290.

Deliberate indifference further incorporates a causation requirement. The Title IX funding recipient's deliberate indifference must subject the students to further harassment, to wit, the indifference must "cause students to undergo harassment or make them liable or vulnerable to it." *Davis*, 526 U.S. at 644-645 (internal quotations omitted). This harassment must take place in a context subject to the school's control. *Id*. at 645. Therefore, the school is only liable when "the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id*. This causation element results

20

in a requirement that harassment, or the likelihood or vulnerability of a student to be subjected to it, must occur subsequent to an official's decision not to remedy a known violation.

The fact that the appropriate person's initial response does not remedy or prevent the harassment, or that the school does not use a particular method to remedy or prevent the harassment, does not provide sufficient grounds for liability. *Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001). A school district is not required to respond to harassment or discrimination in a specific manner, nor is the district required to eradicate all sexual harassment; however, the school district's response must be reasonable in light of the known circumstances. For example, "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances." *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260-261 (6th Cir. 2000). The funding recipient is not required to "engage in [a] particular disciplinary action." *Davis*, 526 U.S. at 648. Accordingly, "[s]chool administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id*.

Based on the record in this case, the Court finds that Warrior Run School District's response to the likelihood of peer harassment was not "clearly unreasonable".

Preliminarily, there only exists an issue of fact here as to whether Principal Cross and Assistant Principal Bertanzetti constitute "appropriate persons" for purposes of Title IX. There is no evidence that Defendants Osenga and Del Gotto, who were only school teachers, had the type of supervisory authority that would render them "appropriate persons" who could subject the School District to Title IX liability. *See Warren*, 278 F.3d at 173 (finding that even a guidance counselor who had sometimes assumed the duties of the principal when the principal was away was not "cloaked with sufficient authority" to be an "appropriate person" when the principal was present); *Does v. Se. Delco Sch. Dist.*, 272 F.Supp.3d 656, 688 (E.D. Pa. 2017) (noting that "there is no evidence to suggest that [school guidance counselor] ever assumed the duties of the principal or was otherwise vested with administrative control over the teaching faculty. Accordingly ... knowledge on her part would not suffice to create liability under Title IX"). Here, Plaintiffs have failed to present any evidence that Osenga and Del Gotto had any administrative authority over other teachers.

Contrary to teachers and low-level administrative staff, the Third Circuit has found that a school principal "who is entrusted with the responsibility and authority normally associated with that position will ordinarily be 'an appropriate person' under Title IX." *Warren*, 278 F.3d at 171. In this case, Principal Cross testified that her job duties included "oversee[ing] the functions of the building itself, the students and [her] staff from scheduling, teachers' schedules to students' schedules, perform[ing] observations and evaluations on

staff members, do[ing] the hiring of staff together with a committee, enrollment of students, course selections and placements of students together with our counselors and the assistant principal …." Doc. 215-5 (Cross Dep.) at 7. She further testified that when discipline issues arose, either she or the assistant principal would handle the issue and that the assistant principal had the authority to engage in, and make conclusions in, investigations without consulting her. *Id.* at 13, 20-21.

Because school officials and administrators' duties vary among school districts, "deciding who exercises substantial control for the purposes of Title IX liability is necessarily a fact-based inquiry." *Murrell v. Sch. Dist. No.1*, 186 F.3d 1238, 1247 (10th Cir. 1999). Here, there is sufficient evidence to create an issue of fact as to whether Bertanzetti was capable of taking corrective action on the school's behalf. According to Bertanzetti, his duties included overseeing the faculty and student body as well as student discipline, and "just about anything else that goes on during the day." Doc. 215-6 (Bertanzetti Dep.) at 5. He also investigated incidents and complaints to determine whether a school policy had been violated. *Id.* at 6. Bertanzetti's responsibilities, including investigating incidents relevant to the instant case, and his apparent authority to address these situations, create a factual question regarding his status as an "appropriate person."

Because there is sufficient evidence to create an issue of fact as to whether Cross, and in particular Bertanzetti, constitute an "appropriate person(s)," the issue becomes whether Cross and/or Bertanzetti had actual knowledge of Mattison's harassment of Bobbie

Jo or other female students at Warrior Run or that Mattison posed a "substantial danger" to other students at Warrior Run.

Assuming that Cross was an "appropriate person" pursuant to Title IX, no actual knowledge or notice can be attributed to her. As discussed above, Plaintiffs do not properly controvert the fact that Cross was unaware of any of Mattison's prior sexual history. See Doc. 216 ¶ 54 (Plaintiffs denying Defendants' statement of facts regarding Cross' lack of knowledge by incorporating by reference two other paragraphs in Plaintiffs' counterstatement of facts, neither of which cite to any portion of the record involving Cross). As this Court found in its previous memorandum opinion, nothing in the record contradicts Cross' deposition testimony that she was unaware of Mattison's sexual history. In fact, the parties appear to concede the issue by concentrating solely on Bertanzetti's knowledge in their respective briefs.

Accordingly, the only remaining issues in Plaintiffs' Title IX claim are whether Bertanzetti had actual knowledge of any peer-on-peer sexual harassment by Mattison, and if so, whether his actions, or lack of action, in addressing such harassment evinced a level of deliberate indifference on the part of the school district.

Here, there is some evidence in the record that may give rise to an inference that Bertanzetti was aware of certain parts of Mattison's sexual history. According to Mattison, when he "first started" at Warrior Run (in 10th grade), he informed Bertanzetti that there were rumors circulating at school about his "history," specifically his sexual history in prior

schools. Doc. 215-3 (Mattison Dep.) at 27-29. Mattison testified that Bertanzetti told him

that he would "take care of it" and that the rumors subsequently stopped. *Id.* at 29-30.

Bertanzetti, however, denied having such a conversation with Mattison. Doc. 215-6

(Bertanzetti Dep.) at 6-8. The only other evidence as to Bertanzetti's knowledge involved

an allegation of sexual misconduct between Mattison and another student, Sara Swartz,

which occurred a year before the Bobbie Jo incident. In that instance, the mother of Swartz

reported to Bertanzetti that Mattison asked Swartz if he could touch her. *Id.* at 7.

Bertanzetti investigated the report, determined that Mattison "had not done that ... and that

he wasn't talking about Sara at all"; he also determined that there was no evidence that

Mattison had physically touched Swartz. *Id.* at 8, 26. Bertanzetti did, however, take

preventative measures to keep the two students separated because they "were both getting

too close to each other." *Id.* at 26. This investigation is consistent with the Manifestation

Determination Review, which referenced the fact that "Duane has been under the watchful

eye of administration and teachers," that "DTA staff members have been made aware of

issues with Duane in school" and that "[d]uring the current school year, Mr. Weaver has

been invited to the school on more than one occasion to discuss issues and concerns with

Duane, specifically his inappropriate sexual tendencies." Doc. 215-8 at 2. *See also* Doc.

215-15 at 201 (Weaver's notes showing that he met with Bertanzetti at the beginning of

Mattison's twelfth grade to discuss a remark he made to a male peer about a female

student's breasts).

Despite these incidents, Bertanzetti also testified that prior to March 14, 2011, no teacher "knew of anything happening" between Mattison and Bobbie Jo; that other than what Bobbie Jo told him, he had no knowledge of any other inappropriate touching by Mattison of Bobbie Jo; and that he did not know why Mattison had previously left Warrior Run during his 11th grade year. Doc. 215-6 (Bertanzetti Dep.) at 11, 15, 18, 34.

Nonetheless, drawing all inferences in the light most favorable to the Plaintiffs, and assuming that Bertanzetti was an appropriate person with actual knowledge, Plaintiffs have fail to establish a genuine dispute of material fact as to the deliberate indifference element of their Title IX claim. For Plaintiffs to succeed on their Title IX claim and establish that the school was deliberately indifferent, there would have to be evidence in the record to demonstrate that Bertanzetti either knew that Mattison was a substantial danger to the other female students or knew that Mattison was sexual harassing Bobbie Jo or other students at Warrior Run, and took insufficient, or no, measures to attempt to remedy the situation.

Here, while there are differing accounts by Bertanzetti and Mattison about their conversation regarding the "rumor," there is nothing to suggest that Bertanzetti's actions in response to that conversation can sufficiently amount to deliberate indifference. As set forth in the facts section, Mattison did not recall telling Bertanzetti anything about his sexual history during this conversation. Doc. 215-3 (Mattison Dep.) at 29. However, Plaintiffs' counsel kept returning to this conversation during deposition. Over the objections of his counsel, Mattison gave additional, vague responses to Plaintiffs' counsel's questioning:

26

Q. And when you spoke with Mr. Bertanzetti about the rumor, he was aware of your prior instances of sexual touching; is that right?

A. Yes, because I had told him about the rumor.

Q. Okay. I think you told him about the rumor, but when you told him about the rumor, was he aware that you had this prior instances [*sic*] of touching?

A. Yes, sir.

Q. Okay. So he knew the rumor to be true?

A. I had sexual –

[Objections by counsel]

Q. You're allowed to answer. [Your counsel] is just being technical.

A. I'm confused. I mean –

[Objections by counsel]

Q. When you told Mr. Bertanzetti about the rumor, Mr. Bertanzetti knew that the rumor was actually true?

A. Yeah, because he questioned me about it and I trusted him enough to let him know my background.

Q. Okay. Before you told him -- is that how he found out about your background, when you told him about the rumor?

A. Yes, sir.

Q. And that was when you first came to school there in tenth grade?

A. Yes, sir.

*Id.* at 88-89. Mattison's testimony about what he told Bertanzetti was, at best, vague and unsupported by any other record evidence. At this point of the deposition, Mattison had

already testified that he did not recall anything else about the conversation besides the fact that he told Bertanzetti about the rumor and that Bertanzetti said "he's going to take care of it." *Id.* at 29. But only after repeated leading questions by counsel, Mattison agreed that Bertanzetti must have known the rumor was true because "I trusted [Bertanzetti] enough to let him know my background," without expounding on what he meant by "my background." *Id.* at 88-89. The Court is constrained to note that Mattison is mentally challenged. Doc. 204 ¶ 3; *see also* Doc. 215-11 (June 12, 2007 Psychiatric Report of Mattison, averring that he has an IQ of 66 and "observed to be very concrete, easily led, and an insecure individual"). Thus, counsel's insistent pressing regarding a conversation that occurred years prior, about which Mattison had already testified that he did not recall, is a highly questionable litigation tactic that does not appear to be designed to elicit any accurate evidence.

Further, assuming the conversation about the "rumor" indeed occurred, this discussion alone could not have obligated Bertanzetti to take any action with Mattison, such that his failure to respond "is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. First, the purported conversation occurred at least two years prior to the Bobbie Jo incident. Second, the conversation arose in the context of discussing a high school rumor about Mattison's "background". It did not put Bertanzetti on notice that Mattison engaged in any misconduct at Warrior Run. Nor can Mattison's testimony about the "rumor" support an argument that Bertanzetti acted with deliberate indifference by failing

to determine, based on this purported conversation alone, that as Plaintiffs argue "Mattison was a serial sex offender who was harassing females in his special needs class well prior to the March 14, 2011 incident", Doc. 215 at 16.[6]

In addition to the conversation between Mattison and Bertanzetti about the "rumor", the only other evidence relating to Bertanzetti's knowledge are (1) the accusation by Swartz

---

[6] The Third Circuit has explicitly rejected the notion that rumors alone are sufficient to establish notice. In analyzing whether a high school administration "knew or should have known of any danger of abuse at a time at which they could have acted to prevent [Plaintiff's] injuries" as required to establish supervisory liability under § 1983, the Court stated:

Johnson [Plaintiff] contends that even if the Administration was not aware of Stevens's [a high school guidance counselor] abuse of her, it can be held liable for failing to respond to the danger posed by Stevens's well-known proclivity for sexually harassing and abusing female students. In other words, Johnson attempts to demonstrate that the Administration had a custom of being deliberately indifferent to Stevens's potential for committing constitutional violations, and that this "deliberate indifference" was the proximate cause of the injuries she sustained. See Beck v. City of Pittsburgh, 89 F.3d 966, 973–74 (3d Cir. 1996); Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996).
As evidence of Stevens's proclivity for sexual harassment, Johnson brought forth various stories and rumors about Stevens walking too closely to female students in the hallway, frequently calling female students out of class to his office, and giving gifts to female students. Even if all of these allegations were true, however, Johnson presented no evidence that they were ever brought to the attention of a supervisory or policy-making official of the administration either before or during (or even after) the time of Stevens's alleged abuse of Johnson. *Moreover, even if school officials had been made aware of these stories before or during Stevens's alleged improper relationship with Johnson, we share the District Court's reluctance "to impose on the district an obligation to treat as true, all rumors, until proven otherwise." In the absence of any direct complaints made to school officials, the mere floating around of unsubstantiated rumors regarding a particular employee—particularly in the high school setting, which is notoriously rife with adolescent gossip—does not constitute the kind of notice for which a school district can be held liable under Monell's "policy or custom" requirement.*

Johnson v. Elk Lake Sch. Dist., 283 F.3d 138, 144 n.1 (3d Cir. 2002) (emphasis added). In light of the Third Circuit's reluctance to permit rumors to serve as a sufficient basis for finding that the appropriate person "knew or should have known of any danger of abuse", a lower standard than that for Title IX wherein the appropriate person must "know[] the underlying facts, indicating sufficiently substantial danger to students", see Bostic v. Smyrna Sch. Dist., 418 F.3d 355, 361 (3d Cir. 2005), mere rumors alone are insufficient to establish actual notice under Title IX, even assuming that Bertanzetti was aware of those rumors.

during Mattison's eleventh grade year, and (2) an incident in twelfth grade where Mattison made a remark to a male peer about a female student's breasts.

With respect to Swartz's accusation, it is undisputed that Bertanzetti conducted an investigation into this incident, the only previously reported incident of sexual misconduct against another student by Mattison at Warrior Run. Although Bertanzetti concluded that there was no proof that Mattison had inappropriately touched Swartz, Bertanzetti did conduct an investigation into the report, including talking to Mattison and Swartz, the classroom teacher and aid who were in the room, and "anybody else who was in the room that may have been there at the time", and ultimately implemented preventative measures to keep Swartz and Mattison separated. Doc. 215-6 (Bertanzetti Dep.) at 8, 25, 26. *See also*, Doc. 215-8 (Manifestation Determination), at 2 (noting that the school took corrective measures to ensure that Mattison was under the "watchful eye" of certain, unspecified administrators and teachers, and informed DTA of "issues with Duane in school").[7]

With respect to the inappropriate remark Mattison made during twelfth grade regarding a female student's breasts, the record indicates that Bertanzetti called and met with Alvin Weaver from DTA the same day that he learned of the incident, and both he and Weaver reprimanded Mattison for the inappropriate comment. Doc. 215-15 at 201.

---

[7] The Manifestation Determination report does not reflect what these "inappropriate sexual tendencies" consisted of, *i.e.* whether they merely involved inappropriate comments or actually involved sexually touching other students. However, the evidence in the record involving Mattison's conduct at Warrior Run prior to the Bobbie Jo incident consists solely of sexual comments.

While Bertanzetti's remedial measures did not ultimately prevent Mattison's harassment of Bobbie Jo, the fact that the appropriate person's initial response does not remedy or prevent the harassment, cannot provide sufficient grounds for liability. *See Baynard*, 268 F.3d at 236. Additionally, it is undisputed that the first time Bertanzetti, or any other teacher or administrator, was made aware of Mattison's harassment of Bobbie Jo was March 14, 2011. Doc. 204 ¶ 37. After learning of the incident, Bertanzetti took immediate action, resulting in Mattison's removal from school that same day. *Id.* ¶ 31. In short, Plaintiffs have not presented a triable issue of fact to establish deliberate indifference by the school district as to Mattison's peer-to-peer harassment of Bobbie Jo. *See Brooks v. City of Philadelphia*, 747 F. Supp. 2d 477, 483-84 (E.D. Pa. 2010) (finding no deliberate indifference under Title IX where two kindergarten boys had engaged in sexually inappropriate behavior on two separate occasions, since "there is absolutely no evidence that Tyler had sexually harassed other students or that the school was aware of any other harassment either before or after these incidents," and after the school became "aware that their initial attempts were not effective, the school district did not simply continue the same methods. Instead, the district complied with the Plaintiffs' request to transfer their son"). *Cf. S.K. v. N. Allegheny Sch. Dist.*, 168 F. Supp. 3d 786, 803 (W.D. Pa. 2016) (holding that plaintiffs sufficiently alleged deliberate indifference when school officials had actual knowledge of persistent, increasingly severe sexual harassment by students, and knew that "the initial measure of a verbal reprimand by [the school principal] had proved to be

ineffective," but "failed to impose any type of punishment that would deter the students from perpetuating the behavior," which then "escalated to the point where it essentially was open, notorious and prevalent and became 'its own sport' among certain of the school's athletes").

Finally, though Plaintiffs make much of Mattison's DTA therapy notes addressing his sexual fantasies, including those targeted at his peers in school, *see, e.g.,* Doc. 215 at 6-10, it is undisputed that Bertanzetti had no knowledge of the sexual desires revealed by Mattison during DTA's weekly therapy sessions. *See* Doc. 215-15 at 178-80 (Weaver testifying at his second deposition that DTA did not share "any treatment notes, plans, records of any kind with anyone from the Warrior Run School District or the teachers," including the newly available evidence from DTA's psychiatric file on Mattison, nor did anyone from DTA "discuss[] with anyone from Warrior Run School District – teachers, principals ... anything having to do with Mr. Mattison's care, treatment, and/or psychiatric/ sexual history"). *See also* Doc. 215-6 at 21 (Bertanzetti testifying that on the day of the Bobbie Jo incident, Weaver came to Warrior Run to remove Mattison from the school, but he did not "share any information about whether Duane had done anything like this in the past").

Because Plaintiffs cannot demonstrate that an appropriate person was deliberately indifferent so as to establish a cause of action under Title IX, the Court need not determine in this Count whether the discrimination or harassment of Bobbie Jo rises to the level of

"severe, pervasive, and objectively offensive" or effectively barred her access to an educational opportunity or benefit.

Summary judgment will thus be granted in favor of the School District on Count II.

## B. Count I – Section 504 of the Rehabilitation Act

Count I of the Second Amended Complaint alleges a violation of Section 504 of the Rehabilitation Act by the Warrior Run School District. Section 504 provides:

> No otherwise qualified individual with a disability in the United States … shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…

29 U.S.C. § 794(a). To establish a violation of Section 504, a plaintiff must show that "(1) [s]he is 'disabled' as defined by the Act; (2) [s]he is 'otherwise qualified' to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) [s]he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school." *Andrew M. v. Delaware Cnty. Office of Mental Health & Mental Retardation,* 490 F.3d 337, 350 (3d Cir. 2007) (quoting *Ridgewood Bd. of Educ. v. N.E.,* 172 F.3d 238, 253 (3d Cir.1999), *superseded by statute on other grounds as recognized by D.F. v. Collingswood Borough Bd. of Educ.,* 694 F.3d 488 (3d Cir. 2012)).[8]

As this Court stated in its previous opinion, although a showing of intentional discrimination

---

[8] Because neither party addresses each of the specific elements necessary to establish a Section 504 violation, other than the necessary level of discrimination, the Court will assume that the first three elements are not in dispute, specifically, that Bobbie Jo is disabled as defined by the Act, that she is otherwise qualified to participate in school activities, and that the school or the board of education receives federal financial assistance. Therefore, the only element at issue is whether Bobbie Jo was excluded from participation in, denied the benefit of, or subject to discrimination by, the school based on her disability.

is not a requisite to establishing a Section 504 claim in general, *see Ridgewood*, 172 F.3d at 253, the statutory language of the Act, which prohibits discrimination against a person "solely by reason of his or her disability" imposes a requisite causation element on a Section 504 claim. Specifically, a plaintiff must show that "[t]he state . . . failed to provide the service for the sole reason that the child is disabled." *Andrew M.*, 490 F.3d at 350.

Here, Plaintiffs blithely assert "the District knew [Bobbie Jo] was a sitting duck for this sexual predator [i.e. Mattison] who was repeatedly acting out in the classroom setting and, that her disability of mental retardation rendered her most vulnerable to his predations." Doc. 215 at 12. However, Plaintiffs have failed to point to any causal relationship between Bobbie Jo's disability and Mattison's misconduct towards her or shown that her disability affected the decisions of Warrior Run School District. Even assuming that one or more of the school defendants did know about Mattison's sexual misconduct history or his sexual propensities, Plaintiffs have failed to demonstrate how this knowledge in itself led to discrimination based on Bobbie Jo's disability. According to Mattison, his special education classes were held in three separate classrooms. Doc. 215-3 (Mattison Dep.) at 31-32. Mattison also testified that he had gym, drivers' education, and art with the "regular" students. Doc. 215-3 at 30. As the Court found in its previous opinion, there is no evidence that Mattison was not permitted to sit next to female students in his "regular" classes or that the school took extra precautions to protect students in regular classes but not students in special education classes. Similarly, there is no evidence that Mattison touched any other

student in his special education classes (other than the accusation by Swartz found to be without basis) or that any of the teachers or administrators were aware of his sexual advances towards Bobbie Jo or any other student in the special education classrooms. *See, e.g.,* Doc. 215-13 at 9-13 (Del Gotto testifying that she was not aware of any time when Mattison had acted inappropriately prior to the Bobbie Jo incident); Doc. 215-17 at 10, 21 (Osenga testifying that she had never heard any "rumors" about Mattison's sexual conduct, nor was she aware that Mattison had a prior history of sexual misconduct).

Thus, there is no record evidence that the School District discriminated against female students in special education classes in any way, nor is there evidence that the School took any actions based on the special education students' disabilities that rendered them more vulnerable to Mattison's potential sexual misconduct. There is no evidence to suggest that Bobbie Jo was treated differently than any other student, disabled or not.

Accordingly, the Court will grant School Defendants' motion for summary judgment on Plaintiffs' Section 504 Rehabilitation Act claim due to Plaintiffs' failure to present any evidence to create a factual dispute as to whether Bobbie Jo was discriminated against due to her disability.

## C. Count III – 42 U.S.C. § 1983

To succeed on a claim under 42 U.S.C. § 1983, the plaintiff must demonstrate a violation of a right protected by the Constitution or laws of the United States, committed by a person acting under color of state law. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (en

banc). In evaluating a Section 1983 claim, a Court must first "identify the exact contours of the underlying right said to have been violated." *Id.* (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). Here, Plaintiffs' claim rests on the substantive due process clause of the Fourteenth Amendment, alleging that Bobbie Jo was deprived of her right to bodily integrity. Doc. 77 ¶ 55.[9] "Liability under the state-created danger theory is predicated upon the states' affirmative acts which work to plaintiffs' detriments in terms of exposure to danger." *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1374 (3d Cir. 1992) (en banc).

To meet the requirements of a state-created danger claim, a plaintiff must show (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006); *Robinson v. Peirce*, 586 F. App'x. 831, 834 (3d Cir. 2014). As this Court previously stated in its prior opinion on summary

---

[9] In its previous opinion on Defendants' motion to dismiss, the Court found that Plaintiffs must proceed on a state created danger theory in order to maintain this claim. Doc. 50, at 8-10. Yet Plaintiffs continue to argue a special relationship theory in their brief in response to the instant motion. Doc. 215 at 22-23. Because the Court has already addressed, and dismissed, any argument that a special relationship can form the basis of Plaintiffs' § 1983 claim, it will not do so again here.

judgment, "[t]he first and fourth elements of a state-created danger test are so intertwined as to be capable of analysis together." Doc. 169 at 34. The analysis asks "whether a state actor's behavior constituted an affirmative act, and, if so, whether the affirmative act created a foreseeable opportunity for harm." *Bright*, 443 F.3d at 283 n.7 (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902 (3d Cir. 1997)). "To adequately plead foreseeability," there must be "an awareness on the part of the state actors that rises to level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 238 (3d Cir. 2008).

Here, Plaintiffs argue that the harm to Bobbie Jo was foreseeable because the School Defendants had knowledge of Mattison's propensity for sexual misconduct. To establish such knowledge, they point to the "Manifestation Determination, Mattison's testimony concerning his informing Bertanzetti of his sexually deviant past towards females, Weaver's testimony concerning interventions at the school regarding sexual abuse by Mattison and the content of the conversations involving Mattison's ongoing sexual deviancy to which Bertanzetti was privy, and even Bertanzetti's testimony concerning his knowledge of the allegations of abuse of [Swartz]." Doc. 215 at 21.

Once again, Plaintiffs make no specific argument as to Cross' knowledge of Mattison's sexual history or any risk he may have posed to other students. At best, as previously discussed, Cross admitted knowing about an investigation by Bertanzetti into the Swartz accusation, which did not find any misconduct on Mattison's part. *See* Doc. 215-5 at

12 (Cross testifying that she was aware of the accusation regarding Mattison and Swartz, that it was investigated by Bertanzetti, and that it was "founded [sic] untrue"). Furthermore, Cross did not even know that Mattison was associated with DTA or received psychiatric treatment from them prior to March 14, 2011, an assertion that has not been contradicted by any other deposition testimony or documentary evidence. *Id.* at 11, 27. Thus, Plaintiffs have failed to point to any evidence that could reasonably impute any knowledge to Cross that Mattison posed foreseeable harm to Bobbie Jo, or any other student at Warrior Run.

In addition, regardless of the extent of Cross' knowledge, Plaintiffs have not put forth any evidence demonstrating that Cross took any affirmative actions in a way that put Warrior Run students in danger or made them more vulnerable to danger. In their brief in opposition to summary judgment, Plaintiffs make an off-handed reference that "Cross and Bertenzetti [sic] plac[ed] Mattison in the special needs classrooms with [Bobbie Jo]." Doc. 215 at 22. However, Plaintiffs fail to support such a statement with any citations to the record. Moreover, the Court's independent review of the record has not uncovered any evidence that either Cross or Bertanzetti had any personal involvement in, or influence over, the decision to place Bobbie Jo in special education classes with Mattison. In fact, Plaintiffs admit that Bobbie Jo was placed in Warrior Run's special education and life skills program because "[Bobbie Jo] identified as having mental retardation," not because any school official affirmatively made a decision to place her there. Doc. 204 ¶ 2. The record further does not provide any evidence to support an assertion that Cross or Bertanzetti made the

affirmative decision to place Mattison in certain special education classes. In addition, it is undisputed that Mattison also suffers from mental retardation, rendering it necessary for him to attend certain special education courses. Summary judgment will therefore be granted to Cross on Plaintiffs' Section 1983 claim.

Similarly, as discussed above with respect to the Title IX claim's analysis, Plaintiffs have not come forward with sufficient evidence to establish knowledge, and therefore foreseeability, on the part of either Osenga or Del Gotto. *See* Doc. 215-13 at 9-13 (Del Gotto testifying that she was not aware of any time when Mattison had acted inappropriately prior to the Bobbie Jo incident; and that while she was told by another teacher that Mattison and Sara Swartz should not be seated next to each other, she was not told of the reason for this arrangement, and she simply assumed that it was because "Sara [Swartz] could be a little forward and that maybe, you know, something was going on between them."); Doc. 215-17 at 14, 19 (Osenga testifying that though she was vaguely aware "there was an issue with another girl [i.e. Swartz]" prior to the Bobbie Jo incident, all she knew was that Bertanzetti had led the investigation, during which Swartz admitted "nothing happened."); *id.* at 10, 21 (Osenga testifying that she has never heard any "rumors" about Mattison's sexual conduct, nor was she aware that Mattison had prior history of sexual misconduct). Furthermore, Plaintiffs' reliance on the Manifestation Determination report cannot support an argument that Del Gotto and Osenga knew about Mattison's sexual misconduct. The report states that "Duane has been under the watchful eye of administration and teachers"

and that "[d]uring the current school year, Mr. Weaver has been invited to the school on more than one occasion to discuss issues and concerns with Duane, specifically his inappropriate sexual tendencies." Doc. 215-8 at 2. However, the report's language is far too general to create an issue of fact as to Del Gotto and Osenga's knowledge. There is no indication that either teacher was involved in any of the meetings, investigations, or disciplinary decisions regarding Mattison. Further, the Manifestation Determination report does not state which teachers were told to watch Mattison, which teachers or administrators had concerns regarding Mattison's sexual tendencies, or even what these "sexual tendencies" consisted of, *i.e.* whether they consisted solely of sexually inappropriate comments or of more serious misconduct. There is also no evidence that Del Gotto or Osenga attended any meetings where Mattison's "inappropriate sexual tendencies" were discussed. Finally, it is undisputed that Bobbie Jo never told anyone, let alone Del Gotto or Osenga, of any sexual harassment by Mattison prior to March 14, 2011. Doc. 204 ¶ 37.

For the reasons set forth above, Plaintiffs have not put forth any evidence that would impute knowledge of Mattison's sexual history to Del Gotto or Osenga, or any evidence that would controvert their testimony that they had no such knowledge. Instead, Plaintiffs merely assert – without citation to the record – that "[a]s indicated in great depth in the Counterstatement of Facts and the 'Disputed Facts' Section of this Brief, Plaintiffs have produced evidence indicating that the District, Cross, Bertanzetti, Marino, Frantz-Fry, Del Gotto, and Osenga were all aware of her limitations, and of Mattison's compulsion to

sexually assault his female classmates." Doc. 215 at 12. Plaintiffs' counterstatement of facts and "disputed facts" section of the brief, however, rely heavily on newly disclosed DTA therapist notes and Weaver's second deposition regarding these notes. As previously discussed, none of the School Defendants, let alone Osenga and Del Gotto, had any access to, or knowledge of, the contents of Mattison's DTA therapy notes. Absent this knowledge, it would not be foreseeable to these defendants that seating Mattison near Bobbie Jo would create a risk for sexual misconduct. In other words, it cannot be said that the simple placement of students next to each other could cause foreseeable harm that a student would in fact inappropriately touch another, especially since neither Osenga nor Del Gotto had reason to believe that Mattison had a history of sexual misconduct. In short, there can be no liability on the part of Mattison's teachers when the evidence does not create a genuine dispute as to whether they had "actual knowledge or an awareness of risk that is sufficiently concrete to put [them] on notice" of potential harm to Bobbie Jo. *Phillips*, 515 F.3d at 238.

However, as noted in the analysis of the Title IX claim, there is a factual issue as to Bertanzetti's knowledge of Mattison's sexual history. Though the Swartz investigation concluded that the accusation against Mattison was unfounded, and though DTA did not share any treatment information with Bertanzetti, there remains an issue of fact as to what Mattison told Bertanzetti during their conversation about the "rumor" when Mattison first

arrived at Warrior Run in tenth grade. [10] Therefore, drawing all inferences in favor of the

Plaintiffs, and thus taking as true that Bertanzetti had some knowledge of Mattison's sexual

history, the Court must determine whether a material factual dispute exists as to whether

Bertanzetti affirmatively used his authority in a way that created a danger to Bobbie Jo, or

rendered her more vulnerable to danger, and if so, whether his affirmative action(s)

amounted to deliberate indifference.

> The line between where state action ends and inaction begins is a blurry one:

> > We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger . . . and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

*Ye v. United States*, 484 F.3d 634, 637 (3d Cir. 2007) (citing *Bowers v. DeVito*, 686 F.2d

616, 618 (7th Cir.1982)). In determining if a factual dispute existed with respect to whether

one or more defendants in this case exercised his or her authority to take affirmative action

that was the "but for" cause of the Bobbie Jo's injury, this Court's previous summary

---

[10] As for Mattison's more egregious conduct that occurred during his time at Warrior Run involving sexual abuse of a chicken at his host home in eleventh grade, it is undisputed that Bertanzetti had no knowledge of that incident. Doc. 215-15 (Weaver Dep.) at 138-39 (Weaver testifying that Warrior Run was not informed of the reason Mattison was removed from school in eleventh grade, because it did not have "anything to do with him presenting a danger to other students," but rather, involved an animal). Bertanzetti also testified that prior to March 14, 2011, no teacher "knew of anything happening" between Mattison and Bobbie Jo; that he had no knowledge of other inappropriate touching by Mattison of Bobbie Jo; and that he did not know why Mattison had previously left Warrior Run during his eleventh grade year. Doc. 215-15 at 11, 15, 18, 34. *See also* Doc. 215-15 at 178-80 (Weaver testifying at his second deposition that DTA did not share of Mattison's therapy treatment information, including Mattison's sexual fantasies, "with anyone from the Warrior Run School District or the teachers").

judgment opinion analyzed several Third Circuit cases that expounded upon the state created danger theory.

In *D.R.*, the Third Circuit found no liability in the absence of affirmative actions by school defendants. There, the school had allegedly been aware that two female high school students had been subject to verbal and physical sexual harassment by multiple male classmates over the course of several months in a class bathroom, but did nothing to intervene. *D.R.*, 972 F.2d at 1373. The Third Circuit "readily acknowledge[d] the apparent indefensible passivity of at least some school defendants under the circumstances," but determined that the plaintiffs had failed to show "that the school defendants either impermissibly limited the freedom of the plaintiffs to act on their own behalf, or barred their access to outside support. Nor do they demonstrate that defendants violated a constitutional duty by creating or exacerbating the danger posed by the student defendants." *Id.* *See also Bright*, 443 F.3d at 284, 292-93 (affirming the district court's dismissal of the complaint, when "what is alleged to have created a danger [in the complaint] was the failure of the defendants to utilize their state authority, not their utilization of it," and noting that "[i]t is *misuse* of state authority, rather than a failure to use it, that can violate the Due Process Clause").

By contrast, the Third Circuit found affirmative state action in *Kneipp*, where plaintiffs were stopped by the police on a wintery evening for causing a disturbance on a highway. *Kneipp v. Tedder*, 95 F.3d 1199, 1201 (3d Cir. 1996). Both appeared intoxicated, but the

police let the husband go home first because he had to care for the couple's infant. *Id.* at 1201-02. The police then released the wife in her heavily inebriated state to walk home alone. *Id.* at 1202. She was later found unconscious at the bottom of an embankment. *Id.* at 1203. Her exposure to the cold had caused anoxia, leading to permanent brain damage. *Id.* Unlike in *D.R.* and *Bright*, *Kneipp* found that the police had affirmatively acted to increase Samantha's risk of harm because the police "used their authority as police officers to create a dangerous situation or to make Samantha more vulnerable to danger had they not intervened." *Id.* at 1209. *See also Rivas v. City of Passaic*, 365 F.3d 181, 196 (3d Cir. 2004) (affirming denial of summary judgment because a jury could find that EMTs affirmatively misrepresented to police that plaintiff assaulted them, and then abandoned plaintiff to the police without warning the police that he was having a seizure and should not be restrained; the Court noted that if the EMTs misrepresented the assault to the police, then they would have "placed Mr. Rivas in greater danger by falsely accusing him of acting violently").

Based on the guidance above, this Court must conclude that this case provides yet another example of state inaction on the part of Bertanzetti. With respect to Bertanzetti, Plaintiffs only argue that he "affirmatively acted … [by] placing Mattison in the special needs classrooms with BJS." Doc. 215 at 22. This argument is without merit. Again, there is no evidence of record that Bertanzetti had any involvement in the decision to place Mattison in the special needs classrooms with Bobbie Jo – not only do Plaintiffs fail to cite to any part of

the record to support their assertion, but they also fail to devote any more argument to this assertion in their brief. Instead, at its core, Plaintiffs' brief turns on the argument that the School Defendants failed to "monitor[] [Mattison] around females" and that "it could be a contested material fact to be decided by the jury concerning whether this monitoring actually took place." *Id.* at 18. Such "failure to monitor" arguments amount to negligence at best and cannot be said to constitute any affirmative actions that led to Mattison's sexual misconduct. *See Brown v. Sch. Dist. of Philadelphia*, 456 F. App'x. 88, 91 (3d Cir. 2011) (holding that the *failure* of a school to provide supervision of a mentally handicapped student did not constitute an affirmative act, though Plaintiff contended "that school officials affirmatively promised to provide her with one-on-one adult supervision and that she and her family relied on that promise in continuing to send her to school … the crux of that argument is that the school promised and then failed to provide her with the supervision. We agree with the District Court that this is not an affirmative act. The same is true regarding the School District's failure to expel or appropriately punish violent students"); *D.R.*, 972 F.2d at 1374 (finding no liability when two female students were sexually molested by male students in a classroom bathroom, and noting that at most, the school "'acts' in assigning an inexperienced student teacher to the class … as well as their failure to put a stop to the non-sexual pandemonium may have created a recognizable risk that plaintiffs would receive little education in that class, and perhaps, physical injury due to the roughhousing. Plaintiffs did not suffer harm, however, from that kind of foreseeable risk. Plaintiffs' harm came about

45

solely through the acts of private persons without the level of intermingling of state conduct

with private violence that supported liability...") (internal citation omitted); *Morrow*, 719 F.3d

at 178 (affirming district court's dismissal of state created danger claim and holding that

failure to expel student who was known to bully others did not constitute an affirmative act).

In *Nace v. Pennridge School District*, a recent Third Circuit case, the Court affirmed

dismissal of a state created danger claim on summary judgment where a basketball coach,

Romig, had sexually abused a student, noting that "Romig had cleared a background check,

had begun coaching at Pennridge without any complaints, and was reported to be a good

coach based on [the school director's] prior experience supervising him at [a prior school]."

*Nace v. Pennridge Sch. Dist.*, -- F. App'x. --, 2018 WL 3737960, at *6 (3d Cir. Aug. 6, 2018).

There, the evidence revealed that "Romig had been accused of improper sexual texting with

[another student] over two years earlier while at [a previous school]," however, Romig's

supervisor "was told only that Romig had an 'issue with texting'" and the supervisor "did not

ask any follow-up questions, and he and [school principal] decided not to investigate

further." *Id.* Finding such evidence insufficient to show that "(1) [the school] disregarded

actual knowledge that Romig would sexually assault a student or (2) Romig posed a plainly

obvious risk that should have been known," the Third Circuit held that "the District Court

correctly granted summary judgment to [School] Defendants on [plaintiff's] state-created

danger claim." *Id.* at *7.

In this case, Bertanzetti's failure to "monitor[] [Mattison] around females" cannot be reasonably categorized as an affirmative act. Doc. 215 at 18. This is especially true where, as here, the record shows that Bertanzetti promptly acted to investigate, remedy, and protect students against sexual harassment whenever an accusation or problem involving Mattison arose. In other words, the only evidence of Bertanzetti's knowledge of Mattison's sexual misconduct is that (1) he had a vague conversation with Mattison about a "rumor" about Mattison in tenth grade; (2) he had investigated an accusation by Swartz in Mattison's eleventh grade year; and (3) there was an incident where Mattison talked to a male peer about a female student's breasts at the beginning of his twelfth grade year. It is undisputed that Bertanzetti took immediate action in investigating the latter two incidents. With respect to the Swartz accusation, after an investigation, Bertanzetti determined the accusation to be unfounded. Nevertheless, after learning from a teacher that Swartz and Mattison were "both getting too close to each other," Bertanzetti implemented "protective measures to keep them separated." Doc. 215-6 at 25. With respect to the comment Mattison made in twelfth grade, Bertanzetti arranged a same day meeting with Mattison and Weaver wherein Mattison was verbally reprimanded for his behavior. *See, e.g.,* Doc. 215-15 at 201 (Weaver's notes reflecting that Bertanzetti called him for a meeting because Mattison had been "talking to a male peer about a girl and made a comment about touching her breasts" and that Mattison was reprimanded for the comment). Bertanzetti also took immediate action after learning of the Bobbie Jo incident, including informing DTA and removing

Mattison from school the same afternoon. Doc. 204 ¶ 31; *see also id.* ¶ 37 (noting that the first time Bertanzetti, or any other teacher or administrator, was made aware of Mattison's harassment of Bobbie Jo was March 14, 2011, the day that Mattison was expelled). In sum, the record does not support Plaintiffs' assertion that Bertanzetti "took no action to protect the other females in the classroom whatever, including [Bobbie Jo]." Doc. 215 at 18. Instead, the evidence reveals that Bertanzetti took reasonable actions to address such incidents every time he was made aware of them.

As for the conversation about the "rumor" regarding Mattison, as stated in the Title IX analysis, it is undisputed that the conversation about the rumor primarily revolved around Mattison's frustration upon learning about an unsavory rumor about *himself*; there is no evidence that the conversation revealed any sexual misconduct by Mattison at Warrior Run that would have warranted investigation by Bertanzetti. In any case, any affirmative, enhanced "monitoring" efforts that Plaintiffs believe should have been taken but were not, would at most constitute a failure to act by Bertanzetti, not an affirmative action on his part. Plaintiffs' argument in opposition to summary judgment is only an accusation that Bertanzetti *failed* to monitor Mattison more closely because the conversation about the "rumor" approximately two years earlier should have in some way put Bertanzetti on notice that Mattison was a substantial risk to female students. Putting aside the attenuated causal

connection of such an argument, this "failure to act" on the part of Bertanzetti cannot be

used to show an affirmative misuse of state authority.[11]

---

[11] Having found that Osenga and Del Gotto did not have knowledge of Mattison's past sexual history, and it was thus not foreseeable to them that Bobbi Jo may be a victim of Mattison or that Bobbi Jo was at risk of harm, the Court need not address the affirmative action requirement as to these Defendants. Nonetheless, the Court reiterates its analysis in the prior summary judgment opinion:

> The only affirmative action that can be said to be at issue here is the seating placement of Mattison by Del Gotto and Osenga in the classrooms. Osenga did not seat Mattison next to Bobbie Jo, and any affirmative action on her part, even if she did have knowledge of Mattison's sexual history, can therefore not be said to have made Bobbie Jo more vulnerable to the harm Mattison may have caused.
> While Bobbie Jo and Mattison were seated near each other in Del Gotto's class, this is insufficient in itself to establish that Del Gotto created a dangerous situation for Bobbie Jo or made her more vulnerable to danger than had these two students not been seated near each other. The fact that Mattison was seated directly behind Bobbie Jo cannot be said on the record evidence to be the catalyst for Mattison's sexual touching of her or that "but for" this proximity of seating, he would not have acted on his sexual impulse to do so. According to Ms. Swanger, Bobbie Jo informed her that Mattison had once touched her in Osenga's class (Dep. of Elaine Swanger, at 39), a class in which Mattison and Bobbie Jo were not seated near each other, thereby indicating that Mattison's seat placement did not necessarily play a role in his decision to touch Bobbie Jo. Nor is there any other evidence that Mattison chose to act sexually inappropriately towards Bobbie Jo simply because she was the person sitting near him. The only other allegation against Del Gotto merely amounts to a failure on her part to act, specifically, to "[]effectively monitor him" (Doc. 163, at 13).
> Thus, an examination of the facts in evidence produced during discovery shows that at most, Del Gotto did nothing to prevent Bobbie Jo's injuries from occurring. The only arguably affirmative action that took place was Del Gotto's placement of Bobbie Jo near Mattison in her class. Though Del Gotto's presumed placement of Bobbie Jo near Mattison may be deemed to meet an expansive definition of an affirmative act, Del Gotto can just as easily be characterized as having engaged in a failure to use her authority to seat Mattison elsewhere in the classroom, a failure that does not constitute the requisite affirmative act for the imposition of liability under a state created danger theory.
> With respect to Del Gotto's alleged failure to constantly monitor Mattison, this amounts to negligence at best and cannot be said to constitute an affirmative action that led to Mattison's sexual misconduct. See Brown v. Sch. Dist. of Philadelphia, 456 Fed.Appx. 88, 91 (3d Cir. 2011) (the failure of a school to provide supervision of a mentally handicapped student after she had previously allegedly been propositioned by another student and hit in the head, even after promising the parents that it would do so, does not constitute an affirmative act by the school or its employees for purposes of establishing § 1983 liability).

Further, neither Bertanzetti nor any other school defendant did anything to restrict either Bobbie Jo's freedom or her parents' freedom. The Court in *D.R. by L.R.* determined there was insufficient evidence that "the school defendants either impermissibly limited the freedom of the plaintiffs to act on their own behalf, or barred their access to outside support." 972 F.2d at 1376; *see also Brown v. Grabowski*, 922 F.2d 1097, 1116 (3d Cir. 1990). The same applies to the situation here. Plaintiffs do not contend that Bobbie Jo was prohibited from moving seats or that she ever asked to move seats and there is no evidence that Bobbie Jo ever told anyone of any sexual misconduct by Mattison prior to March 14, 2011.

Finally, assuming *arguendo* that Plaintiffs could establish that the School Defendants took any affirmative action that created a danger to Bobbie Jo or rendered her more vulnerable to danger, and assuming that the resulting harm to Bobbie Jo was foreseeable and fairly direct, no reasonable factfinder could find that the School Defendants' actions were so "deliberately indifferent" that they would shock the conscience. As the Court noted in its previous summary judgment opinion, the Third Circuit adopts a sliding scale approach for the conscience-shocking element of the state created danger theory, explaining that "the state actor's behavior must always shock the conscience. But what is required to meet the conscience-shocking level will depend upon the circumstances of each case, particularly the extent to which deliberation is possible." *Sanford v. Stiles*, 456 F.3d 298, 310 (3d Cir. 2006).

---

Doc. 168 at 42-44. Thus, even if the Court were to find an issue of fact as to Osenga and/or Del Gotto's knowledge of Mattison's past sexual misconduct, summary judgment remains proper as to these defendants.

The level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases. In a hyperpressurized environment, an intent to cause harm is usually required. On the other hand, in cases where deliberation is possible and officials have the time to make unhurried judgments, deliberate indifference is sufficient .... We also recognize that there are circumstances involving something less urgent than a split-second decision but more urgent than an unhurried judgment. Generally, this category will include situations in which the state actor is required to act in a matter of hours or minutes .... [In those circumstances,] the defendants [must] disregard a great risk of serious harm.

*Id.* at 309-10 (internal quotation marks and citations omitted). *See also, Chainey v. Street,* 523 F.3d 200, 219-220 (3d. Cir. 2008) ("Deprivation [of a protected interest] violates due process only when it shocks the conscience, which encompasses only the most egregious official conduct. . . . While the meaning of the [shocks the conscience] standard varies depending upon factual context, merely alleging an improper motive is insufficient, even where the motive is unrelated to the merits of the underlying decision.") (internal citations and quotations omitted). The Third Circuit summarized the levels necessary to establish conscience shocking behavior as follows: (1) deliberate indifference; (2) gross negligence or arbitrariness that indeed shocks the conscience; or (3) intent to cause harm. *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 241 (3d Cir. 2008).

Here, Plaintiffs' entire case revolves around the theory that Warrior Run's teachers and administrators knew about Mattison's issues and the risks he posed to the other students for a significant period of time, yet failed to take any action. Because this argument is clearly based on a theory that deliberation was possible and the teachers and

administrators had time to make "unhurried judgments", a deliberate indifference standard is appropriate in this case.

For the same reasons set forth in the analysis of the Title IX claim, Plaintiffs fail to establish that any of the Defendants were deliberately indifferent to Bobbie Jo's needs by "consciously disregard[ing] a substantial risk of serious harm" posed by Mattison. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 427 (3d Cir. 2006) (quoting *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 65 (3d Cir. 2002)) (internal quotation marks omitted). As set forth in the analysis of the Title IX claim, the only defendant who arguably had any knowledge of Mattison's "propensity" for sexual misconduct was Bertanzetti, who took some action to remedy and address every specific situation each time he was made aware of an issue with Mattison. Furthermore, it is undisputed that Bertanzetti did not know of any inappropriate sexual contact between Mattison and any student at Warrior Run prior to the Bobbie Jo incident in March, 2011.[12]

None of the individual school defendants' conduct, in light of the circumstances known to them, can be reasonably found to be conscience shocking, nor do their *affirmative*

---

[12] In the context of a state created danger claim, the Third Circuit has "describe[d] deliberate indifference as requiring 'that a person consciously disregard a substantial risk of serious harm'", *Kaucher,* 455 F.3d at 427 (quoting *Ziccardi v. City of Philadelphia,* 288 F.3d 57, 65 (3d Cir. 2002)) (internal quotation marks omitted), but has found that "actual knowledge" is not required to satisfy the deliberate indifference culpability standard, *see Phillips,* 515 F.3d at 242 ("Our test for whether a plaintiff has alleged that an action 'shocks the conscience' does not contain a requirement that the actor know his or her actions are 'conscience-shocking.'"). Rather, the state actor's conduct "must evince a willingness to ignore a foreseeable danger or risk." *Morse,* 132 F.3d at 910. Although it is not required that Defendants know their behavior is conscience shocking, Plaintiffs have not demonstrated a triable issue of fact as to any of the defendants' willingness to ignore a foreseeable danger.

actions, if any, bear "a direct causal relationship" to "foreseeable and fairly direct" harm suffered by Bobbie Jo, such that she was rendered "more vulnerable to danger than had the [School Defendants] not acted at all." *Id.* at 431-32.

Therefore, the Court will grant the individual school defendants' motion for summary judgment because Plaintiffs have not demonstrated a triable issue of fact with respect to their state-created danger claim under the difficult and stringent standard which must be met to show a violation of an individual's substantive due process rights.

## D. Count IV – Breach of Fiduciary Duty

Plaintiffs bring a breach of fiduciary duty claim against the individual School Defendants, based on the broad allegations that these defendants owed "Bobbie Jo Swanger[] a duty to use reasonable care in carrying out their duties" and that they "willfully failed to provide Bobbie Jo Swanger with an environment that is reasonably safe from the intentional harmful acts of other students." Doc. 77 ¶¶ 62-63. Defendants contend that they are immune from suit with respect to this claim under the Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat. Ann. § 8541 *et seq.* ("PSTCA"). Doc. 205 at 19-20.

Pursuant to the Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat. Ann. § 8541 *et seq.* ("PSTCA"), a local agency cannot be held "liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. Cons. Stat. Ann. § 8541. The Act provides for eight exceptions to this rule: (1) vehicle liability; (2) care, custody or control of personal property;

53

(3) real property; (4) trees, traffic controls and street lighting; (5) utility services facilities; (6)

streets; (7) sidewalks; and (8) care, custody or control of animals. 42 Pa. Cons. Stat. Ann. §

8542(b). Additionally,

> "[m]unicipal *employees,* including school district employees, are generally
> immune from liability to the same extent as their employing agency, so long
> as the act committed was within the scope of the employee's employment. 42
> Pa. Cons.Stat. § 8545. However, there is an exception to this general rule:
> Employees are not immune from liability under § 8545 where their conduct
> amounts to 'actual malice' or 'willful misconduct'".

*Sanford*, 456 F.3d at 315. The Pennsylvania Supreme Court has recognized willful

misconduct as requiring a demanding level of fault. *Id.* "Willful misconduct has been

defined by the Pennsylvania Supreme Court as 'conduct whereby the actor desired to bring

about the result that followed or at least was aware that it was substantially certain to follow,

so that such desire can be implied.'" *Id.* (quoting *Renk v. City of Pittsburgh,* 641 A.2d 289,

293 (Pa. 1994)). "[E]ven where a public employee acts with a degree of culpability

equivalent to "recklessness," Pennsylvania law nevertheless affords him immunity." *Bright*,

443 F.3d at 287 (finding that defendants were entitled to immunity when "Bright does not

allege that the individual state defendants desired to bring about harm to Annette Bright (or

to her sister) or that they were aware that such harm 'was substantially certain to follow" and

that even "[a]ssuming *arguendo* that a reasonable jury could infer such culpability from

[allegations of deliberate indifference], the individual state-actor defendants would still not

have engaged in 'willful' misconduct and would still be entitled to immunity").

It is undisputed that none of the eight exceptions to the PSTCA apply here. Thus, Plaintiffs must have presented evidence to create a material factual dispute as to whether the individual school defendants' conduct could amount to actual malice or willful misconduct. As discussed throughout this opinion, there is insufficient evidence upon which a reasonable jury could find actual malice or willful misconduct on the part of any of the individual school defendants. Therefore summary judgment will be granted in favor of Cross, Bertanzetti, Del Gotto, and Osenga on Plaintiffs' breach of fiduciary duty claim.[13]

## V. Conclusion

For the foregoing reasons, the Court will grant the School Defendants' motion for summary judgment. Doc. 202. A separate Order follows.

Robert D. Mariani
United States District Judge

---

[13] The individual school defendants also argue that they are entitled to absolute immunity with respect to Counts III and IV pursuant to the Paul D. Coverdell Teacher Protection Act, and that the request for punitive damages in Counts III and IV must be dismissed against them. Doc. 205 at 14-15, 20-22. The Court need not reach these arguments, as summary judgment will be granted to the School Defendants on other grounds.