# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ELAINE AND VICTOR SWANGER,　　　：
as parents and legal guardians of　：
B.J.S., and B.J.S.,　　　　　　　：
　　　　　　　　　　　　　　　：
　　　　　　　　Plaintiffs,　　　：
　　　　v.　　　　　　　　　　：　　4:11-CV-894
　　　　　　　　　　　　　　　：　　(JUDGE MARIANI)
WARRIOR RUN　　　　　　　　：
SCHOOL DISTRICT, et al.,　　　　：
　　　　　　　　　　　　　　　：
　　　　　　　　Defendants.　　 ：

## MEMORANDUM OPINION

### I. INTRODUCTION

This is an action arising from an inappropriate sexual touching incident between two mentally challenged high school students. Elaine and Victor Swanger, parents of Plaintiff Bobbie Jo Swanger, sued Defendant Duane Mattison, a student in Bobbie Jo's special education class, for inappropriately touching their daughter in her private areas; his school district and school officials and teachers; and a nonprofit organization that provided psychiatric treatment to Mattison. Presently before the Court is a renewed Motion for Summary Judgment by Defendants Diversified Treatment Alternatives ("DTA") and Alvin Weaver (collectively "Mental Health Defendants"). Doc. 198. Defendants Warrior Run School District, Patricia Cross, Douglas Bertanzetti, Tammy Osenga, and Cynthia Del Gotto (collectively "School Defendants") also moved for summary judgment, which will be addressed in a separate opinion. Doc. 202.

1

The operative Complaint in this case is the Second Amended Complaint, which sets

forth nine counts: (1) violation of Section 504 of the Rehabilitation Act of 1973; (2) violation

of Title IX of the Education Amendments of 1972; (3) violation of substantive due process

rights under 42 U.S.C. § 1983; and (4) breach of fiduciary duty, all against the School

Defendants; (5) assault , (6) battery, and (7) intentional infliction of emotional distress, all

against Mattison; and (8) negligence and (9) violation of substantive due process rights

under 42 U.S.C. § 1983, all against the Mental Health Defendants. Doc. 77. The relevant

issues in this motion were first briefed in Mental Health Defendants' original motion for

summary judgment, which this Court granted on September 30, 2015. Doc. 171.

On appeal, the Third Circuit vacated the Court's judgment without reaching the

merits of the Court's summary judgment opinion, and instead instructed that the Court

should assess "whether federal courts should recognize the [Pennsylvania's Mental Health

Procedures Act] broader protections as a federal privilege," and whether, in light of such

assessment, the Court should allow the disclosure of DTA's psychiatric treatment records of

Mattison prior to adjudicating any further dispositive motions. *Swanger v. Warrior Run Sch.

Dist.*, 659 F. App'x 120, 125 (3d Cir. 2016). However, the Third Circuit's instruction was

largely rendered moot on remand, as Defendant Mattison waived his privilege to his

psychiatric records. The disclosure of these records supplemented the parties' original

record for summary judgment, and the Defendants filed renewed motions for summary

judgment, arguing that none of the new evidence should prevent the Court from granting

summary judgment again in their favor. Thus, the task before the Court is to determine to what extent, if any, its previous summary judgment opinions are impacted by the newly available evidence. For the reasons that follow, the Court will grant Mental Health Defendants' Motion for Summary Judgment in part and deny it in part.

## II. STATEMENT OF UNDISPUTED FACTS

In accordance with Local Rule 56.1, the Mental Health Defendants have submitted a Statement of Material Facts in Support of their Motion for Summary Judgment as to which they submit there is no genuine issue or dispute for trial. Doc. 200. Plaintiffs have submitted their response, a Counter Statement of Facts. Doc. 210. The following facts are not reasonably in dispute except as otherwise noted.

Elaine Swanger and Victor Swanger are parents of Plaintiff Bobbie Jo Swanger, who was a mentally challenged student at Warrior Run School District in its special education and life skills program. Doc. 200, ¶¶ 1, 2. Defendant Duane Mattison was also a student in Warrior Run's special education and life skills program, and under the legal and physical custody of the Tioga County, Pennsylvania Department of Human Services. *Id.* at ¶ 3. Defendant DTA is a Pennsylvania non-profit organization that provides individualized psychiatric treatment programs for at-risk adolescent males. *Id.* at ¶ 8.[1] DTA is licensed by

---

[1] Though Plaintiffs purport to "deny" this statement of fact, their only explanation for the "denial" is that "[i]n the context of this case, DTA provides counseling and placement for adjudicated delinquent and/or dependent youth who are primarily referred to DTA by county children and youth or juvenile probation." Doc. 210 ¶ 8 (internal quotation marks omitted). The Court fails to see how this "denial" controverts the statement that DTA is a non-profit organization that provides psychiatric treatment for adolescent males. This is simply one of numerous examples where Plaintiffs purport to "deny" statements of facts without

3

the Pennsylvania Department of Public Welfare Office of Mental Health and Substance Abuse Services and the Office of Children and Youth Families. *Id.* ¶ 9. Defendant Alvin Weaver is a mental health professional in DTA's Community Residential Rehabilitation program where he is "part of a treatment team that provides counseling to post-traumatized individuals." Doc. 210-2 (First Weaver Dep.), at 6-7. Weaver was Duane Mattison's "mental health professional and case manager" during part of Mattison's treatment period at the DTA. Doc. 210-1 (Diggan Dep.) at 15.

Adolescent males are typically referred to DTA for treatment by county Children & Youth Services Departments, Juvenile Probation Departments, or Mental Health Mental Retardation Services programs. Doc. 200 ¶ 13; *see also* Doc. 210 ¶ 13. Once a patient has met certain treatment milestones and has demonstrated awareness of DTA's program and rules and expectations, the patient is eligible to transfer to the Montour Learning Center, DTA's "second home" for continued treatment. *Id.* ¶ 15. At this Learning Center, adolescents continue their treatment with DTA staff on relapse prevention plans and other goals that the adolescent needs to accomplish before becoming eligible for post-placement. *Id.* ¶ 16. Once a patient successfully completes DTA's residential treatment programs and is eligible for post-placement, the adolescent may return to his family, transition to an independent living environment with the assistance of DTA, or be placed with a foster care family through DTA's foster care program or other agency. *Id.* ¶ 18. While in DTA's foster

challenging the statements' truthfulness or citing to proper portions of the record for support. All such "denials" will be deemed as admitted by the Court, and Plaintiffs' counsel are on notice that such practice will not be countenanced by the Court in the future.

4

care program, the adolescent continues to undergo weekly individual and group therapy sessions and periodic psychiatric evaluations. *Id.* ¶ 19; *see also* Doc. 210 ¶ 19.

In May 2007, Tioga County's Court of Common Pleas adjudged Mattison as a "Dependent Child" in need of treatment, supervision, and/or rehabilitation pursuant to Pennsylvania's Juvenile Act, and ordered that Mattison be placed in the custody of the Tioga County Human Services Agency. *Id.* ¶ 26. The Court also ordered the Laurel Youth Services Diagnostic Unit to conduct a diagnostic evaluation, which concluded that Mattison was in need of treatment and recommended that he be enrolled in DTA's residential treatment program. *Id.* ¶¶ 26-27. In a Tioga County Department of Human Services report issued a month later, the Department set forth several specific concerns based on Mattison's history both as a victim of sexual abuse and a perpetuator of sexual misconduct:

> Duane Mattison was accepted for services when he and his mother moved back into the area. Duane had been attending sexual abuse therapy but his mother had discontinued the therapy ... Duane was caught at school having sexual relations with another boy. Duane was caught inappropriately touching several girl's behinds in his classroom ... [Mattison's then school, Williamson High School] wanted Duane gone. [It was] decided that Duane should go to DTA ... the Diagnostic team decided that Duane should be sent to a place for Sexual Offenders and Sexual Abuse. However, Duane's IQ is 66 and the team is concerned that Duane will not understand the program. DTA is going to Interview Duane tomorrow.

Doc. 201-19 (Tioga County Department of Human Services, June 20, 2007 Report) at 2.

The Report then recommended that Mattison stay at Laurel Youth Services "until opening at DTA" and that the team would set up a "[t]ransition to DTA foster home if Duane cannot stay at Laurel." *Id.* In May 2007, Mattison entered DTA's residential treatment program. *Id.* ¶

5

28. After some time, Mattison was transferred to DTA's second home at the Montour Learning Center. *Id.* at ¶ 29; *see also* Doc. 210 ¶ 29. Kristen Powell, Mattison's caseworker at the Montour Learning Center, testified that she was not aware of any problems with him acting out sexually during his treatment at the Center. Doc. 210-4 at 11. Michael Jones, DTA's Administrative Coordinator at the Center, testified that "Duane had demonstrated no sexually inappropriate behavior within the residential treatment component [at the Center]," which spanned a period of two years. Doc. 200 ¶ 32. Finally, Mattison himself also testified that no incidents occurred while he lived at DTA. *Id.* ¶ 33.

In February 2009, Mattison graduated from the Montour Learning Center and was placed in the foster home of Pat and Bob Baier. *Id.* ¶ 34. Soon thereafter, Mattison began attending Warrior Run High School during his tenth grade year. *Id.* ¶ 39. At the beginning of Mattison's eleventh grade year, Warrior Run conducted an investigation after a female student, Sara Swartz, accused Mattison of asking her "if he could touch her breasts." Doc. 210-6 (Bertanzetti Dep.) at 7. After interviewing both Mattison and Swartz, as well as other students who had been in the room at the time, the school concluded that Mattison "had not done that. He hadn't asked to touch her inappropriately ... he was talking with other boys and that he wasn't talking about Sara at all. And that was backed up by one of the other boys in the classroom." *Id.* at 8. DTA was made aware of this accusation. Doc. 210-12 (Second Weaver Dep.) at 195. However, less than two months later, in November 2009, DTA removed Mattison from Warrior Run High School and placed him back in alternative

education "after he had sexual contact with a chicken at the Host Home." Doc. 210-9 (October 25, 2010 DTA Psychological Evaluation) at 4. After completing his eleventh grade in the alternative education program, and because he "did not exhibit any additional sexual acting out behaviors after [November 2009]", DTA suggested that "[Mattison] should be given the opportunity to attend public school for his 12th grade year." *Id.* Thus, Mattison was re-enrolled at Warrior Run High School for his twelfth grade year.

There is a disputed issue of fact as to whether—and to what extent—DTA was involved in the re-enrollment process of Mattison into Warrior Run. Defendants contend that "[n]either DTA, nor its employees were directly involved in Mattison's enrollment at Warrior Run." Doc. 200 ¶ 36. In support, Defendants point to the deposition of Jones, DTA's administrative coordinator, who testified that "[g]enerally [the enrollment process] is for parents and for foster parents," and that he was not personally involved in Mattison's school placement. Doc. 210-12 (Jones Dep.) at 12, 15. Defendants also point to the testimony of Shelly Diggan, the clinical coordinator for the specialized foster care program at DTA, who testified that "[t]ypically the foster parents are responsible for the enrollment [into public school] but what [DTA] will provide is what they refer to as a letter of intent. Just basically stating the client's name, what grade they're going to be entering into, whether or not they [need] learning support or regular mainstream education...if we have obtained any educational records, we will forward those as well and put those with a packet for the foster parents to do the enrollment process." Doc. 210-1 (Diggan Dep.) at 12-13. Finally,

7

Defendants rely on the testimony of Kristen Powell, Mattison's caseworker at DTA's Montour Learning Center, who testified that while teachers at the Center would typically communicate with the public school to get the student "set up and enrolled to attend," she was "never involved in that enrollment process." Doc. 201-11 (Powell Dep. at 9).

Plaintiffs, however, contend that DTA played an active and instrumental role in re-enrolling Mattison at Warrior Run in twelfth grade. Plaintiffs point to an "Act 30 admittance form," which was a requisite form for Mattison's enrollment process, that appears to be signed by both his foster parent and by Shelly Gira, an employee at DTA, affirming that Mattison has not previously been suspended or expelled from a public school "for an act or offense involving weapons, alcohol or drugs or for the willful infliction of injury to another person or for any act of violence committed on school property...." Doc. 201-5 (Cross Dep. Ex. 1) at 5. Plaintiffs also aver that Weaver signed certain papers at Warrior Run as Mattison's "Parent/Guardian/Surrogate." Doc. 210-8 at 5, 8. In short, the parties dispute how significant a role DTA played in Mattison's re-enrollment at Warrior Run.

Shortly after Mattison was re-enrolled in twelfth grade, Weaver was called to Warrior Run for a meeting because Mattison had been "talking to a male peer about a girl and made a comment about touching her breasts." Doc. 210-12 at 201. Both Doug Bertanzetti, Warrior Run's vice-principal, and Alvin Weaver talked to Mattison about the wrongful nature of his comment, telling him that it was "sexually inappropriate and offensive." *Id.* Though Weaver admonished Mattison for this incident, he privately noted in his therapy notes that

8

this is "a step in the right direction. Meaning that this was a conversation about an age appropriate female with whom he has interacted, it was not a deviant fantasy about an animal, and he did not act out against her sexually." *Id.* at 201.

Approximately six months later, on March 14, 2011, the incident that precipitated this lawsuit occurred between Mattison and Bobbie Jo in their English class. Doc. 200 ¶ 40. Mattison, seated in the desk immediately behind Bobbie Jo, admitted at his deposition that he reached around his desk and touched her private areas. *Id.* ¶ 41; *see also* Doc. 210-3 (Mattison Dep.) at 57-58, 63 (testifying that he "asked [Bobbie Jo] if [he] could put [his] hand up her shirt and feel her breast and she had shook her head yes . . . and asked her if [he] could put [his] finger in her vagina, she shook her head yes" and that he had also asked Bobbie Jo "to suck [his] penis" on this occasion). Nathan Neidig, another student seated behind Mattison, testified that he saw that Mattison had his hand down Bobbie Jo's pants. *Id.* ¶ 42. After class, Neidig reported what he had witnessed to their teacher, Defendant Del Grotto. *Id.* ¶ 43. Del Gotto testified that she and Trish Marino, another teacher at Warrior Run, then asked Bobbie Jo to show them what happened between her and Mattison. *Id.* ¶ 44. The incident was then reported to Bertanzetti, who met with Mattison, and Mattison admitted that he put his hand up Bobbie Jo's shirt. *Id.* ¶¶ 45, 46. Mattison was removed from Warrior Run High School that afternoon. *Id.* ¶ 47; Doc. 210 ¶ 47. According to a report created after Warrior Run's investigation of the March 14, 2011 incident, titled the "Manifestation Determination" report, the school decided to remove Mattison from school

9

and ask him to return to the Montour Learning Center at DTA, noting that "Duane admittedly knows what he did was wrong" and that he "has been in treatment/counseling for similar behaviors," without expounding further on what such behaviors were. Doc. 210-8 at 5. The report also summarized Mattison's history as follows:

> Prior to this incident Duane has been reported by his teachers to have had issues of inappropriateness with another female in his class. Duane has been under the watchful eye of administration and teachers. DTA staff members have been made aware of issues with Duane in school and they have been working with him .... During the current school year, Mr. Weaver has been invited to the school on more than one occasion to discuss issues and concerns with Duane, specifically his inappropriate sexual tendencies .... Due to a series of concerns over the course of the school year, Duane's teachers have been more closely observing his behavior, especially when he is in close proximity to female students in his class.

*Id.* at 4-5. It is unclear what these "issues of inappropriateness" or "series of concerns" refer to, though they presumably refer to the incidents summarized above, where Mattison was accused of talking about Swartz's breasts in eleventh grade and was disciplined for making a comment regarding a female student's breasts to a male peer. Doc.210-6 at 7; Doc. 210-12 at 201. The school determined it "will not proceed with disciplinary action since Duane will return to DTA." Doc. 210-8 at 6.

The day of the March 14, 2011 incident, Bertanzetti also contacted Ms. Swanger and informed her that Mattison had inappropriately touched Bobbie Jo. *Id.* ¶ 49. Ms. Swanger testified that during that telephone call, Bertanzetti referenced past sexual misconduct by Mattison, and told her "that Duane had had a similar incident with another girl in the classroom," and that "Duane had been removed from the school [in eleventh grade]

because of that incident, but that he had been allowed to come back. And he said that they wanted to get Duane out of the school district and keep him out of the school district and if I would bring charges against him that would make it easier for them to do that. And he said that if I would bring charges against Duane, I could prevent it from happening to another girl." Doc. 210-7 (Swanger Dep.) at 17. After receiving the call from Bertanzetti, Ms. Swanger contacted the Pennsylvania State Police to report the incident and pursue criminal charges against Mattison. Doc. 200 ¶ 50. On May 17, 2011, a criminal complaint was filed in Northumberland County, Pennsylvania, charging Mattison with aggravated indecent assault, indecent assault, and indecent exposure based on the March 14, 2011 incident. Id. ¶ 52. As a result, Mattison pled guilty to the charges of indecent assault and nolo contendere to indecent exposure. Id. ¶ 53. On August 25, 2011, the state court placed him on probation for two years. Id. ¶ 54. The court further ordered that Mattison successfully complete a residential treatment program called the Mainstay North Program. Id. at ¶ 55.

It is undisputed that before March 14, 2011, Bobbie Jo never told anyone that Mattison had acted inappropriately towards her, Doc. 200 ¶ 57, even though the record reflects that he had done so, Doc. 210-3 at 44. While the Swangers did not notice or recognize any signs of sexual abuse in their daughter, according to Ms. Swanger, approximately one month before the March 2011 incident, Bobbie Jo "got quieter" and would spend more time in her room reading by herself, instead of with the family. Id. ¶¶ 59, 60. However, the Swangers have not consulted with any healthcare professional regarding

Bobbie Jo and the problems that may have resulted from the incident with Mattison. *Id.* ¶ 64. According to Ms. Swanger, Bobbie Jo "chose not to talk to anyone." *Id.* ¶¶ 65, 66; Doc. 210 ¶¶ 65, 66; Doc. 210-7 (Swanger Dep.) at 56.

As noted above, in the parties' previous round of motion for summary judgment briefing, Defendants had not disclosed all of Mattison's psychiatric records from DTA, which this Court previously deemed as privileged. Doc. 149. On appeal, the Third Circuit declined to "address the substantive merits" of the Court's summary judgment rulings, and instead found that on remand, this Court should conduct a further assessment as to whether the Pennsylvania's Mental Health Procedures Act ("MHPA")'s broad confidentiality protections should be recognized as a federal common law privilege, and noted that if the Court "declines to recognize the MHPA as a federal common law privilege, it should review the DTA documents *in camera* to determine the extent to which they are protected under the narrower federal psychotherapist-patient privilege." *Swanger*, 659 F. App'x at 122, 126. However, the parties resolved their privilege disputes upon remand, as "Mattison signed an Authorization To Disclose Health Information which provided for the disclosure of his entire record from [DTA]." Doc. 200 ¶ 76. After the disclosure of these records, Defendant Alvin Weaver submitted to a second deposition on June 19, 2017, during which he was asked to expound upon various case notes and DTA records from the newly disclosed evidence. Doc. 210-12. Both his deposition and the new evidence referenced in the deposition were submitted for the record.

In their brief in opposition to the instant motion for summary judgment, Plaintiffs

argue that new details revealed through the DTA weekly therapy case notes show that DTA

had knowledge of Mattison's likelihood to engage in inappropriate sexual behavior at

school. These notes detail a history of what might well be described as disturbing sexual

fantasies as well as sporadic sexual misconduct by Mattison, including, in relevant part:

- **September 9, 2009 Note** – Mattison's then-DTA counselor, Karen Brown, wrote that Mattison reported a situation at school where "a male peer 'hump[ed]' him in the locker room while in his boxers. Duane expressed that the situation reminded him of when he was made to have sex with a male peer in the bathroom in the past." Doc. 210-12 at 193. At deposition, Weaver explained that this type of situation at school is not one in which DTA would become involved, because "[u]nfortunately, you see a lot of that type of behavior with teenage boys." *Id.* at 53. Brown's note also stated that Mattison "continues to not process fantasies related to his host mother's granddaughter, **girls from the youth group that he now sees in school**, the host mother's younger grandchildren and the dogs." [2] *Id.* at 193.

- **September 30, 2009 Note** – Karen Brown wrote that "[a]fter receiving information from [DTA] staff I questioned [Mattison] about an incident at school where Duane was accused of touching a girl's breasts [3] ... Through additional questioning, I helped Duane talk about additional behaviors such as anal stimulation using objects, **becoming aroused at school** or at home ... not processing fantasies about his host parents' grandchildren, the dogs or **males at school**, and masturbating more frequently than he reports..." *Id.* at 195.

- **November 12, 2009 Note** – shortly after Mattison was removed from Warrior Run in eleventh grade for sexually abusing a chicken, Karen Brown wrote that she discussed the incident with Mattison. *Id.* at 196. At deposition, Weaver testified that

[2] In DTA vernacular, "processing" refers to "talk[ing] about" certain fantasies, while "lapsing" refers to "masturbat[ing] to a fantasy that was deviant in nature." *Id.* at 22, 34. DTA's counselors believed that if a patient was not processing his fantasies, it would be "more likely that he would masturbate to deviant fantasies," which would "reinforce[] the deviant thinking." *Id.* at 54-55.

[3] This is a reference to the 2009 Swartz accusation, which, as discussed above, resulted in a school investigation that concluded that the accusations were unfounded. Doc. 210-6 (Bertanzetti Dep.) at 7-8; *see also id.* at 26 (Bertanzetti testifying that the investigation revealed "nothing that would indicate that [Mattison] had done that, yes, physically touched her"); Doc. 210-12 at 65 (Weaver testifying he was "aware that there was an accusation, but there was never any verification that it occurred that I recall.").

Duane was removed from school to prevent "other concerns ... [since] at this point, he had touched the chicken." *Id.* at 71.

- **April 28, 2010 Note –** At this point, Alvin Weaver had taken over as Mattison's weekly counselor, he reported that Mattison "has been having consenting as well as deviant fantasies. He reported he has had many deviant fantasies and has lapsed to some of them." *Id.* at 199.[4]

- **August 30, 2010 Note –** At this time, Mattison had been re-enrolled in Warrior Run. Weaver noted that on this day, he was called to Warrior Run by Bertanzetti "for assistance with Duane. **He had apparently been talking to a male peer about a girl and made a comment about touching her breasts** ... [Weaver] confronted Duane in a very direct manner letting him know that regardless of who the conversation was about, it was sexually inappropriate and offensive .... Duane was apprehensive to agree but knew it was correct. [Weaver] then let Duane know he was aware of the situation that occurred at work last week where [Duane] made sexually harassing remarks to a female co-worker, Duane began to deny it until [Weaver] repeated to him what he said to [the co-worker] ... [Weaver] let Mr. Bertanzetti know that we would support any consequence [the school] wished to give him for this behavior. [Bertanzetti] was appreciative of the support." *Id.* at 201. In his notes, Weaver privately opined that he viewed "this situation as a step in the right direction. Meaning that this was a conversation about an age appropriate female with whom he has interacted, it was not a deviant fantasy about an animal, and he did not act out against her sexually. In fact he was discussing asking her if he could touch her breasts. In the past he would have just done it. This does not make the situation right but it give a healthier frame of reference to work from to develop healthy and socially acceptable sexual values." *Id.*

- **September 2, 2010 Note –** Weaver wrote that "Duane reported he did not struggle in school today and avoided situation where he could engage in sexual conversations." *Id.* at 201.

- **September 21, 2010 Note –** Weaver wrote that Mattison "continues to complete his fantasy journals on a regular basis and gave a verbal report of consenting as well as deviant fantasies. He struggles with some deviant thoughts about **males and girls dressed in tight clothing at school**." *Id.* at 205. At deposition, Weaver testified

_____

[4] While Weaver never explicitly defined what the therapist notes mean by "deviant" fantasies, it can be inferred that deviant fantasies include not only fantasies about animals or children, but also non-consenting fantasies in general. *See, e.g.*, Doc. 210-12 at 217 (October 25, 2010 Psychological Report) ("When asked about deviant fantasies Duane indicated that he feels in fact that most of his recent sexual fantasies have been appropriate (consenting)..."); *id.* at 203 (therapist note averring that Mattison reported of having "consenting as well as deviant fantasies...").

that by "struggles," he meant that Mattison "wants to masturbate to [these fantasies]." When asked if it would "be better if he wasn't thinking about them," Weaver responded "[i]t would be better, but that's highly unlikely" and that "[t]here is no cure when it comes to sexual thoughts in deviant sexual thinking, the goal is a reduction or management." *Id.* at 95-96. He also testified that he would only become concerned that Mattison would act on these fantasies if "he was maybe consistently masturbating to a deviant fantasy," but he would not be concerned "if he's talking about it and not acting on it, or reinforcing it with the masturbation." *Id.* at 96-97.

- **October 25, 2010 Note** – Weaver wrote that "Duane reported some struggle with **girls in school and at work.** He has been very actively fantasizing about them and is attempting not to lapse to a deviant fantasy about them." *Id.* at 207.

- **October 25, 2010 Psychological Evaluation Report** – This is a formal report created by the DTA "to determine if [Mattison's Community Residential Rehabilitation Host Home] service remains medically necessary." *Id.* at 212. The report found, among other things, that **"[i]n the last few months [Mattison] has made a few sexual comments to peers at school and has been confronted for that; however the comments appear to have been rather age-appropriate rather than deviant. There are no reports of Duane acting out sexually in the last few months.** He has done well at the public school where his academics and behavior are described as adequate." *Id.* at 217.[5]

The report concluded that Mattison should remain in Community Residential Rehabilitation Host Home services, because he "remains at least moderate risk to reoffend sexually and he definitely needs the structure and guidance available through the CRR Host Home Program to reduce his risk of reoffending. As noted above there was an incident about one year ago of Duane acting out sexually with a chicken; as a result of that episode he was taken out of his public school placement and placed back in an Alternative Education setting for the rest of the 11th grade (last school year). He is being given an opportunity to attend public school this year for his 12th grade year, so far he is doing well there. Given Duane's ongoing moderate risk to reoffend, coupled with the sexual acting out behavior at the Host

---

[5] The report also included troubling—though temporally remote—incidents of sexual misconduct by Mattison prior to his entry in DTA treatment in 2007, including "sexually inappropriate behaviors involving touching several girls within his [previous] school." *Id.* at 212. During treatment at DTA, he had also disclosed that he had sexually abused children when he was 10 to 15 years old. *Id.* It is unclear if these self-reports have been verified. The report also noted that Mattison had reportedly been sexually abused himself by his stepmother from ages 2-4, and by a 16-year-old girl when he was 10. He was also physically abused by his biological mother before the age of 2, resulting in his removal from his biological mother's home. *Id.* at 213.

Home last fall, it is clear that Duane is not ready to return to his family or to a regular foster home setting." *Id.* at 218.

At deposition, Weaver affirmed the October 25, 2010 report's findings of Mattison's recent behavior, testifying that while Mattison had difficulty controlling his sexual and aggressive impulses prior to his arrival at DTA, at the time the report was written, Mattison's sexual impulses were "not nearly as much [a concern] as it was when he first entered the program. At this point, he had already completed a 19-month course, I believe it was, in residential treatment with no sexually acting out behaviors." *Id.* at 110. He also testified that after the incident where Mattison sexually abused a chicken, "it was almost nine months" before Mattison was allowed back to Warrior Run. *Id.* at 110-11.

- **February 2, 2011 Note** – Weaver reported that "Duane processed his interactions with peers in school. Overall he continues to do well. He is struggling with his interactions with females at times." *Id.* at 211.

Based on these newly available records, Plaintiff argue that summary judgment should be precluded because they show that the Mental Health Defendants knew that Mattison was "engaging in high risk, sexually aggressive, deviant fantasies and behavior towards females in his class," such that his inappropriate sexual behavior towards Bobbie Jo was foreseeable. Doc. 209 at 20.

### III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, ...[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127

17

S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV. ANALYSIS

### A. Summary Judgment Will Be Granted in Favor of the Mental Health Defendants on Plaintiffs' Negligence Claim Based on the "Duty to Warn" Theory Because Bobbie Jo Was Not A Readily Identifiable Victim.

Plaintiffs bring a state law based negligence claim against the Mental Health Defendants, alleging that they "determined, or should have determined, that Defendant Mattison presented a serious danger of acting out sexually against other students" at Warrior Run and did not warn the school about Mattison's "known sexually aggressive behavior" despite "a duty to exercise reasonable care to protect by warning the intended or readily identifiable victims of Defendant Mattison against such danger." Doc. 77 ¶¶ 86-88. In the previous motion for summary judgment, the Court had ruled that the Mental Health Defendants did not owe a duty to warn or disclose Mattison's mental health information to Plaintiffs. Doc. 170. In the renewed motion, Defendants argue that even taking into

account the new evidence from Mattison's psychiatric file, "there are no new record facts or changes in the law that should change the Court's prior analysis and determination on Mental Health Defendant's Motion for Summary Judgment." Doc. 199 at 7.

While the new evidence reveals more details of Mattison's disturbing sexual fantasies and struggles, the Court is inclined to agree that Plaintiffs' negligence claim continues to fail because the duty to warn a third party is a limited obligation requiring a "specifically identified or readily identifiable victim," which is not present here. *Emerich v. Philadelphia Ctr. for Human Dev., Inc.*, 720 A.2d 1032, 1040 (Pa. 1998). Generally, under Pennsylvania law, a plaintiff alleging negligence must show that: (1) the defendant had a duty to conform to a certain standard of conduct; (2) the defendant breached that duty; (3) such breach caused the injury in question; and (4) the plaintiff incurred actual loss or damage. *Pyeritz v. Commonwealth,* 32 A.3d 687, 692 (Pa. 2011). Whether a defendant is under a legal duty to conform to a reasonable standard of care is a question of law for the Court to decide, while the question of "whether there has been a neglect of such duty is generally for the jury." *Emerich,* 720 A.2d at 1044. Further, "[t]he issue of whether an act or a failure to act constitutes negligence may [also] be removed from consideration by a jury and decided as a matter of law when the case is free from doubt and there is no possibility that a reasonable jury could find negligence." *Id.*

In Pennsylvania, there is generally no duty to control the conduct of a third party to protect another from harm. *Id.* at 1036. However, a limited exception exists where a

defendant either has a special relationship with the third person "which imposes a duty upon the actor to control the third person's conduct" or has a special relationship with the intended victim which gives rise to a right to protection for the victim. Restatement (Second) of Torts § 315 (1965). Looking to other courts that have considered the issue in the context of mental health care professionals, the *Emerich* court found that "the concept of a duty to protect by warning, albeit limited in certain circumstances, has [been] met with virtually universal approval [in other courts]." *Emerich*, 720 A.2d at 1037 (collecting cases). Adopting the reasoning from these cases, *Emerich* held that "a mental health professional who determines, or ... should have determined, that his patient presents a serious danger of violence to another, bears a duty to exercise reasonable care to protect by warning the intended victim against such danger." *Id.* at 1040. This limited duty to warn "arises *only* where a specific and immediate threat of serious bodily injury has been conveyed by the patient to the professional regarding a *specifically identified or readily identifiable* victim." *Id.* at 1041 (emphasis added). In other words, the privilege between a patient and his mental health care professional may be overcome only by "a finding of a duty on the part of a mental health professional to warn an intended victim of a patient's threats of serious bodily harm." *Id.* at 1043.

Here, the limited duty outlined by *Emerich* cannot form a basis for liability because Mattison made no references to specifically identified or readily identifiable victims during his psychiatric treatment. It is true that DTA and Weaver were aware of Mattison's past

sexual history, including certain sexual misconduct prior to his treatment at the DTA, a sexual abuse incident with a chicken during Mattison's eleventh grade year, and persistent, generalized, disturbing fantasies throughout the course of his treatment. But *Emerich* requires much more than knowledge of such generalized fantasies and past misconduct, which were not related to any students at Warrior Run. There is no evidence that Mattison communicated to any DTA mental health professional an intent to cause serious bodily harm to a "specifically identified" or a "readily identifiable" individual. Here, the most that is revealed by the record is that DTA knew about Mattison's past incidents where he had inappropriately touched students in a previous school, had sexually abused a chicken in his host home, and had generalized fantasies about "males and girls dressed in tight clothing at school." *See, e.g.,* Doc. 201-19 at 2 (Tioga County Department of Human Services June 20, 2007 Report) (noting that in Mattison's previous high school, he "was caught at school having sexual relations with another boy" and was "caught inappropriately touching several girl's behinds in his classroom"); Doc. 210-9 at 4 (October 25, 2010 DTA Psychological Evaluation) (explaining that Mattison was removed from Warrior Run for his remaining eleventh grade school year "after he had sexual contact with a chicken at the Host Home"); Doc. 210-12 at 205 (September 21, 2010 Therapist Note stating that Mattison "struggles with some deviant thoughts about males and girls dressed in tight clothing at school").

These incidents, while alarming, do not amount to a threat against any specific student(s) at Warrior Run who are "readily identifiable" as a victim of Mattison's potential

sexual misconduct. The most specific evidence of Mattison's sexual propensities related to students at Warrior Run is the revelation that he fantasizes about "males and girls dressed in tight clothing at school." Doc. 210-12 at 205. Such vague fantasies, without more, would not equip mental health professionals to "readily identify" the potential victim. Not only would it would be a nearly impossible task for the mental health professional to seek out and identify all "males and girls dressed in tight clothing" that Mattison had come into contact with, but even if it were practicable, it would be "an unreasonable extension of the concepts of duty and foreseeability to broaden a physician's duty to a patient and hold a physician liable to the public at large within the factual scenario of this case." *Estate of Witthoeft v. Kiskaddon*, 733 A.2d 623, 630 (Pa. 1999).

In *Estate of Witthoeft*, the Pennsylvania Supreme Court clarified the limits of *Emerich*, finding that a doctor does not have a duty to warn the Department of Transportation about his patient's vision disorder, when the patient injured a third party while driving. *Id.* In so holding, the Court distinguished *DiMarco v. Lynch Homes-Chester County, Inc.*, 583 A.2d 422 (Pa. 1990), which held that a doctor may be liable when the patient had a communicable sexual disease and transferred that disease to her sexual partner. The *Estate of Witthoeft* noted that *DiMarco* was a limited holding, where "the focus of the court ... was on the unique medical condition at issue." *Estate of Witthoeft*, 733 A.2d at 628. "In the context of a communicable disease, the physician's duty to provide accurate information is critical because information regarding the risks of contacting the disease or

22

the dangers of transmitting the disease are often times not known to the general public." *Id.* Furthermore, "[i]n *DiMarco*, the third party actually relied upon the erroneous medical advice," whereas in *Estate of Witthoeft*, there was "no indication that [the victim] or [the patient] relied to their detriment upon erroneous advice from Dr. Kiskaddon to his patient." *Id.* at 629.

The Court finds that though the instant case presents a closer question than those presented in *Estate of Witthoeft* and *DiMarco*, it is nevertheless more akin to the former than the latter. Here, it is true that the Mental Health Defendants had notice of Mattison's sexual misconduct in the past, but none of his prior acts, standing alone, would constitute a threat of future misconduct towards any particular student or students at Warrior Run. As stated above, the only evidence relating to his potential desire to inappropriately touch anyone at Warrior Run were his fantasies about "males and girls dressed in tight clothing at school." Doc. 210-12 at 205. These fantasies are arguably directed towards a smaller class of persons than "the public at large," but they were still just that—an adolescent's disclosures of generalized, personal fantasies to his therapist regarding his peers at school. There is nothing in the record to suggest that Mattison ever had fantasies about inappropriately touching a specific person at Warrior Run, or that he had told anyone at DTA that he had *in fact* groped anyone at Warrior Run, let alone Bobbie Jo. The Court therefore cannot say that Bobbie Jo was a readily identifiable victim such that DTA and Weaver had a duty to warn her. *Estate of Witthoeft*, 733 A.2d at 630 (finding that the plaintiff "is simply not a

foreseeable victim that this court will recognize. We will not stretch foreseeability beyond the point of recognition for to do so will be to make liability endless"). The Court does not read *Emerich's* limited exception to extend so broadly as to apply to therapy sessions where an adolescent male expresses generalized sexual fantasies about his classmates in school. To rule otherwise would mean that every time a patient reveals personal fantasies during therapy, his mental health professional must risk undermining psychotherapist-patient confidentiality in order to warn unspecified classes of persons where the patient went to school or worked.

Perhaps recognizing that such a duty to warn would be unreasonably broad, Plaintiffs attempt to circumscribe the class of identifiable victims to "female children and the parents of those children enrolled in the special education class with Mattison at Warrior Run." Doc. 209 at 11. But nothing in the record supports such an arbitrary delineation of the scope of Mattison's sexual fantasies. As detailed above, Mattison not only fantasized about peers at school, but also persons (and at times, even animals) outside of school, such as those in his host home, his workplace, or his church youth group. Furthermore, even if the Mental Health Defendants were obligated to pay special attention to Mattison's potential to act out sexually in school, it is undisputed that Mattison's school-related fantasies extended to both "males and girls dressed in tight clothing at school"—all without making a single reference to any targeted fantasies towards students in his special education class, or any other identifiable trait. *See, e.g.,* Doc. 210-12 at 205. There is nothing in the record

to support Plaintiff's factually unreasonable restriction of the duty to warn to *only* female

classmates in Mattison's special education class, as opposed to both male and female

students in his special education class, or female students in all his classes, or even the

entire student body at Warrior Run. *Cf.* Doc. 210-3 (Mattison testifying that in addition to

special education class, he also had gym, driver's education, and art classes "with all the

regular students"); Doc. 210-12 at 193 (therapy note referencing Mattison's prior sexual

history with a male classmate in a previous school and noting that Mattison reported a

recent incident where "a male peer 'hump[ed]' him in the locker room while in his boxers" at

school).

Plaintiffs also at times refer to "a class of discrete, readily identifiable, prospective

victims [as] the females in his class," Doc. 209 at 15, but as noted above, Mattison

described fantasies involving both male and female students in school. Furthermore, the

scope of Mattison's deviant, sexual fantasies extends far beyond only male and female

students at school. Throughout his treatment, he revealed that he struggled with fantasies

relating to "his host mother's granddaughter, girls from the youth group that he now sees in

school, the host mother's younger grandchildren and the dogs." Doc. 210-12 at 193; *see*

*also id.* at 195 (referencing Mattison's "fantasies about his host parents' grandchildren, the

dogs or males at school"). Of these sexual fantasy subjects, DTA informed Mattison's host

parents about his fantasies relating to their grandchildren. *See id.* at 20, 24 (Weaver

testifying that Mattison's host parents were advised of his past history of sexual conduct, as

well as his fantasies regarding their grandchildren). DTA made these disclosures so that Mattison's host parents can "effectively supervise him in their home" and ensure that Mattison would not be left alone with the grandchildren. *Id.* at 41-41 (Weaver testifying that one reason that the host family is informed of Mattison's sexual fantasies regarding their grandchildren is to "make sure that they're aware that he's having those thoughts, that he is talking about them, but to make sure that they maintain their awareness and follow the strategies put in place to protect everyone").

This decision by the DTA highlights the difference between which potential victims can be "readily identified" and which cannot. First, Mattison's fantasies about his host parents' grandchildren are specifically targeted at a limited class consisting of several persons, all of whose identities are easily ascertainable by the DTA. Second, Mattison's potential contact with his host family is surely more frequent, substantive, and personal in nature than his contact with any one classmate at Warrior Run. And it is almost certainly more likely that he would be left alone with a family member for long periods of time than he would be left alone with his classmates without adult supervision. In such limited circumstances, DTA was within reason in disclosing Mattison's sexual fantasies regarding his host parents' grandchildren to the host family. Such a duty of disclosure, however, does not apply equally to his sexual fantasies about his peers at school.

In a somewhat analogous case to this one, the Third Circuit found that a therapist did not have duty to warn the patient's ex-wife before he was released from a mental health

program and shot his ex-wife's children and her neighbor's children eighteen hours later, as the patient made "no specific threat of immediate harm … against [the ex-wife] or her children before [he] left [the VA health institution]." *DeJesus v. U.S. Dep't of Veterans Affairs*, 479 F.3d 271, 280 (3d Cir. 2007). In that case, the patient had a history of violence and abuse towards his children, his estranged wife, and others. In her log entries, the therapist noted that she was concerned about DeJesus "due to his past history of wanting to hurt others, particularly his estranged wife who recently served him divorce papers and has not allowed contact with youngest daughter for over a year. He is in a custody battle with wife. He has also in past had thoughts of hurting self." *Id.* at 277. However, "[a]t no point on March 22," the day before the patient shot his ex-wife's two children and two neighbor children, "did DeJesus make any specific threats against his wife and children." *Id.* at 277. In that case, the plaintiffs agreed that no specific threats against the ex-wife were made, but argued that because the therapist "wrote a letter to the family court attesting to DeJesus's improved mental health, the VA then had a duty to inform any person who may have relied on that letter if DeJesus's mental health state changed." *Id.* at 280. The Third Circuit found such reasoning unpersuasive, noting that "it would be very difficult to identify all persons who would have relied on [the therapist's] letter." *Id.*

Though Plaintiffs do not make an analogous reliance argument in this case, the similar fact pattern of *DeJesus* is instructive. In *DeJesus*, as here, the Court was faced with a therapist recording concerns about the patient's propensity to harm others, which

ultimately occurred. The question, however, is whether such concerns arose out of the patient's generalized desires towards violence or inappropriate sexual behavior, which are common subject matters explored in therapy, or whether they arose out of a *specific* threat to harm *specific* victims. Certainly both *DeJesus* and the instant case present a closer question than that contemplated by the Pennsylvania Supreme Court in *Emerich*, but this Court is constrained to agree with *DeJesus*'s reasoning that "[b]ecause of the Pennsylvania Supreme Court's narrow reading of failure-to-warn claims, we do not believe that, given the opportunity, it would expand *Emerich* to a situation that involves no *specific* threat of *immediate* harm against a *readily identifiable* victim." *Id.* at 280 (emphasis added).

In sum, there is no evidence in the record that rendered anyone, much less Bobbie Jo, a readily identifiable victim. The therapist notes do not contain any details with respect to Mattison's relationships with peers at Warrior Run except the references to fantasies regarding "males and girls dressed in tight clothing at school." In fact, while Mattison had previously touched several students' buttocks at a previous school, Mattison's treatment at DTA appeared to have been helpful in preventing inappropriate sexual touching. Jones, DTA's administrative coordinator at the Montour Learning Center, DTA's in-house educational program in which Mattison participated for approximately two years, testified that he was not aware of any sexual misconduct during Mattison's treatment. Doc. 201-12 at 6 (noting that within the "24 months in residential treatment," Mattison had "demonstrated no sexually inappropriate behavior within the residential treatment component"). *See also*

Doc. 210-12 at 108-110 (Weaver testifying that while Mattison had difficulty controlling his sexual and aggressive impulses, it was "not nearly as much [a concern] as it was when he first entered the program. At this point, he had already completed a 19-month course ... in residential treatment with no sexually acting out behaviors"). Further, there is no evidence, or even allegation, that he had forcibly sexually assaulted another student at any school, or that he inflicted serious harm or demonstrated any propensity for violence. In any event, as discussed above, those previous incidents of inappropriate sexual touching occurred before Mattison entered treatment at DTA. Such temporally remote events, coupled with intervening treatment, cannot amount to "a specific and immediate threat of serious bodily injury" to one of his fellow students at Warrior Run, such that the Mental Health Defendants had a duty to warn the school or any of his peers of such harm. *Emerich*, 720 A.2d at 1040.

Thus, the Mental Health Defendants did not have a duty to seek out, identify, and warn Bobbie Jo of threats of serious bodily harm based on their knowledge of Mattison's past sexual history and fantasies. To rule otherwise would force mental health professionals to engage in an overly broad, and almost certainly speculative and subjective exercise, resulting in the over-disclosure of psychiatric records and a patient's most intimate desires to a large class of people in his everyday life. *Cf. F.D.P. v. Ferrara*, 804 A.2d 1221 (Pa. Super. Ct. 2002) (finding no duty to commit patient to a mental health institution in order to protect third parties from harm and noting the policy concerns that would result from ruling otherwise: "[t]reatment of the mentally ill is not an exact science. If we allow recovery

29

against mental health and mental retardation providers for harm caused by patients except in the clearest circumstances, we would paralyze a sector of society that performs a valuable service to those in need of mental health care"). Because there is no evidence from the record that Plaintiff Bobbi Jo was a "readily identifiable" victim of a specific and immediate threat of serious bodily harm from Mattison, the negligence claim against the Mental Health Defendants will be dismissed.[6]

## B. Summary Judgment on Plaintiffs' Section 1983 Claim Cannot Be Granted Because the Newly Available Evidence Creates An Issue of Fact as to the Existence of Deliberate Indifference on the Part of the Mental Health Defendants.

In addition to a negligence claim, Plaintiffs also brought a Section 1983 claim based on the substantive due process clause of the Fourteenth Amendment, alleging that DTA and Weaver, acting under color of state law, deprived Bobbie Jo of her right to bodily integrity. Doc. 77 ¶ 93. To succeed on a claim under 42 U.S.C. § 1983, the plaintiff must demonstrate a violation of a right protected by the Constitution or laws of the United States, committed by a person acting under color of state law. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (en banc). In evaluating a Section 1983 claim, a Court must first "identify the exact contours of the underlying right said to have been violated" and determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." *Id.* (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). In

---

[6] Because the negligence claim will be dismissed on the merits, the Court need not address whether the Mental Health Defendants would have been protected by immunity under the Mental Health Procedures Act ("MHPA"), 50 P.S. § 7101, et seq., which is an alternative argument presented by the Defendants. Doc. 199 at 4-8.

its previous summary judgment opinion, the Court found that the Mental Health Defendants had no obligation under the due process clause to protect Bobbie Jo due to the absence of a special relationship between them and Bobbie Jo, and because the record did not show that the Mental Health Defendants acted with deliberate indifference in the face of foreseeable harm to Bobbie Jo under the state created danger theory. Doc. 170 at 23-33.

The Court finds that there is nothing in the newly available evidence that would meaningfully change its previous opinion's analysis under the special relationship theory. "[W]hen the state enters into a special relationship with a particular citizen, it may be held liable for failing to protect him or her from the private actions of third parties." *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1369 (3d Cir. 1992) (en banc). However, "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf … which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect [the plaintiff's] liberty interests against harms inflicted by other means." *DeShaney v. Winnebago Cnty. Dep't of Social Srvcs.*, 489 U.S. 189, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (holding that Department of Social Services was not liable even when they had notice of a father's abuse of child, as the "most that can be said of the state functionaries in this case is that they stood by and did nothing"). In other words, the Due Process Clause does not "impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* at 195.

In *D.R.*, two female high school students sued their school, which was allegedly aware that the plaintiffs had been verbally, physically, and sexually molested routinely by multiple male classmates over the course of several months in a unisex bathroom and class darkroom, but did nothing to intervene. 972 F.2d at 1373. The Third Circuit "readily acknowledge[d] the apparent indefensible passivity of at least some school defendants under the circumstances," but noted that the harm was caused by private actors (*i.e.*, the male students), not state actors. *Id.* at 1376. Thus, the Court found that the analysis must proceed under *DeShaney*, which required that that the school defendants "either impermissibly limited the freedom of the plaintiffs to act on their own behalf, or barred their access to outside support." *Id.*

Relying on *DeShaney*, *D.R. by L.R.*, and their progeny, this Court previously rejected the special relationship theory for Plaintiffs' Section 1983 claim because of the highly attenuated relationship—if any—between DTA and Bobbie Jo such that DTA had a duty to protect her from harm. Doc. 170 at 23-27. Perhaps realizing that the newly available evidence has no bearing on the existence of such a relationship, Plaintiffs do not address the special relationship theory in their new brief in opposition to summary judgment, but rather focus exclusively on the state created danger theory. Thus, the Court finds that Plaintiffs have abandoned the special relationship theory in their pursuit of the Section 1983 claim. In any event, the Court's previous analysis, which noted that the key inquiry is not who "exercised custody or control over Mattison," but rather "whether Bobbie Jo, whose

32

parents undisputedly were her primary caretakers, was deprived of access to sources of help by the Mental Health Defendants," remains unchanged by the newly disclosed psychiatric records. Doc. 170 at 27. The record continues to contain no evidence that DTA ever restrained or prevented, or even had the power to restrain or prevent, Bobbie Jo from acting on her own behalf, or that DTA otherwise deprived her of access to sources of help. Bobbie Jo never informed anyone of Mattison's actions against her prior to March 14, 2011, including her own parents. Doc. 200 ¶ 57. The Mental Health Defendants never even had notice of who Bobbie Jo was. Consequently, a special relationship theory under the Section 1983 claim fails for the same reasons as the Court discussed in its previous opinion, namely that Plaintiffs have not put forth any evidence demonstrating the presence of a special relationship between the Mental Health Defendants and Bobbie Jo.

The Court, however, is constrained to revisit its analysis of the state created danger theory in light of the newly available evidence, which raises a question as to the Mental Health Defendants' deliberate indifference given the extent and depth of their knowledge of Mattison's sexual propensities. "Liability under the state-created danger theory is predicated upon the states' affirmative acts which work to plaintiffs' detriments in terms of exposure to danger." *D.R.*, 972 F.2d at 1374. To meet the requirements of a state-created danger claim under the Fourteenth Amendment substantive due process clause, a plaintiff must show that "(1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship

between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (internal citations omitted). In its previous opinion, the Court declined to reach the fourth element, noting that "there is an issue of fact as to who enrolled Mattison at Warrior Run," which Plaintiffs allege is the affirmative action that resulted in Bobbie Jo's harm. Doc. 170 at 29 n. 9. Similarly, the Court assumed that the Mental Health Defendants were state actors for purposes of determining that summary judgment motion. *Id.* at 27. The Court continues to find that both requisite elements remain issues of fact in this case.

First, the inquiry into whether a non-governmental entity may be deemed a state actor is a fact intensive one. "The principal question at stake is whether there is 'such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself.'" *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005) (quoting *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001)). The Third Circuit has "outlined three broad tests generated by Supreme Court jurisprudence to determine whether state action exists: (1) 'whether the private entity has exercised powers that are traditionally the

exclusive prerogative of the state'; (2) 'whether the private party has acted with the help of or in concert with state officials'; and (3) whether 'the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity.'" *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir.1995)).

Though their brief is far from clear, and though they claim that the "evidence passes each [state actor test]," it appears that Plaintiffs are primarily relying on the first test by arguing that DTA has taken over the function of Tioga County in the care and custody of Mattison. Doc. 209 at 17. Plaintiffs argue that "DTA and Weaver assumed custody, care, and control of Defendant Mattison from Tioga County Department of Human Services, who had custody and responsibility for Mattison pursuant to the Court's Dependency Order." *Id.* Because "[c]aring for dependent children is a power traditionally reserved for the state and exercised by it," Plaintiffs argue that "DTA and Weaver were exercising that power on behalf of the state [i.e. Tioga County Department of Human Services] when they enrolled Mattison in Warrior Run." *Id.* Plaintiffs also assert that DTA receives state funding without offering any supporting citation to the record. *Id.* Based on the available evidence, it is unclear what relationship DTA has with Tioga County's Department of Human Services. However, it is undisputed that Mattison was under the legal custody of Tioga County after the Court adjudged him as a "Dependent Child pursuant to Pennsylvania's Juvenile Act" and that Tioga County then placed Mattison in DTA's residential treatment program. *Id.* ¶¶ 26, 27.

*See also* Doc. 210-12 at 70, 150 (Weaver testifying that Mattison arrived at DTA because he "was referred by Tioga County Human Services" and that DTA would provide "updates on a regular basis" to Mattison's case worker from Tioga County Human Services").

While such evidence is hardly conclusive, it sufficiently raises a triable issue of fact as to whether DTA can be considered a state actor for purposes of this motion. On the record before the Court, it is plausible that DTA's role in taking over the custody of dependent children of Tioga County is so substantial that it can be said to be performing a traditional function of the state, or alternatively, that there exists "a position of interdependence" between Tioga County and DTA such that the latter "must be recognized as a joint participant in the challenged activity." *Kach*, 589 F.3d at 646. *See also Obado v. Univesity of Med. & Dentistry of New Jersey-Behavioral Healthcare*, 2012 WL 12903880, at *6 (D.N.J. May 21, 2012) (holding psychiatrist and hospital's involuntary commitment of plaintiff to be a state action, since "it is clear that [psychiatrist's] role in certifying individuals for involuntary commitment and treating them at a short-term facility, although private, is deeply entwined with a highly coordinated effort by the State of New Jersey to screen, evaluate, and treat mentally ill individuals who may be dangerous to themselves or others. Such 'entwinement will support a conclusion that an ostensibly private [party] ought to be charged with a public character and judged by constitutional standards.'") (quoting *Brentwood*, 531 U.S. at 302)).

Second, as this Court found in its previous opinion, there remains an issue of fact as to whether DTA engaged in an affirmative action by re-enrolling Mattison in Warrior Run in twelfth grade. Here, Plaintiffs point to certain administrative paperwork for Mattison's enrollment process, i.e. his "Act 30" form. The form was signed by both Mattison's foster parent and an employee at DTA, affirming that Mattison has not previously been suspended or expelled from a public school for certain acts of violence and other offenses. Doc. 201-5 (Cross Dep.) at 5. Later, at the time of Mattison's removal from Warrior Run, Alvin Weaver also signed Warrior Run's formal removal papers as Mattison's "Parent / Guardian / Surrogate," thus creating an inference that DTA had been intimately involved in Mattison's public school decisions and even represented itself as his "guardian" or "surrogate" to Warrior Run. Doc. 210-8 at 5, 8. Further, Weaver's signature as Mattison's "guardian" or "surrogate" also raises a question as to whether DTA indeed took over the legal custody and care of Mattison as a Dependent Child of Tioga County. Thus, to the extent Plaintiffs argue that DTA's act of re-enrolling Mattison in school in his twelfth grade was an affirmative state action, there exists an issue of fact that would preclude summary judgment.

In its previous opinion, this Court found that notwithstanding the issue of fact as to who re-enrolled Mattison, the state created danger theory must fail because there was no evidence of deliberate indifference on the part of the Mental Health Defendants that shocked the conscience, and because Bobbie Jo was not a foreseeable member of a discrete class of persons subjected to the potential harm brought about by any of the

Defendants' affirmative acts. However, as detailed below, the Court must revise its previous conclusions in light of the newly supplemented record.

At first blush, it may seem inconsistent for the Court to find that a triable issue of fact exists as to whether Bobbie Jo is a foreseeable victim as "a member of a discrete class of persons subjected to potential harm" under the state created danger theory, but to find no viable liability or issue of fact under *Emerich* because she was not a "specifically identified or readily identifiable" victim. This Court has been unable to find any cases in this Circuit illuminating the differences in the scope of foreseeability under the two claims. However, the Court finds that the disparate standards required under the two theories of liability allows for such a distinction. While the limited exception created under *Emerich* imposes liability *only* "where a specific and immediate threat of serious bodily injury has been conveyed by the patient to the professional regarding a specifically identified or readily identifiable victim," *Emerich*, 720 A.2d at 1041, the state created danger theory allows for a much broader class of victims by asking whether "the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the [defendant's] actions." *Bright*, 443 F.3d at 281. *See also Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 172 (3d Cir. 2017) (holding that a student-athlete is a foreseeable victim of coach staff's decisions to require student to continue football practice despite exhibiting concussions symptoms, and noting that "[t]he bar for proving this element [of foreseeability] is not terribly high, as we have previously held that a relationship can exist where a plaintiff

is a member of a group that is subject to potential harm brought about by the state's actions. It is clear that a student-athlete stands in such a relationship with the coaching staff") (internal citations omitted). Thus, the state created danger theory does not require the heightened level of specificity with respect to the class of foreseeable victims as that required under *Emerich*.

Ultimately, the Court's previous opinion relied most heavily on the fact that the record did not evince deliberate indifference on the part of the Mental Health Defendants, nor did it raise an inference that Bobbie Jo was a foreseeable victim. Doc. 170 at 31-33. The analysis of these two key elements are necessarily intertwined – if the harm suffered by Bobbie Jo was not foreseeable nor fairly direct, then the Defendants' actions would also not likely be deliberately indifferent. However, the newly available evidence, which reveals the depth of the Defendants' knowledge as to Mattison's sexual propensities, compels the Court to reassess its previous analysis. On the newly supplemented record, a reasonable factfinder could find Mattison's groping of Bobbie Jo was a foreseeable result of his re-enrollment into Warrior Run, and that she was a member of a discrete class of persons that were subject to "*potential* harm," i.e. Mattison's peers, none of whom needed to be readily identified under a state created danger claim. *See Gremo v. Karlin*, 363 F. Supp. 2d 771, 778-79, 789 (E.D. Pa. 2005) (finding "students at George Washington High School" to be a discrete class of foreseeable victims under the state created danger theory, where a group of fifteen students "repeatedly targeted innocent students in known, unsecured,

unmonitored common areas of the George Washington High School" for two years and

finding that the group of fifteen students "were not a threat to the population at large, but

only to that class of persons"); *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 247 (3d Cir.

2016) (finding a kindergarten student who was sexually assaulted by an unidentified adult

was a "foreseeable victim" when her teacher released her to the adult, in contravention of

the school's policy requiring identification before releasing children to another adult's

supervision, because the student "was a member of the discrete class of kindergarten

children for whose benefit the School District's release policy had been instituted").

With respect to the element of deliberate indifference, as the Court previously noted,

the Third Circuit adopts a sliding scale approach for the element, explaining that "the state

actor's behavior must always shock the conscience. But what is required to meet the

conscience-shocking level will depend upon the circumstances of each case, particularly the

extent to which deliberation is possible." *Sanford v. Stiles*, 456 F.3d 298, 310 (3d Cir.

2006).

> The level of culpability required to shock the conscience increases as the time
> state actors have to deliberate decreases. In a hyperpressurized
> environment, an intent to cause harm is usually required. On the other hand,
> in cases where deliberation is possible and officials have the time to make
> unhurried judgments, deliberate indifference is sufficient …. We also
> recognize that there are circumstances involving something less urgent than
> a split-second decision but more urgent than an unhurried judgment.
> Generally, this category will include situations in which the state actor is
> required to act in a matter of hours or minutes …. [In those circumstances,]
> the defendants [must] disregard a great risk of serious harm.

*Id.* at 309-10 (internal quotation marks and citations omitted). Here, Plaintiffs' state created danger theory is based on the Mental Health Defendants' knowledge of Mattison's propensity for inappropriate sexual behavior. Because this argument is clearly based on a theory that deliberation was possible and DTA and Weaver had time to make "unhurried judgments," a deliberate indifference standard is appropriate in this case. In the context of a state created danger claim, deliberate indifference requires "'that a person consciously disregard a substantial risk of serious harm.'" *Kaucher*, 455 F.3d at 427-28 (quoting *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 65 (3d Cir. 2002)) (internal quotation marks omitted).

Under Plaintiffs' theory, Bobbie Jo was a member of a foreseeable class of victims of Mattison's inappropriate sexual propensities, i.e. the students at Warrior Run, when the Mental Health Defendants re-enrolled Mattison in twelfth grade. Here, the record reflects that though Mattison had completed two years of treatment at the Montour Learning Center before enrolling in Warrior Run for the first time, he still suffered a lapse in control over his sexual impulses after he sexually abused a chicken in his host home during eleventh grade. Doc. 210-9 (October 25, 2010 DTA Psychological Evaluation) at 4. Though the incident did not involve a peer nor did it occur on the premises of Warrior Run, it evinced a risk of loss of control on the part of Mattison. Throughout this time and continuing into his re-enrollment in twelfth grade, DTA's therapy notes continued to document Mattison's inappropriate sexual desires, including fantasies related to his host family's grandchildren, male and female

peers at school, and even dogs. Doc. 210-12 at 193. As recently as a few months before the Bobbie Jo incident, Weaver's notes revealed that he had knowledge that Mattison had made sexually harassing remarks to a female co-worker at his workplace. *Id.* at 201. Weaver was also called into Warrior Run in twelfth grade because Mattison had made a sexually explicit comment about a female student's breasts. *Id.* Though Weaver ultimately viewed the incident "as a step in the right direction," he candidly admitted in his private notes that "in the past [Mattison] *would have just done it*," suggesting that Mattison could have actually touched the female student's breasts instead of merely talking about it. *Id.* Furthermore, according to a report by the DTA issued a month later, Mattison "remain[ed] at least moderate risk to reoffend sexually and he definitely needs the structure and guidance available through the CRR Host Home Program to reduce his risk of reoffending." Doc. 210-12 at 218. Though the report found that since Mattison had been re-enrolled in Warrior Run in twelfth grade, he has been "doing well there," it went on to state that "[g]iven Duane's ongoing moderate risk to reoffend, coupled with the sexual acting out behavior at the Host Home last fall, it is clear that Duane is not ready to return to his family or to a regular foster home setting." *Id.*

Finally, throughout these notes, DTA counselors continued to express concern that Mattison was not properly processing his inappropriate fantasies and not being forthcoming in his therapy sessions. *See, e.g., id.* at 201 (when Weaver confronted Mattison about the sexual harassment incident at work, Mattison "began to deny it until [Weaver] repeated to

42

him what [Mattison] said..."); *id.* at 195 (Weaver writing that he discussed Mattison's "additional behaviors" such as "not processing fantasies about his host parents' grandchildren, the dogs or males at school, and masturbating more frequently than he reports..."); *id.* at 71 (Weaver testifying that he knew that Mattison's previous DTA therapist, Karen Brown, "had questioned [Mattison's] honesty"). Despite the above, the Mental Health Defendants may have re-enrolled Mattison in Warrior Run, and there is no evidence in the record to suggest that they ever informed the school district about Mattison's history at his previous schools, his sexual abuse of the chicken, or his sexual desires. Doc. 210-12 at 177-79 (Weaver testifying that DTA never shared "any treatment notes, plans, records of any kind with anyone from the Warrior Run School District or the teachers" or any information "concerning Mattison's treatment and care").

The Court is keenly aware that such evidence is highly circumstantial and somewhat attenuated. In other words, none of the evidence above *compels* a finding that the Mental Health Defendants had knowledge that Mattison posed a substantial risk of sexually groping a female peer upon re-enrollment, especially since the history of Mattison's conduct did not include sexually groping a peer at Warrior Run. However, it is for the trier of fact to make the factual determination as to whether the Defendants' circumstantial knowledge amounts to a "disregard of a substantial risk of serious harm." It is enough that the newly available evidence has raised sufficient questions such that this determination must be left for the jury. *See Rivas v. City of Passaic*, 365 F.3d 181, 196 (3d Cir. 2004) (affirming denial of

summary judgment on state created danger claim, because a "jury could find … that [EMTs] consciously disregarded a great risk of serious harm to Mr. Rivas by misrepresenting [his assault on the EMTs] and then abandoning Mr. Rivas to the police" without warning the police that he was having a seizure and should not be restrained, and noting that if the EMTs "misrepresented the assault, not only did they abdicate their duty to render medical assistance, but they placed Mr. Rivas in greater danger by falsely accusing him of acting violently"); *Bryan v. Erie Cty. Office of Children & Youth*, 861 F. Supp. 2d 553, 580 (W.D. Pa. 2012) (finding factual issue precluded summary judgment on foster parents' claim that the Erie County Office of Children & Youth had been deliberately indifferent when they placed a foster child in their home, who later sexually assaulted the foster parents' son).

In *Bryan*, a case that is somewhat analogous to this one, a foster child, J.O., had displayed "an ongoing pattern of assaultive and sexually inappropriate behavior" before being placed in the plaintiffs' home, where he sexually assaulted his foster parents' son. *Bryan*, 861 F. Supp. 2d at 580. At summary judgment, the evidence revealed that J.O.'s past incidents included sexually abusing a half-sister and a niece, and threatening to "blow things up," "shoot people" and "stab people," leading the defendant's case worker to question "whether foster care was even a suitable option for J.O., given the risks he posed to himself 'and others.'" *Id.* at 579. The court found such prior misconduct and threats of violence were "sufficient to support the reasonable inference that [the Office of Children & Youth] should have known that J.O. had the *propensity* to act in such a manner." *Id.*

(emphasis in original). Thus, the Court denied summary judgment because the evidence

showed "an awareness of a risk that was sufficiently concrete to put [defendants] on notice

of J.O.'s potential for sexual assault and rape," especially when the defendants were aware

"that the Bryans did not want a sexual offender [as a foster child]"; that "there were younger

children in Bryan house"; and that "J.O. had a long history of physically aggressive behavior

and sexual acting out." *Id.* at 579-80.

The facts in this case are considerably less specific with respect to the Mental Health

Defendants' knowledge, especially since *Bryan* dealt with the placement of a foster child

who had *a history of sexually assaulting* minors at his prior homes, whereas here, Mattison

had no analogous history of sexually groping anyone at Warrior Run since DTA began

treating him. Nevertheless, a reasonable factfinder may find, based on the new evidence

regarding the Mental Health Defendants' knowledge of Mattison's sexual misconduct and

desires, that Defendants' act of re-enrolling Mattison in Warrior Run amounts to a conscious

disregard of a substantial risk of harm. If so, then the re-enrollment of Mattison would bear

"a direct causal relationship" to the danger faced by Bobbie Jo, since it rendered her more

vulnerable to sexual molestation by Mattison than had Defendants not re-enrolled him. To

the extent the court's previous opinion ruled otherwise on the issues of deliberate

indifference and foreseeability of Bobbie Jo's harm, *see, e.g.,* Doc.170 at 32 (the Court's

previous opinion finding that "there are no facts of record creating a dispute for trial as to

whether DTA and Weaver's determination that Mattison could return to Warrior Run was

infected with deficiencies of such egregious nature that they could amount to conduct that shocks the conscience"), those conclusions must be tempered by the newly available evidence showing the extent of Mattison's persistent disturbing sexual desires, which at times crossed the threshold into his acting on certain inappropriate sexual impulses. At this stage, there is additional evidence that speaks to the depth, frequency, and substance of the Mental Health Defendants' knowledge of Mattison's sexual misconduct history and sexual desires towards his peers. The Court does not express an opinion on whether such knowledge is sufficient for a finding of liability under the state created danger theory. Rather, it is sufficient for the Court to note, at this stage, that the questions of whether the Mental Health Defendants indeed re-enrolled Mattison in twelfth grade at Warrior Run, and whether such an action, if true, is conscience-shocking, should be reserved for the factfinder at trial. Accordingly, the Court will deny the Mental Health Defendants' motion for summary judgment on Plaintiffs' Section 1983 claim based on the state created danger theory.

## V. CONCLUSION

For all of the foregoing reasons, the Court will grant Defendants Diversified Treatment Alternatives and Alvin Weaver's motion for summary judgment in part and deny it in part. Doc. 198. A separate Order follows.

Robert D. Mariani
United States District Judge