THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ELAINE AND VICTOR SWANGER, :
as parents and legal guardians of :
B.J.S., and B.J.S., :
:
          Plaintiffs, :
v. : 4:11-CV-894
: (JUDGE MARIANI)
DIVERSIFIED TREATMENT :
ALTERNATIVES, et al., :
:
          Defendants. :

## MEMORANDUM OPINION

Presently before the Court is the Motion in Limine of Defendants Diversified Treatment Alternatives ("DTA") and Alvin Weaver (hereinafter "Mental Health Defendants"). (Doc. 231). Defendants' motion requests that the Court "preclude testimony of Duane Mattison and [Plaintiff] BJS in this Trial." (*Id.* at ¶ 2). Defendants request that the Court preclude testimony by these two individuals because "they are easily confused and will not be competent witnesses", "they each lack mental capacity and the ability to understand and speak truthfully", and their testimony is "unnecessary and not relevant" in light of the trial issues delineated by the Court in its opinion addressing the Mental Health Defendants' motion for summary judgment, and that the "presentation of such testimony will serve to confuse the factfinder and generate prejudice against any of the institutional entities that interacted with BJS and Mattison." (*Id.* at ¶¶ 3, 5, 6, 7).

Pursuant to Federal Rule of Evidence 601,

> Every person is competent to be a witness unless these rules provide otherwise. But in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision.

Fed. R. Evid. 601.

Here, the only claim remaining for trial is Plaintiffs' Section 1983 claim against the Mental Health Defendants (Count IX). Because no state law supplies the rule of decision for any claim or defense in this action, the Court's will apply federal law in assessing Defendants' motion with respect to the witnesses' competency.[1] *See e.g., Andrews v. Neer*, 253 F.3d 1052, 1062 (8th Cir. 2001)(explaining in a § 1983 action for excessive force that "Rule 601 contains a single exception to this general rule of competency – state law governs competency when it 'supplies the rule of decision.' *Id.* This proviso has no application, however, 'in civil cases in which the substantive law being applied is found in some federal statute. Hence, the federal law of competency governs suits under ... the various federal statutes concerning civil rights.' 27 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6007, at 74 (1990). Furthermore, '[w]here state substantive law is being used "to fill the interstices or gaps in federal statutory phrases" as part of the "federal common law," the Conference Report [on FRE 601] suggests that state competency law need not be applied under Rule 601.' *Id.* at 75.").

---

[1] Both Defendants and Plaintiff almost exclusively rely on Pennsylvania state law in support of their respective positions. However, because Rule 601 dictates that state law only "governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision", and no party has asserted that a state law claim or defense is at issue in this § 1983 action, the Court's analysis will focus on federal law. Nonetheless, even if the Court were to perform an analysis under Pennsylvania law, the result in this Opinion would not differ.

The Advisory Committee Notes to Rule 601 make clear that the "general ground-clearing [in the language of Rule 601] eliminates all grounds of incompetency not specifically recognized in the succeeding rules of this Article." Fed. R. Evid. 601 advisory committee's note to 1972 proposed rules. As the Advisory Committee explained:

> No mental or moral qualifications for testifying as a witness are specified. Standards of mental capacity have proved elusive in actual application. A leading commentator observes that few witnesses are disqualified on that ground. Weihofen, Testimonial Competence and Credibility, 34 Geo. Wash. L. Rev. 53 (1965). Discretion is regularly exercised in favor of allowing the testimony. A witness wholly without capacity is difficult to imagine. The question is one particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence. 2 Wigmore §§ 501, 509. . . .
>
> . . . Interest in the outcome of litigation and mental capacity are, of course, highly relevant to credibility and require no special treatment to render them admissible along with other matters bearing upon the perception, memory, and narration of witnesses.

*Id.* The Federal Rules of Evidence "largely convert issues of competency into ones of credibility." *United States v. Bevans*, 728 F.Supp. 340, 347 (E.D.Pa. 1990), *aff'd*, 914 F.2d 244 (3d Cir. 1990) (table).

It is therefore "a well-established principle, embodied in Fed. R. Evid. 601, that witnesses are presumed competent to testify." *United States v. Devin*, 918 F.2d 280, 291-292 (1st Cir. 1990); *see also, United States v. Clemons*, 658 F.Supp. 1116, 1120 (W.D.Pa. 1987) (citing *United States v. Lightly,* 677 F.2d 1027, 1028 (4th Cir. 1982)); *United States v. Phibbs*, 999 F.2d 1053, 1068 (6th Cir. 1993) ("[T]he Federal Rules of Evidence strongly disfavor barring witnesses on competency grounds due to mental incapacity."). This well-established principle has been deeply rooted in the American legal system for over a

3

century, as noted by a sister Circuit: "[t]he [Supreme] Court said more than a century ago that even a 'lunatic or a person affected with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue.'" *Devin*, 918 F.2d at 291-292 (quoting *District of Columbia v. Armes*, 107 U.S. 519, 521-522, 2 S.Ct. 840, 841-843, 27 L.Ed. 618 (1883)).

Thus, although "[n]o mental or moral qualifications for testifying as a witness are specified" in Rule 601, *see* Fed. R. Evid. 601 advisory committee's note to 1972 proposed rules, "[e]very witness is presumed to be competent to testify under Fed. R. Evid. 601, unless it can be shown that the witness does not have personal knowledge of the matters about which he is to testify, or he does not have the capacity to recall, or he does not understand the duty to testify truthfully," *Clemons*, 658 F.Supp. at 1120 (citing *Lightly*, 677 F.2d at 1028). "This rule applies to persons considered to be insane to the same extent that it applies to other persons." *Lightly*, 677 F.2d at 1028; *see also, United States v. Odom*, 736 F.2d 104, 112 (4th Cir. 1984) ("Neither feeble-mindedness nor insanity renders a witness incompetent or disqualified.").[2] The determination of competency is primarily for the trial

---

[2] *See also, Bornstad ex rel. estate of Bornstad v. Honey Brook Tp.*, 2005 WL 2212359 (E.D. Pa. 2005):
> A witness's testimony is admissible if it is
> based on personal knowledge even though the witness is not positive about what he or she perceived, provided the witness had an opportunity to observe and obtained some impressions from his or her observations. This is true even if the witness admits to having perceptual problems. A complete disclosure or revelation of the witness's problems will allow the jury to assess the witness's testimony in light of the circumstances.
> 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 602.03[2][b] (2d ed.2000).

*Bornstad*, 2005 WL 2212359, at *6.

4

court and is within the Court's sound discretion. *See Devin*, 918 F.2d at 292; *United States v. Barnes*, 803 F.3d 209, 219-220 (5th Cir. 2015).

The party challenging the competency of a witness bears the burden of proving the incompetence. *See e.g., Lopez v. Meluzio*, 2006 WL 3833115, at * 5 (E.D.N.Y. 2006) ("The burden of proving a witness's incompetence lies with the objecting party"); *Koeppel v. Bassett*, 2015 WL 857701, at *2 (D.N.J. 2015) (party objecting to the competency of a child on the basis that the child was unduly influenced by another person "must show that the child did not perceive the events in question or is testifying from suggestion rather than her own recollection; mere assertion of such concerns is not enough."); *United States v. Skorniak*, 59 F.3d 750, 755 (8th Cir. 1995) (finding that where Defendant asserted that his brother was "not competent to testify due to his mental state", this statement, without more, was "insufficient to overcome the presumption embodied in Federal Rule of Evidence 601 that all witnesses are presumed competent to testify.").

Here, although the Mental Health Defendants attached to their motion the entire deposition transcripts of BJS and Mattison, neither their motion nor their supporting brief points to any specific portion of either deposition which supports their position. Nor have Defendants provided this Court with any other evidence, including any affidavits from medical professionals, teachers, or other individuals personally acquainted with either witness, which may lend support to Defendants' assertion that Mattison and/or BJS are mentally incompetent to testify. As a result, adhering to the basic tenet of Rule 601 that a witness is generally presumed competent to testify, Defendants have failed to meet their burden of showing that Mattison and BJS are incompetent to testify.

Nonetheless, despite Defendants' failure to point to any specific portion of either witness's deposition testimony or provide any other documentation in support of their position, the Court has thoroughly reviewed both depositions.

A review of Mattison's deposition raises no questions in this Court's mind as to his competency at trial, and, without specific citations from Defendants as to what in the deposition supports their argument, or any other evidence to support their argument, the Court adheres to the well-established presumption embodied in Rule 601 that all witnesses are presumed competent to testify. Specifically, Mattison testified during his deposition that he understood that he was under oath and that this meant he had to tell the truth. (Dep. of Mattison, at 5). He was able to state his name, age, and the names of the individuals with whom he currently resides. Mattison was able to recollect with whom he used to live, including his aunt, biological parents, and foster parents, the names of the high schools he attended, and how long he was at DTA. Mattison was also able to give a general description of his sexual history and understood the concept of consent and that his past sexual touching of both boys and girls was not consensual. (*See generally, id.* at 6-19; 21-22, 25-26; *see also, id.* at 83-84 ). With respect to the incident with BJS, Mattison acknowledged that he knew what counsel was "talking about" and was able to testify about how he knew her and what classes they had together. Mattison admitted that he sexually touched BJS, the manner in which he did so, and offered specifics as to what occurred between himself and Plaintiff, and the repercussions arising from his actions. (*Id.* at 32, 36-37, 39-78; *see also, id.* at 85). Mattison was also able to describe when and why he was at

DTA, the services they provided him, and some of his interactions with Defendant Weaver. (*See e.g., id.* at 9, 17, 19, 25, 71-75, 83-84, 87-88, 90).

Mattison's deposition testimony demonstrated that he understands his obligation to tell the truth under oath, is capable of offering general information about himself, and has personal knowledge of the events at issue which he was able to recollect with some detail and give a clear account of his knowledge and perceptions on the relevant issues. Mattison was able to understand most, if not all, of counsel's questions and provide coherent answers. Although the Mental Health Defendants may disagree with certain statements made by Mattison or believe that he is either incapable of telling the truth or willfully lying, these disagreements are matters for cross-examination and impeachment, going directly to the credibility of Mattison and the weight a jury may choose to give his testimony. However, in light of the evidence presented to this Court, Defendants have entirely failed to offer any evidence to place Mattison's mental competency in question.

However, with respect to BJS, a review of that deposition testimony raises an issue in this Court's mind as to whether Plaintiff understands the duty to testify truthfully. BJS demonstrated a general ability to respond to simple questions (such as her age, birthday, names of siblings, friends, and pets, grades in school). (Dep. of BJS, at 13-14, 33-34). Plaintiff also appeared to understand the questions asked of her by counsel about the events involving Mattison and was able to provide coherent answers which addressed the specific questions asked. She was able to give general answers about her relationship with Mattison, interactions with him during the school year, and where and when Mattison touched her and in what manner. (*Id.* at 18-30).

Despite the limited evidence of record which indicates that BJS has personal knowledge of the matters about which she will be called to testify and has the capacity to recall those matters,[3] BJS' deposition testimony raises a different, yet fundamental, question for this Court: whether she has a sufficient understanding to apprehend the obligation of an oath and the duty to testify truthfully.

At the beginning of BJS' deposition, the following exchange occurred between counsel for Defendant Warrior Run School District and BJS:

> Q. Okay? Now, the court reporter told you to raise your right hand and said you're to tell the truth, the whole truth and nothing but the truth. Do you remember her just doing that?
>
> A. Yes.
>
> Q. Okay. And you raised your right hand, you said I do; right?
>
> A. (Witness nods head.)
>
> Q. Is that a yes?
>
> A. Yes.
>
> Q. Okay. Do you understand what that means?
>
> A. No.
>
> Q. Okay. Do you understand that what – do you understand when you say -- do you understand what it means to tell the truth?

---

[3] BJS has repeatedly demonstrated that she has personal knowledge of the matters at issue in this action and has the capacity to explain what occurred between her and Duane Mattison. Although the Court declines to rule on the admissibility of Plaintiff's interview at the Pennsylvania State Police barracks, a video of which was submitted by the Plaintiff in opposition to Defendants' motion for summary judgment (Doc. 211, Ex. 13), that interview also provides guidance for this Court in determining Plaintiff's competency to testify.

8

A. No.

Q. Okay. Do you understand the difference between a truth and a lie? Do you want me to ask that question again?

A. Yes, please.

Q. Do you understand the difference between telling the truth and telling a lie?

A. No.

. . . .

Q. Do you understand the difference between something that happened and something that didn't happen?

. . . .

Q. Do you want me to ask you again?

A. (Witness nods head.)

Q. Is that a yes?

A. Yes.

Q. Okay. Do you understand that if I ask you a question and I ask you about something that happened, do you understand the difference between telling me something that happened and something that didn't happen?

A. I don't know.

Q. You don't know?

A. (Witness shakes head.)

Q. Do you want to take -- do you under – if I ask you about something that happened in school, okay, and I said I wanted you to tell me the truth about what happened, do you understand what that means?

9

MR. ZICOLELLO [Plaintiff's counsel]: Can I try? --- [BJS] remember before you were going to come here today for this, your mom and dad talked you about what a deposition was? Did your mom and dad tell you you would be coming here today and people would ask you questions?

THE WITNESS: Yes.

MR. ZICOLELLO: Okay. Did your mom and dad tell you that, you know, you just needed to listen to the questions and then tell the truth? Did they tell you that?

THE WITNESS: Yes.

MR. ZICOLELLO: Okay. Do you know what they mean by that? If I put this glass in front of you and I told you it was filled with water, right now that glass is filled to the top with water, it might spill, am I telling the truth or am I lying to you? Why don't we take a break.

(Recess).

(Dep. of BJS, at 5-7). Following the break, the following exchange occurred:

MR. ZICOLELLO: .... Now, I know that you did something even -- you did something like this when you were in court; right?

THE WITNESS: (Witness nods head.)

MR. ZICOLLELO: Okay. And you actually had to get up there and sit in front of a bunch of people and answer questions; right?

THE WITNESS: (Witness nods head.)

MR. ZICOLELLO: Okay. I know you're nodding your head, but this lady over here, she's actually hitting keys. She's typing everything I'm saying and you know what, when you do this, when you do this (indicating), she can't type that. You actually have to say something so she can type it. You have to say yes or no words. And it was like that when you were in court; right? You had to say words to the questions?

THE WITNESS: Yeah.

MR. ZICOLELLO: Yeah. So that's what it is here today. And when you were in court, the lawyers asked you questions; right?

THE WITNESS: Yes.

MR. ZICOLELLO: Okay. And you answered the questions; right?

THE WITNESS: Yes.

MR. ZICOLELLO: Okay. And the lawyers in court, one of the questions they asked you was do you -- do you know the difference between telling the truth and telling a lie. Is that one of the things they asked you?

THE WITNESS: Yes.

MR. ZICOLELLO: Okay. And did you answer them?

THE WITNESS: Yeah.

(*Id.* at 8-9).

When counsel for Warrior Run School District then again attempted to ascertain whether Plaintiff understood what it means to tell the truth, Plaintiff continued to not understand. Although BJS first responded in the affirmative when asked whether she "underst[ood] the difference between telling the truth and not telling the truth, between telling a truth and a lie", the following exchange soon after occurred:

Q. When you're sitting there, okay, I'm going to ask you to tell me what a lie -- lie to me, tell me a lie. Do you know what it is to lie?

A. No.

Q. If I said tell me the truth, do you know what I mean when I said tell me the truth? Do you know what that means?

A. No.

Q. Now, I don't want you to be nervous. Okay? Are you nervous?

A. No.

Q. Okay. So when you have to tell the truth, do you know what that means to tell the truth? Do you know the difference between real and make believe, real and made up? Do you know the difference between real and made up?

A. No.

(*Id.* at 11-12).

The Court recognizes that it is well-established that all witnesses are presumed competent to testify and that Plaintiff's mental disabilities are more properly bases for impeachment and should go to a jury's assessment of her credibility and the proper weight to accord her testimony.[4] The Court is also cognizant that "witness capacity is particularly suited to the jury as a question of weight and credibility, and that discretion is regularly exercised in favor of allowing the witness to testify." *United States v. Callahan*, 801 F.3d 606, 622-623 (6th Cir. 2015) (citing Fed. R. Evid. 601, Advisory Committee Notes) (internal quotation marks and brackets omitted). However, the above-quoted exchanges raise a

---

[4] *See e.g., Stutza v. McCarville*, 420 F.3d 757, 762 (8th Cir. 2005) (finding District Court erred in equating a developmentally disabled person's lack of competency to handle her affairs, and who had a guardian and conservator, with a lack of ability to testify to general facts and events that occurred between that person and the defendants); *Andrews*, 253 F.3d at 1062-1063 ("[Witness's] status as an involuntarily committed schizophrenic was available for the appellants' use to challenge [witness's] credibility. But his status does not *ipso facto* render him incompetent to testify in federal district court. . . ."); *United States v. Callahan*, 801 F.3d 606, 622-623 (6th Cir. 2015) (affirming District Court's denial of government's request that a cognitively disabled witness undergo a psychological examination to determine her competency to testify where District Court "was satisfied that [the witness] understood that oath [to testify truthfully]" and where jury was provided "with a full opportunity to evaluate her capacity and credibility.").

threshold issue that must be addressed prior to Plaintiff being permitted to testify at trial, *i.e.*, BJS's ability to understand the obligation of an oath and the basic duty to testify truthfully. The Court thus deems it necessary to reserve on Defendant's motion with respect to BJS' competency and to conduct a voir dire of BJS, outside the presence of the jury, prior to Plaintiff's counsel calling her as a witness during trial. The Court will therefore order the parties to each submit a list of proposed voir dire questions that they would like the Court to ask BJS. Although the Court will conduct the initial voir dire of Plaintiff, it may ask counsel to ask any relevant follow-up questions to a limited extent as necessary.

Finally, although Defendants' motion also argues that the testimony of Mattison and BJS is "unnecessary and not relevant" in light of the trial issues delineated by the Court in its opinion addressing the Mental Health Defendants' motion for summary judgment and that the "presentation of such testimony will serve to confuse the factfinder and generate prejudice against any of the institutional entities that interacted with BJS and Mattison" (*see* Doc. 231, at ¶¶ 6, 7), Defendants fail to brief either of these assertions in their supporting brief, aside from a general reiteration of these statements (*see* Doc. 232, at 5). The Court interprets the Mental Health Defendants' vague assertions as challenging the relevance and admissibility of Mattison and BJS' testimony under Federal Rules of Evidence 401, 402, and 403.[5] However, because Defendants have failed to substantively brief this issue or set forth

---

[5] Under the Federal Rules of Evidence, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. Irrelevant evidence is not admissible and relevant evidence is admissible unless otherwise provided by the Constitution, federal statute, Federal Rules of Evidence, or other rules prescribed by the Supreme Court. Fed. R. Evid. 402. Relevant evidence may be excluded "if

13

their position in any comprehensive manner, and the Court has not yet heard any testimony in this action nor seen any of the evidence to be presented, the Court is not in a position to assess the relevancy or prejudicial value of any testimony Mattison and BJS may offer at trial. Defendants' request on the basis of Rules 401, 402, and/or 403 will therefore be denied without prejudice. In so ruling, the Court does not reach the relevance or admissibility of any testimony that Mattison and BJS may offer.

For the foregoing reasons, the Mental Health Defendants' Motion in Limine (Doc. 231) requesting that the Court preclude the testimony of Duane Mattison and BJS at trial will be denied in part and reserved in part. The Court will deny Defendants' motion as to the preclusion of Mattison's testimony on the basis of lack of competency but will reserve ruling on the issue of BJS' competency pending a voir dire of Plaintiff prior to her being called as a witness at trial.

_____
Robert D. Mariani
United States District Judge

---

its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403.